# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

### Case No.  2013-cv-62381-ROSENBAUM/HUNT

JAMAAL ANDERSON, JACOB BELL, DERRICK GAFFNEY, TAVARES GOODEN, FRANK GORE, SANTONIO HOLMES, GREG JONES, JEVON KEARSE, KENARD LANG, RAY LEWIS, BRANDON MERIWEATHER, SANTANA MOSS, CLINTON PORTIS, LITO SHEPPARD, FRED TAYLOR, and GERARD WARREN,

       Plaintiffs,

v.

BRANCH BANKING AND TRUST COMPANY, as successor in interest to BankAtlantic, LLC,

       Defendant.

_____/

### DEFENDANT, BRANCH BANKING AND TRUST COMPANY'S, MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT OR, IN THE ALTERNATIVE, MOTION FOR A MORE DEFINITE STATEMENT

Defendant, Branch Banking and Trust Company, as successor in interest to BankAtlantic (hereinafter "BankAtlantic"), pursuant to Rules 8, 9, 10, and 12 of the Federal Rules of Civil Procedure, hereby files the following Motion to Dismiss the Amended Complaint filed by Plaintiffs, Jamaal Anderson, Jacob Bell, Derrick Gaffney, Tavares Gooden, Frank Gore, Santonio Holmes, Greg Jones, Jevon Kearse, Kenard Lang, Ray Lewis, Brandon Meriweather, Santana Moss, Clinton Portis, Lito Sheppard, Fred Taylor, and Gerard Warren (collectively, the "Plaintiffs") or, in the Alternative, Motion for a More Definite Statement:

## I.     INITIAL STATEMENT

This case is about a group of current and former professional football players who all turned to an independent financial management company—Pro Sports Financial, Inc. ("Pro Sports")—to provide them with "concierge" financial services and money management services. Now, in an attempt to recuperate the funds that they claim to have lost as a result of the purportedly unauthorized transactions that Pro Sports initiated on their behalf, these players are

seeking reimbursement from BB&T, which is not alleged to have engaged in any wrongdoing whatsoever and which is only being sued as successor in interest to BankAtlantic, for these transactions, all the while ignoring the fact that their own omissions in failing to monitor their accounts ultimately allowed Pro Sports to engage in the actions of which they now complain.

The Amended Complaint fails to state any legally cognizable claim against BankAtlantic. Specifically, while attempting to impose liability on BankAtlantic for events occurring seven years ago, the Plaintiffs disregard their own common law, statutory, and contractual duties, which require the Plaintiffs, regardless of grouping, to safeguard and monitor their accounts and to report any unauthorized activity occurring therein.  As seen below, these contractual defenses bar all of the claims raised by the Plaintiffs.  Similarly, many of the claims are barred by the statute of limitations.  As a result, the Plaintiffs have failed to state any cognizable cause of action against BankAtlantic and the Amended Complaint should consequently be dismissed.

Additionally, the Amended Complaint skirts the real facts of this case and attempts to improperly lump all of the Plaintiffs together despite the individualized nature of each of the Plaintiff's claims.  As a result, the Amended Complaint glaringly omits facts that are both necessary to place BankAtlantic on notice of the basis for the individual Plaintiff's claims and that are pertinent and necessary to the defense of this case, thereby falling well short of the requirements of the pleading standards of the Federal Rules of Civil Procedure.  As such, the Amended Complaint should be dismissed or, in the alternative, the Plaintiffs should be directed to provide a more definite statement so that this case is properly framed.

## II.     FACTS CONTAINED IN THE AMENDED COMPLAINT

The Plaintiffs herein are all current or former professional football players who allegedly entered into distinct and individual Client Service Agreements with Pro Sports, a financial management firm owned by Jeffery B. Rubin ("Rubin").  *See* Amended Complaint, ¶¶ 23-24. Pursuant to the Client Service Agreements, Pro Sports provided each individual player with unspecified tax planning, business counseling, and "concierge services."  *Id*. at ¶¶ 23-25.  The Plaintiffs fail to expound on or to offer any further clarification as to the type of "concierge" services rendered by Pro Sports.

The Plaintiffs claim that Pro Sports and Rubin deposited "tens of millions of dollars of Plaintiffs' money" into separate accounts at BankAtlantic, which were opened in the name of the individual Plaintiffs.  *Id*. at ¶¶ 28-29.  It is significant to note at the outset that the Plaintiffs do

not deny that Pro Sports had some form of authorized access to their funds as the subject accounts (some of which were admittedly authorized and some of which were allegedly unauthorized) were all undeniably opened by Pro Sports using the Plaintiff's individual funds. *Id*. What is unclear from the allegations is the nature and extent of Pro Sports' relationship with the Plaintiffs as well as Pro Sports' access to the Plaintiffs' funds and legitimate accounts.

### The Group "A" Plaintiffs

The Plaintiffs' separate themselves into two groups. The Plaintiffs first identify what they refer to as the Group "A" Plaintiffs, consisting of Gaffney, Gore, Kearse, Lang, Lewis, Moss, Portis, Sheppard, and Taylor. While these Plaintiffs admit that Pro Sports was engaged to provide them with unidentified financial services, the Group "A" Plaintiffs claim that between October 16 and 17, 2006, Pro Sports opened up individual accounts at BankAtlantic in their respective names with forged signature cards. *Id*. at ¶ 13. The Group "A" Plaintiffs specifically plead that these accounts "were opened using monies that were on deposit in accounts previously maintained by the Group A Plaintiffs at [BankAtlantic]." *Id*. at ¶ 43. The Group "A" Plaintiffs clearly and explicitly deny any knowledge of the new, allegedly unauthorized accounts by stating that "[n]one of the Group A Plaintiffs had knowledge or approved of the opening or maintaining of the Group A Accounts." *Id*. at ¶ 49.

The Group "A" Plaintiffs then claim that the mailing address associated with the new accounts was Pro Sports' address. *Id*. at ¶ 44. The Group "A" Plaintiffs also claim that the new accounts were opened as Power of Attorney Accounts and that Pro Sports employees were designated as the attorney-in-fact on the Power of Attorney forms. *Id*. at ¶ 47. Plaintiffs then assert that this framework allowed Pro Sports and Rubin to subsequently make unauthorized transfers of money out of each of the unauthorized Group "A" Accounts without detection, resulting in the loss of millions of dollars.

Evident from this stated chain of events is that—although the Group "A" Accounts were admittedly opened using Plaintiffs' funds that were already on deposit with BankAtlantic in valid accounts—the Plaintiffs ignore and fail to address the circumstances surrounding the transfer of their funds out of the legitimate accounts to the new, allegedly unauthorized accounts. Specifically, the Group "A" Plaintiffs omit several significant facts, including: (1) how Pro Sports initially accessed their funds to open the Group "A" Accounts; (2) whether the transfers out of the initial accounts were authorized, and if not, then; (3) why the initial transfers out of the

3

legitimate accounts were never detected or reported.  These facts are all likely individualized and are necessary for BankAtlantic to form a response to the Amended Complaint and be fully apprised of its defenses as to each Plaintiff.  Regardless, based on these cursory allegations, the Group "A" Plaintiffs purport to raise the following claims against BB&T, solely in its capacity as successor in interest to BankAtlantic: (1) Negligence; (2) Refund of Unauthorized and Ineffective Funds Transfer; (3) Aiding and Abetting Breach of Fiduciary Duty; (4) Aiding and Abetting Fraud; (5) Breach of Fiduciary Duty; and (6) Negligent Supervision.

### The Group "B" Plaintiffs

The Group "B" Plaintiffs consist of Anderson, Bell, Gooden, Holmes, Jones, Meriweather, and Warren.  While the Group "B" Plaintiffs claim that all of their accounts were Power of Attorney accounts with unidentified Pro Sports employees designated as the respective attorney-in-fact, the Plaintiffs claim that "some" of the Group "B" Accounts were opened without having a valid Power of Attorney executed as of the date of the opening of the account. *Id*. at ¶¶  66-68.[1]  The Group "B" Plaintiffs fail to specify, however, which of the individual Group "B" Plaintiffs this allegation pertains to or who was named as the attorney-in-fact as to each respective account.

Notably, unlike the Group "A" Plaintiffs, the Group "B" Plaintiffs do not appear to dispute the legitimacy of either the existence of any of their accounts or the designation of a Pro Sports employee as the attorney-in-fact for these accounts.  *Id*. at ¶¶ 66-67.  Accordingly, in a creative attempt to impose liability on BankAtlantic for the actions of the unidentified attorney-in-fact, the Group "B" Plaintiffs allege that BankAtlantic "knew that the Group B Accounts were to be used strictly for concierge or bill pay services" and that BankAtlantic allowed Pro Sports to make unidentified and unauthorized transfers from the Group "B" Accounts.  *Id*. at ¶¶ 67, 70-74. Based on these claims, the Group "B" Plaintiffs purport to raise the following claims against BankAtlantic: (1) Breach of Contract; (2) Refund of Unauthorized and Ineffective Funds

---

[1] Although the Group "B" Plaintiffs make general allegations that all of the accounts were Power of Attorney accounts, they subsequently seem to indicate that at least some of the accounts may not have been Power of Attorney accounts. For example, in paragraph 95 of the Amended Complaint, the Group "B" Plaintiffs assert that BankAtlantic breached its agreements with the Plaintiffs by allowing funds "to be transferred pursuant to the applicable power of attorney *(if any)* to fund improper transactions that exceeded the scope of the applicable power of attorney *(if any)*." (emphasis added).  Therefore, it is entirely unclear as to whether some, none, or all of the Group "B" Accounts were power of attorney accounts.

Transfer; (3) Aiding and Abetting Breach of Fiduciary Duty; (4) Aiding and Abetting Fraud; (5) Breach of Fiduciary Duty; and (6) Negligent Supervision.

### The County Crossing Project

Both the Group "A" and Group "B" Plaintiffs raise passing allegations relative to a "casino/bingo project" in Alabama referred to as the "County Crossings Project."[2]  *Id.* at ¶ 35. Specifically, the Plaintiffs claim that:

> While some of [the Plaintiffs] may have heard of the County Crossing Project, may have had general information about the nature of the project and/or may have been aware of the potential for making loans or transaction relating to the County Crossing Project in exchange for a return on the loans or transactions, these [Plaintiffs] did not approve of the extent or volume of any such transactions, did not understand the nature or appreciate the risk associated with any such transactions . . .

*Id.* at ¶¶ 60, 77.  The Plaintiffs then claim that many of the unauthorized transactions they take issue with were "loans" or transactions made for the benefit of the County Crossings Projects. *Id.* at ¶ 36.  There are a total of four allegations in the entire 186 paragraph Amended Complaint raised with regard to the County Crossings Project, and consequently, it is entirely unclear as to: (1) the extent of each Plaintiff's relationship with the County Crossings Project; (2) what relationship the County Crossings Project had relative to the individual accounts at issue; (3) which Plaintiffs were aware of the County Crossing Project; and (4) which Plaintiffs actually made "loans" to the County Crossings Project.

### III.  LEGAL ARGUMENT

#### A.  LEGAL STANDARD FOR A MOTION TO DISMISS

To determine the merits of a Rule 12(b)(6) motion to dismiss, the Court must take the factual allegations of a complaint as true.  *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).   However, "conclusory allegations or legal conclusions masquerading as factual conclusions" are not sufficient.  *See Robinson v. Jewish Ctr. Towers, Inc.*, 993 F. Supp. 1475, 1476 (M.D. Fla. 1998). While a complaint attacked by a motion to dismiss for failure to state a claim upon which relief can be granted does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

---

[2] The Plaintiffs refer to this project as the "County Crossings Project."  Upon information and belief, in reality, the project was named the "Country Crossings Project."  For purposes of this Motion, however, BankAtlantic will refer to the project as the "County Crossings Project."

requires more than labels and legal conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). To survive a motion to dismiss for failure to state a claim upon which relief can be granted, the factual allegations must be enough to raise a right to relief above the speculative level. *Id*. While the Federal Rules have eliminated the cumbersome requirement for most cases that a claimant set out in detail the facts upon which he bases his claim, the general rule governing pleadings still requires a showing, rather than a blanket assertion, of an entitlement to relief. *Id*. As a threshold requirement, the complaint must possess "enough heft" to show that the pleader is entitled to relief, and allegations "plausibly suggesting (not merely consistent with)" the elements of a cause of action. *Id*. at 557 (citations omitted).

The Supreme Court has reaffirmed and elaborated on its opinion in *Twombly* and emphasized the robustness of factual allegations required to satisfy the pleading requirements. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). In *Iqbal*, the Supreme Court held that the standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id*. at 1949. Rather, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570). A complaint does not meet this standard where it "pleads facts that are 'merely consistent with' a defendant's liability." *Id*. (quoting *Twombly*, 550 U.S. at 557).

Federal Rule of Civil Procedure 8(a)(2) also requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." The "point is to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008) (citing *Twombly*, 550 U.S. 544). Similarly, Rule 10 provides that "[e]ach claim founded on a separate transaction or occurrence . . . shall be stated in a separate count . . . ." In explaining the relationship between Rules 8, 10, and 12, it has been explained that they:

> work together to require the pleader to present his claims directly and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not.

*Davis*, 516 F.3d 980, n. 57; *see also Palmer v. Albertson's LLC*, 418 F. App'x 885, 898 (11th Cir. 2011).

Based on this standard, both this Court and the Eleventh Circuit Court of Appeals have consistently rejected complaints that are in a "shotgun" type form. *See Davis*, 516 F.3d at 980 (stating that since 1985, the Eleventh Circuit Court of Appeals has explicitly condemned shotgun pleadings upward of fifty times). This has resulted in the dismissal or severance of parties that are improperly "lumped" together. *Scott v. Yellon*, 2:13-cv-157-FTM-38DNF, 2013 WL 3802797, at *1 (M.D. Fla. July 11, 2013) (dismissing complaint under Rule 8 due to plaintiffs' improper "lumping" of defendants); *Hofmann v. EMI Resorts, Inc.*, No. 09-20526-CIV, 2010 WL 9034908, at *2 (S.D. Fla. July 21, 2010) (severing plaintiffs that improperly lumped themselves together); *Davis*, 516 F.3d at 980 (affirming dismissal where eight plaintiffs were "all bunched together" in three counts without linking particular plaintiffs to particular circumstances and causes of action); *Bautista v. Los Angeles County*, 216 F.3d 837 (9th Cir. 2000) (finding that where a complaint is seeking individual relief for each plaintiff, the plaintiffs must comply with Rule 8 by pleading a plain statement of their claim and identifying the transactions giving rise to their claim and the elements of their prima facie case). Applying this standard to the Amended Complaint, dismissal is warranted and appropriate.

**B.    THE AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO COMPLY WITH THE PLEADING REQUIREMENTS OF RULES 8, 9, 10, AND 12.**

As seen above, the Federal Rules of Civil Procedure require the Plaintiffs to provide a short and plain statement showing that the Plaintiffs are entitled to relief. *See* Fed. R. Civ. P. 8(a)(2). Assuming for the purposes of this Motion that this action may even be properly maintained as a single suit, which it cannot, each Plaintiff's claims should be included in a separate count and should include enough factual allegations to raise the right of relief above the "speculative" level. *See* Fed. R. Civ. P. 8, 12. In enacting Rules 8 and 10, it was:

> [a]ssumed that complaints would be drafted as clearly and definitively as possible as possible, so that the defendant could understand the cause(s) of action the plaintiff was asserting and frame a responsive pleading, and the district court, having a clear and definitive response before it, could recognize the parties' claims and defenses, identify the issues of fact to be litigated, and proceed to a just result.

*Davis*, 516 F.3d at 979. Accordingly, complaints that fail to tie facts and allegations to certain plaintiffs and simply lump them together—such as is the case here—should be dismissed. *Id*. (dismissing claims of eight plaintiffs that were "bunched" together and recognizing that this is an impermissible tactical strategy to be employed by plaintiffs).

Although the deficiencies as to both the Group "A" and Group "B" Plaintiffs are addressed in detail below, with respect to the Amended Complaint as a whole, the Plaintiffs fail to provide any distinct factual allegations sufficient to give notice as to each of the Plaintiff's individual claims as required under Rule 8.  For example, the Plaintiffs admit that they each entered into a separate Client Service Agreement with Pro Sports, but the Plaintiffs fail to attach their individual contracts or to describe any of their individual terms.  The Plaintiffs also assert in a conclusory fashion that "certain transactions on the Plaintiffs' accounts were unauthorized and exceeded the scope of the Plaintiffs' Client Service Agreement with Pro Sports," but fail to explain how they exceeded the scope of the Client Service Agreements or to identify the specific, allegedly unauthorized transactions.  *See* Amended Complaint, ¶ 34.

Notably, by stating that "certain" transactions exceeded the scope of the Client Service Agreements with Pro Sports, the Plaintiffs tacitly admit that Pro Sports was, in fact, authorized to engage in at least some transactions on their behalf.  Despite this admission, the Amended Complaint wholly fails to explain the extent of Pro Sports' authorization to either access their accounts or to make investments at their direction.  As a result, the Plaintiffs have not only failed to provide BankAtlantic with notice of the specific transactions with which they take issue, but have failed to provide notice as to how the transactions were unauthorized or exceeded the scope of their individual Client Service Agreements with Pro Sports.  This makes it extraordinarily difficult, if not impossible, for BankAtlantic to meaningfully defend against the non-distinct and conclusory legal allegations contained in the Amended Complaint, warranting dismissal.

### i. *Specific Pleading Deficiencies as to Group "A."*

In support of their claims, the Group "A" Plaintiffs assert, without differentiation as to their individual circumstances, that "*some* of the Group A Plaintiffs *may* have heard of the County Crossings Project" and that *some* of them "*may* have had general information about the nature of the project" and/or "*may* have been aware of the potential for making loans or transactions relating to the County Crossing Project" but that, even in those circumstances, the unidentified Plaintiffs did not appreciate the "extent or volume of any such transactions, did not understand the nature or appreciate the risk associated." *Id*. at ¶ 60 (emphasis added).  As such, it appears as though at least some subset of the Plaintiffs in Group "A" are presenting a claim that Pro Sports exceeded the scope of its authorization to invest in the casino-based County Crossings Project, while others are presenting the distinct claim that Pro Sports lacked any

authorization whatsoever.  Nonetheless, in the fashion in which the Group "A" Plaintiffs have chosen to plead their claims, BankAtlantic is wholly unable to discern which facts apply to which Plaintiffs.  The most that can be gleamed from the Amended Complaint is that "some" of the Plaintiffs "may" have been aware of the investments and authorized some, all, or none of the transfers at issue.  Accordingly, BankAtlantic is simply left to guess as to which of the Group "A" Plaintiffs had knowledge of the County Crossings Project, which transactions involving the County Crossings Project were authorized, and which ones were unauthorized.

As an illustration as to why more specific information regarding the individual Plaintiffs is crucial to the prosecution and defense of this case, it should be noted that Group "A" Plaintiff, Clinton Portis ("Portis"), previously filed a Complaint in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, as case 11-37299-CA-20, titled *Clinton Portis v. Greenberg Traurig, P.A. and Pamela S. Linden*, relative to the County Crossings Project (the "Portis Complaint").  A true and correct copy of the Portis Complaint is attached hereto as Exhibit "A."[3]  In the Portis Complaint, Portis explicitly admits that he was advised of the County Crossings Project by Pro Sports and that he was told by Pro Sports that his investment would be in the form of a loan.  *See* Exhibit "A," ¶¶ 10, 11.  Portis then asserts that Pro Sports convinced him to sign documents pledging his assets to guarantee debt for the project.  *Id*. at ¶ 17.  The Portis Complaint alleges that, as a result, Portis believed that he would have a direct ownership in the County Crossings Project.  *Id*. at ¶ 29.  The Portis Complaint then goes on to assert that "[o]nly after Portis authorized his one million dollar investment, and after he had invested land and guaranteed the repayment of certain debt for the project, did he discover that the Pro Sports Advisors also had a financial interest in the Project."  *Id*. ¶ 38.

The allegations in the Portis Complaint underscore the necessity of requiring each Plaintiff in this case to specify his individual claims and to identify the facts pertaining to his particular circumstances. Specifically, the allegations in the Portis Complaint make it clear that Portis had actual knowledge that he was making a significant voluntary investment—of at least a million dollars—in the County Crossings Project and that he believed he was an owner of the

---

[3] This Court can properly consider the Portis Complaint without converting this Motion to Dismiss into a motion for summary judgment pursuant to Federal Rule of Evidence 201(b) because the Portis Complaint is a public record which is not subject to reasonable dispute. *Horne v. Potter*, 392 F. App'x 800 (11th Cir. 2010) (upholding a dismissal based, in part, on judicial notice of a previous action).

same.  These allegations completely contradict the claims included in this case that, at most, the Group "A" Plaintiffs, including Portis, "may have been aware of the potential for making loans or transactions relating to the County Crossings Project." Rather, the Portis Complaint makes it exceedingly clear that some of the Plaintiffs—Portis, at a minimum—had actual knowledge of the County Crossings Project and were active participants and investors in the same.  Therefore, it appears that at least some of the of the Group "A" Plaintiffs, Portis included, do not even fit the fact pattern of the group to which they are assigned.  *See* Amended Complaint, ¶ 60. Meanwhile, BankAtlantic is simply left to blindly guess as to the extent of each Plaintiffs' awareness, knowledge, and participation in the County Crossings Project.  This is problematic as Rule 8 requires the Plaintiffs to affirmatively plead their case in order to place BankAtlantic on notice of the factual basis for each of their claims.   BankAtlantic's possible defenses of ratification, agency, and actual knowledge as to each Plaintiff all hinge on these important facts.[4]

As to the Group "A" Plaintiffs, the Amended Complaint further asserts that BankAtlantic "occasionally accepted and acted upon wire transfer instructions from Pro Sports employees who were not even named as the attorney-in-fact for a particular account." *Id*. at ¶ 54.  The Group "A" Plaintiffs then provide the total sum of the purportedly unauthorized transactions as to each Group "A" Plaintiff, yet fail to specify the individual transactions that give rise to the sum total.[5] This is troublesome as BankAtlantic cannot identify the specific transactions, the type of each transaction (i.e., check, wire transfer, or withdrawal),[6] legitimize the total amount sought, or determine the applicable defenses—such as the statute of limitations, actual authorization, or ratification—that might apply to the specific transactions.

ii.    ***Specific Pleading Deficiencies as to Group "B."***

---

[4] Given the manner in which the Plaintiffs' claims are pled, it is entirely possible that no single Plaintiff is capable of stating the causes of action contained in the Amended Complaint, but rather, that each Plaintiff is borrowing factual allegations related to the other Plaintiffs in an attempt to state a claim.

[5] The fact that the Plaintiffs are able to provide a total dollar amount leads to the obvious conclusion that the Plaintiffs have isolated the transactions with which they are taking issue, but have failed to identify those transactions in their Amended Complaint.

[6] This information is exceedingly significant as the defenses found in the Uniform Commercial Code, Articles 3 and 4, apply to checking transactions, while Article 4A applies to wire transfers. The defenses are significantly different, and BankAtlantic cannot determine which facts apply to the individual Plaintiffs under the facts as pled.

The allegations raised by the Group "B" Plaintiffs are even more problematic. Like the Group "A" Plaintiffs, the Group "B" Plaintiffs provide a total alleged loss as to each Group "B" Plaintiff without identifying the form, amount, or date of the individual transactions making up the total amount. The Group "B" Plaintiffs also make the same confusing and conclusory allegations regarding the County Crossing Project without identifying which Plaintiffs knew of the County Crossings Project or approved of transactions involving the County Crossings Project. *Id.* at ¶ 77.

Next, in the beginning of the Amended Complaint, the Group "B" Plaintiffs assert that each of the Group "B" Accounts was a Power of Attorney Account and that each attorney-in-fact was a Pro Sports employee. *Id.* at ¶¶ 65-67. The Group "B" Plaintiffs later imply that some of these accounts may not have been Power of Attorney Accounts by claiming that funds were transferred "pursuant to the applicable power of attorney (if any) to fund improper transactions that exceeded the scope of the applicable power of attorney (if any)." *Id.* at ¶ 95. Therefore, the allegations surrounding the Group "B" Plaintiffs are conflicting and unclear, and as a result, it is uncertain as to whether some, none, or all, of the accounts were Power of Attorney Accounts.

The Group "B" Plaintiffs further claim that "*some*" of the Group "B" Accounts were opened without a power of attorney executed as of the date of opening the account, without once identifying which of the seven Group "B" Plaintiffs are actually asserting this claim. *Id.* at ¶ 68 (emphasis added). The only specificity provided as to this allegation is that "one or more" of the Group "B" Plaintiffs are raising this allegation. *Id.* at ¶ 93. The Group "B" Plaintiffs similarly assert that BankAtlantic breached the contractual agreements with "one or more" of the Group "B" Plaintiffs by occasionally accepting and acting upon instructions on the Group "B" Accounts by individuals who were not named as the attorney-in-fact for the relevant Group "B" Account. *Id.* at ¶ 94. Again, BankAtlantic is left in the dark as to which of the Group "B" Plaintiff(s) are actually raising this allegation, the individual identified as the attorney-in-fact on the respective Power of Attorney forms, the transactions at issue, and/or the identity of the person who allegedly provided the unauthorized instructions. Despite the fact that these allegations admittedly only belong to "one or more" of the Group "B" Plaintiffs, all seven Group "B" Plaintiffs are lumped together, without any distinguishing facts, in every one of the six counts raised by the Group "B" Plaintiffs. BankAtlantic cannot possibly adequately defend against

these allegations in the manner pled, and the Plaintiffs should be required to identify the specific allegations of wrongdoing pertaining to each Plaintiff.

Simply put, the Amended Complaint does not provide BankAtlantic with fair notice of the individual Plaintiff's claims and the grounds upon which they rest, which is the purpose of the pleading standards contained in the Federal Rules of Civil Procedure.  Rather, the Plaintiffs, while separated into two groups, are essentially lumped together without providing any meaningful distinguishing allegations as to each individual Plaintiff other than an account number and total loss, while simultaneously asserting that certain facts—such as knowledge of the County Crossings Project, the lack of a valid Power of Attorney at the time of the account openings, and the existence of transactions by individuals other than those identified as the attorney-in-fact—admittedly only belong to "some" or "one or more" of the Plaintiffs.  This violates the spirit of the Federal Rule of Civil Procedure.

From the shotgun-style allegations in the Amended Complaint, it is clear that there are several individualized circumstances at play here, yet the Plaintiffs fail to link particular Plaintiffs to particular facts.  Therefore, the Amended Complaint should be dismissed for failing to comply with the pleading standards of the Federal Rules of Civil Procedure.  In the alternative, the Plaintiffs should be required to provide a more definite statement and directed to link the factual allegations raised to particular Plaintiffs, explain the role of the County Crossing Project, and identify the unauthorized transactions so that BankAtlantic can properly defend itself.  These are individualized claims and circumstances, and they should be pled as such.

### C.    CAUSES OF ACTION RAISED BY BOTH THE GROUP "A" AND GROUP "B" PLAINTIFFS.

#### i.    The Plaintiffs' Claims for Aiding and Abetting Fail to State a Cause of Action.

Counts V-VIII are all premised under a theory of Aiding and Abetting.  Counts V and VI both purport to state causes of action for Aiding and Abetting Breach of Fiduciary Duty on behalf of the Group "A" Plaintiffs and Group "B" Plaintiffs, respectively.  In support of these two counts, the Plaintiffs claim that they extended trust and confidence in Pro Sports and Rubin, and that BankAtlantic had actual knowledge of this relationship.  *See* Amended Complaint, ¶¶ 113, 116, 124, 127. The Plaintiffs then claim that BankAtlantic knowingly "aided, abetted and otherwise provided substantial assistance to Pro Sports, Rubin and Pro Sports employees in their breach of the fiduciary duties owed to" the Plaintiffs.  *Id*. at ¶¶ 119, 130.

Similarly, Counts VII and VIII purport to state causes of action for Aiding and Abetting Fraud on behalf of the Group "A" and Group "B" Plaintiffs, respectively.  As support for these claims, the Plaintiffs allege that Pro Sports and Rubin represented that their "services would be limited in accordance with the Client Service Agreement and that they would otherwise act in the interest of [the Plaintiffs]."  *Id.* at ¶ 135, 146.  The Plaintiffs then claim that these representations were false and that Pro Sports and Rubin "intended to exceed the scope of these representations" for their personal benefit.  *Id.* at ¶¶ 136, 147.  In an attempt to extend liability to BankAtlantic for this "fraud" allegedly committed by Pro Sports and Rubin, the Plaintiffs assert in a conclusory fashion that BankAtlantic "had actual knowledge of the fraud being committed on [the Plaintiffs] by Pro Sports, Rubin, and other Pro Sports employees."  *Id.* at ¶¶ 140, 151. The Plaintiffs offer no facts in support of this conclusion. To plead any cause of action under a theory of Aiding and Abetting, there must be "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by alleged aider and abetter [*sic*]; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013); *Groom v. Bank of Am.*, 8:08-cv-2567-JDW-EAJ, 2012 WL 50250, at *2, *4 (M.D. Fla. Jan 9, 2012) (citing *S & B/BIBB Hines PB 3 Joint Venture v. Progress Energy Fla., Inc.*, 365 F. App'x 202, 207 (11th Cir. 2010)); *Hogan v. Provident Life & Accident Ins. Co.*, 665 F. Supp. 2d 1273, 1287 (M.D. Fla. 2009); *see also ZP No. 54 L.P. v. Fidelity & Deposit Co. of Md.*, 917 So. 2d 368, 372 (Fla. 5th DCA 2005) (applying elements of aiding and abetting to common law fraud). The Plaintiffs have failed to plead these elements.

> **a.**   **Plaintiffs have not plead the requisite "actual knowledge" necessary to state a cause of action for Aiding and Abetting.**

In addressing the element of knowledge, the level of knowledge required to state any claim premised upon a theory of Aiding and Abetting is ***actual knowledge***.  *Groom*, 2012 WL 50250, at *3; *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 907 (11th Cir. 2012) (emphasis added).  Moreover, conclusory statements of actual knowledge or "should have known" allegations are insufficient as they are "bare conclusions . . . devoid of factual support and therefore are not entitled to an assumption of truth."  *Groom*, 2012 WL 50250, at *3-4 ; (citing *Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010), and *Rosner v. Bank of China*, 349 F. App'x 637, 639 (2d Cir. 2009)).  Even aroused suspicions do not satisfy the actual knowledge required to plead a cause of action for Aiding and Abetting. *Court Appointed Receiver of Lancer Offshore,*

*Inc. v. Citco Group, Ltd.*, No. 05-60080, 2008 WL 926513, at *6 (S.D. Fla. March 31, 2008) (standing for the proposition that where a bank only operates as a financial intermediary, it cannot be held to have knowledge); *Estate of Meridian Asset Mgmt., Inc. v. Capital City Bank (In re Meridian Asset Mgmt., Inc.)*, 296 B.R. 243, 244 (Bankr. N.D. Fla. 2000) (same).[7]

While actual knowledge may be shown by circumstantial evidence, courts "stress that the requirement is *actual* knowledge" and the circumstantial facts in support of such a claim must demonstrate that the aider-and-abettor *actually knew* of the underlying wrongs committed. *Wiand*, 938 F. Supp. 2d 1238 (citing *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519. 536 (6th Cir. 2000)). Accordingly, "evidence establishing negligence, i.e., that a bank 'should have known,' will not suffice." *Id.* Constructive knowledge is not enough and even specific allegation of "red flags" such as deposits of "vast sums" of money and unusual or atypical financial transactions do not rise to the level of "actual knowledge" for purposes of an Aiding and Abetting claim. *Groom*, 2012 WL 50250, at *3-4 (granting a motion to dismiss and finding that large deposits and suspicious transactions were not enough to plead an aiding and abetting claim); *see also Wiand*, 938 F. Supp. 2d at 1240 (dismissing aiding and abetting claims even in light of specific allegations that the wrongdoer opened unauthorized "shadow" accounts with incorrect information and the existence of unusual transfers, finding that such facts were still insufficient to plead "actual knowledge"). Although such facts, to the extent they exist (and they do not in this case), "may have put the banks on notice that some impropriety may have been taking place, those alleged facts do not create a strong inference of actual knowledge" of wrongdoing. *Id.* (citing *Lerner v. Fleet Bank N.A.*, 459 F.3d 273, 294 (2d Cir. 2006)). "[W]hile the element of actual knowledge may be alleged generally the plaintiffs still must accompany that general allegation with allegations of specific 'facts that give rise to a strong inference of actual knowledge regarding the underlying fraud.'" *Lawrence v. Bank of Am., N.A.*, 8:09-cv-2162-T-33TGW, 2010 WL 3467501 (M.D. Fla. Apr. 30, 2010) (citing *Rosner*, 2008 WL 5416380, at *5). Simply put, general allegations of actual knowledge must be accompanied by enough specific facts to make the claim "plausible." *Wiand*, 930 F. Supp. 2d at 1243 (citing

---

[7] It is important to note that Florida law "does not require banking institutions to investigate transactions." *Lawrence*, 455 F. App'x 904 (citing *Home Fed. Sav. & Loan Ass'n of Hollywood v. Emile*, 216 So. 2d 443, 446 (Fla. 1968)); *cf. O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1205 (11th Cir. 2003) (banks have the "right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds").

*Iqbal*, 556 U.S. at 678 (a complaint must include more than "unadorned conclusory accusations" and must contain enough facts to make a claim "plausible")).

> **1.    The Plaintiffs have not pled that BankAtlantic had "actual knowledge" of either a fiduciary relationship between Pro Sports and the Plaintiffs or a breach thereof.**

Applying this standard to Plaintiffs' Aiding and Abetting Breach of Fiduciary Duty claims, the Plaintiffs must prove and plead that BankAtlantic had actual knowledge of both: (1) the existence of a fiduciary duty between the Plaintiffs and Pro Sports; and (2) the fact that Pro Sports was breaching that duty.   Here, at best, Plaintiffs only provide conclusory and unsupported allegations that BankAtlantic had "actual knowledge of the fiduciary relationship between [the Plaintiffs] and Pro Sports and Rubin . . . ."   *See* Amended Complaint, ¶¶ 116, 127. The only concrete fact offered in support of these allegations is that BankAtlantic was aware of the Client Service Agreements.  The Plaintiffs have failed to attach or reference specific terms of their respective Client Service Agreements, however, and therefore it is unclear how BankAtlantic's alleged knowledge of the Client Service Agreements gives rise to a "strong inference" of BankAtlantic's knowledge of a fiduciary relationship between Pro Sports and the Plaintiffs.

Additionally, throughout the Amended Complaint, the Plaintiffs minimize the relationship between themselves and Pro Sports by stressing the fact that Pro Sports was only providing the players with limited services in the form of unspecified "tax planning, business counseling, and concierge services." *Id.* at ¶ 124.[8]  The Plaintiffs emphasize the narrow scope of Pro Sports' authority, thereby cutting against any argument that BankAtlantic was aware of a fiduciary relationship between Pro Sports and the Plaintiffs.  *Id.* at ¶¶ 135, 136, 146, 147.  The scant allegations offered by the Plaintiffs are not enough to impute actual knowledge of any fiduciary relationship between Pro Sports and the Plaintiffs to BankAtlantic.

Turning to BankAtlantic's knowledge of the breach of any duty owed, Plaintiffs raise the conclusory accusation that BankAtlantic had "actual knowledge that certain transactions on the

---

[8] In fact, it appears that the Plaintiffs purposely attempted to narrow and limit the nature of their relationship with Pro Sports. Presumably, this was a tactical decision made to prevent BankAtlantic from raising corresponding defenses that Pro Sports was acting as the Plaintiffs' agent and within the scope of its authority. Plaintiffs should not be allowed to distance themselves from Pro Sports on one hand only to allege the existence of a fiduciary relationship with Pro Sports on the other.

Plaintiffs' account were unauthorized" and that BankAtlantic therefore had actual knowledge that Pro Sports breached the fiduciary duties owed the [Plaintiffs]." *Id*. at ¶¶ 34, 118, 129. Once again, Plaintiffs fail to offer any facts whatsoever that would support these conclusions. Plaintiffs even fail to identify which transactions BankAtlantic allegedly "knew" were unauthorized or explain the facts giving rise to BankAtlantic's purported "actual knowledge" that they were unauthorized or of any resulting breach on the part of Pro Sports.

In fact, the only allegations that Plaintiffs offer that could possibly substantiate their claims that BankAtlantic knew that Pro Sports was breaching any duty owed are the unadorned claims that BankAtlantic allowed numerous, suspicious withdrawals and that BankAtlantic had sufficient identification information to determine that some of the accounts were not opened by the Plaintiffs. *See* Amended Complaint, ¶¶ 33, 52. This is nothing more than a thinly-veiled attempt to employ a "should have known" standard and, as seen above, allegations of improper account openings, large or suspicious transactions, and even heightened suspicions, are not sufficient to plead actual knowledge. Rather, the Plaintiffs are required to plead sufficient facts to create a "strong inference" of actual knowledge, and Plaintiffs have failed to do so.

### 2. *Plaintiffs have failed to properly plead that BankAtlantic had actual knowledge that Pro Sports was engaging in fraudulent activity.*

Likewise, in support of their claims for Aiding and Abetting Fraud, the Plaintiffs assert that Pro Sports and Rubin committed fraud by exceeding the scope of their representation. *Id*. at ¶¶ 135-46. Plaintiffs then raise the baseless allegation, without any explanation, that BankAtlantic "had actual knowledge of the fraud being committed . . . ." *Id*. at ¶¶ 140, 151. These conclusory statements are not supported by any specific facts whatsoever, and therefore, standing on their own, are insufficient to plead the requisite actual knowledge. Moreover, Plaintiffs have offered no facts that would support any assertion that BankAtlantic had actual knowledge that the transactions exceeded the scope of Pro Sport's representation or that Pro Sports was not acting in the Plaintiffs' best interest. As seen above, the Plaintiffs have failed to explain the nature and extent of Pro Sports' authority and relationship with the Plaintiffs at all, and without clearly defining the scope of Pro Sports' authority, it is impossible to claim that BankAtlantic somehow "knew" that Pro Sports was exceeding the scope of the same.

Moreover, where a plaintiff alleges a claim based upon fraud, Rule 9 of the Federal Rules of Civil Procedure requires that the plaintiff allege the facts supporting the claim with

particularity. *See Tippens v. Round Island Plantation L.L.C.*, 09-CV-14036, 2009 WL 2365347, at *5 (S.D. Fla. July 31, 2009) (dismissing a claim for aiding and abetting fraud due to the plaintiff's failure to plead with particularity under Rule 9). The Plaintiffs' claims of Aiding and Abetting Fraud are not plead with the requisite particularity. and this claim should be dismissed on this basis alone. As such, it cannot be said that the allegations in the Amended Complaint are sufficient to support any claim that BankAtlantic possessed "actual knowledge" that Pro Sports was engaging in fraudulent activity.

### b.    Plaintiffs have not pled that BankAtlantic knowingly provided substantial assistance as necessary to state a cause of action for Aiding and Abetting.

A claim predicated upon Aiding and Abetting also requires the defendant to have provided "substantial assistance" to the ultimate wrongdoer. Substantial assistance occurs when a defendant "affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Groom*, 2012 WL 50250, at * 4 (citing *Hines v. FiServ, Inc.*, No. 8:08–cv–2569–T–30AEP, 2010 WL 129838 (M.D. Fla. Mar. 25, 2010)). Even when a financial institution permits its customer to engage in suspicious transactions (which are not even at issue in this case), there is no substantial assistance. *Id.* Routine banking services, such as allowing a wrongdoer to "***create accounts, transfer funds among accounts, and to make withdrawals***" are insufficient to plead substantial assistance. *Lawrence*, 2010 WL 3467501, at *4 (emphasis added) (citing *Rosner*, 2008 WL 5416380); *see also Lawrence*, 455 F. App'x 904. Merely conducting normal, lawful banking operations such as were performed here, is not enough to establish aiding and abetting. *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 552 (Fla. 2d DCA 2003). Consistent with the "actual knowledge" requirement associated with each of the other elements of Aiding and Abetting, the plaintiff must also plead that the defendant rendered such substantial assistance with actual knowledge that the assistance was aiding the primary wrongdoer. *Lawrence*, 2010 WL 3467501, at *4 (stating that "the plaintiff must also plead that the defendant knowingly rendered substantial assistance in the commission of the wrongdoing").

In this case, the Plaintiffs have alleged nothing more than the provision of routine banking services on the part of BankAtlantic in support of its claims of substantial assistance. Specifically, BankAtlantic is alleged to have allowed Pro Sports to open accounts, make transfers between accounts, make transfers out of accounts, and make withdrawals. *Id.* at ¶¶ 61, 78. This exact activity has been held to be insufficient to plead the necessary element of

17

substantial assistance to support a claim of Aiding and Abetting. *Lawrence*, 2010 WL 3467501, at *4.   Again, banks do not have to question transactions and have the "right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds." *O'Halloran*, 350 F.3d at 1205.   Furthermore, even if such ordinary banking transactions were sufficient to state a claim for Aiding and Abetting, which as demonstrated above they are not, the Plaintiffs have nonetheless failed to demonstrate any facts supporting the notion that BankAtlantic had actual knowledge that it was rendering substantial assistance to Pro Sports' fraud or breach of duty.   As a result, the Plaintiffs have also failed to plead the requisite actual knowledge of substantial assistance required to support any claim for Aiding and Abetting. Therefore, Counts V, VI, VII, and VIII should be dismissed.

> ## ii.      Counts IX and X Fail to State a Cause of Action for Breach of Fiduciary Duty.

Counts IX and X purport to state a cause of action for Breach of Fiduciary against BankAtlantic on behalf of the Group "A" and Group "B" Plaintiffs, respectively.   In order to state a cause of action for Breach of Fiduciary Duty, the Plaintiffs must plead the existence of a fiduciary relationship and a breach thereof, which results in damage. *SouthTrust Bank v. Export Servs., Inc.*, 190 F. Supp. 2d 1304, 1308 (M.D. Fla. 2002) (citing *Moss v. Appel*, 718 So. 2d 199, 201-02 (Fla. 4th DCA 1998)). In support of their claim that a fiduciary relationship existed between Plaintiffs and BankAtlantic, the Plaintiffs assert that BankAtlantic: (1) offered a specific division dedicated to athletes; (2) maintained the ability to receive greater economic benefit from these customers; (3) maintained the ability to act upon "extra knowledge" about the persons that qualified; and (4) maintained a "close, active and prominent relationship with Pro Sports." *See* Amended Complaint, ¶¶ 156, 161. The Group "A" Plaintiffs also assert the existence of a fiduciary relationship on the part of BankAtlantic by virtue of its alleged actions in opening the Group "A" Accounts without the Group "A" Plaintiffs' consent[9] and allowing the Group "A" Accounts to be opened as Power of Attorney accounts. *Id*. at ¶ 156.

Plaintiffs, however, have not pled any facts that would overcome the presumption under Florida law against the existence of a fiduciary relationship between the Plaintiffs and BankAtlantic.   As a general proposition, the relationship between a bank and its customer is that

---

[9] BankAtlantic vehemently disputes that the Plaintiffs did not consent to the opening of the accounts at issue or authorize the transactions upon which they base their claims.  Even if the Plaintiffs' allegations were true, however, which they are not, the Plaintiffs' claims still fail.

of a creditor to debtor, and the bank owes no fiduciary responsibilities. *Keys Jeep Eagle, Inc. v. Chrysler Corp.*, 897 F. Supp. 1437, 1443 (S.D. Fla. 1995); *Motorcity of Jacksonville, Ltd. v. Se. Bank, N.A.*, 83 F.3d 1317, 1339 (11th Cir. 1996) (reversed on other grounds); *Barnett Bank of West Fla. v. Hooper*, 498 So. 2d 923, 925 (Fla. 1987); *Carpenter v. Comm. Bank of Homestead*, 710 So. 2d 65, 66-67 (Fla. 3d DCA 1998); *First Nat'l Bank & Trust Co. of the Treasure Coast v. Pack*, 789 So. 2d 411, 414 (Fla. 4th DCA 2001). "When the parties are dealing at arm's length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other." *Mount Sinai Medical Ctr. of Greater Miami, Inc. v. Heidrick & Struggles, Inc.*, 188 F. App'x 966, 969 (11th Cir. 2006); *Bankest Imports, Inc. v. ISCA Corp.*, 717 F. Supp. 1537, 1541 (S.D. Fla. 1989). A fiduciary duty only arises where a bank establishes a confidential relationship with a customer and the transaction is one from which the bank is likely to benefit. *Barnett Bank of W. Fla.*, 498 So.2d at 925; *Atl. Nat'l Bank of Fla. v. Vest*, 480 So. 2d 1328 (Fla. 2d DCA 1985). Importantly, in order to establish the existence of a fiduciary relationship, "a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Welnia, LLC v. Bodymedia, Inc.*, 6:08-cv-742-Orl-31DAB, 2008 WL 3155148, at * 2 (M.D. Fla. Aug. 4, 2008) (citing *Watkins v. NCNB Nat'l Bank of Fla., N.A.*, 622 So. 2d 1063, 1065 (Fla. 3d DCA 1993)).

Neither the Group "A" nor Group "B" Plaintiffs have alleged anything more here than an arm's length relationship and have certainly failed to allege any set of circumstances sufficient to meet Plaintiffs' burden to establish that they were somehow "dependent" on BankAtlantic or that BankAtlantic undertook some affirmative steps to "counsel or protect" Plaintiffs. In fact, a review of the Depositor's Agreement underscores the fact that all that existed between BankAtlantic and the Plaintiffs was a normal banking relationship. At most, Plaintiffs allege that BankAtlantic opened a division dedicated to athletes and that BankAtlantic **maintained the ability** to "act upon extra knowledge." *Id*. at ¶¶ 156, 161 (emphasis added). What is glaringly absent from Plaintiffs' allegations, however, are any specific actions taken on the part of BankAtlantic to "counsel or protect" the professional athletes or any allegations that BankAtlantic did, in fact, ever act upon its alleged "extra knowledge" for its own benefit and to the detriment of the Plaintiffs.

Similarly, there are no allegations that the Plaintiffs were dependent on BankAtlantic. Reading the Amended Complaint in totality, Plaintiffs were receiving financial and business

counseling from Pro Sports, thereby supporting the notion that the Plaintiffs were <u>not</u> dependent on BankAtlantic. In sum, they were seeking the advice of an entity totally separate from BankAtlantic.[10]

Even addressing the Group "A" Plaintiffs' additional allegations that BankAtlantic formed a fiduciary relationship by virtue of its actions in opening accounts without their knowledge, there are still simply no allegations offered that would support the notion that the Group "A" Plaintiffs were somehow dependent on BankAtlantic or that BankAtlantic was "counseling" or "advising" them.  Specifically, the Group "A" Plaintiffs admit that these new, allegedly unauthorized accounts were funded by deposits drawn on valid deposit accounts owned by the Group "A" Plaintiffs.[11]   Further, the Group "A" Plaintiffs do not allege any special circumstances surrounding these initial, valid accounts that would give rise to a fiduciary duty or that BankAtlantic prevented them from discovering the unauthorized transfers out of the valid accounts and into the unauthorized accounts. The Group "A" Plaintiffs admit that they were aware of the previous valid accounts, and therefore, they should have had ample opportunity to discover any unauthorized transfers or withdrawals from those accounts. As such, the Plaintiffs have not pled any dependency on their part as they were in a better position to discover the purportedly unauthorized transfers from the valid accounts—and, consequently, the purportedly unauthorized accounts themselves—than BankAtlantic was. As a result, the Plaintiffs have failed to plead a fiduciary relationship based upon the opening of the Group "A" Accounts.

Turning to the Group "B" Plaintiffs, the Group "B" Plaintiffs have also failed to allege any cognizable breach of any such fiduciary duty owed.  Specifically, the Groups "B" Plaintiffs assert that the Group "B" Accounts were all Power of Attorney accounts with an accompanying Power of Attorney form.  *See* Amended Complaint, ¶ 68.  In turn, the Power of Attorney form attached to the Amended Complaint reflects that the attorney-in-fact could take any action relative to the accounts that the account holder could.  *See* Exhibit "B" to the Amended Complaint.  Therefore, it is unclear how there could ever be a breach of any duty under such circumstances as any transaction undertaken by the attorney-in-fact would have been authorized. *O'Halloran*, 350 F.3d at 1206  (financial institution cannot be held liable for withdrawals made

---

[10] In fact, as disclosed by the Portis Complaint, at least one of the Plaintiffs was represented by independent counsel regarding the transactions at issue.

[11] Again, BankAtlantic disputes the assertion that the accounts were unauthorized or opened without the Plaintiffs' knowledge.

by individual authorized on the account).  As seen above, banks have the "right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds."  *Id.* at 1205.  Therefore, the Group "B" Plaintiffs have failed to allege a cognizable breach of any duty owed, and Counts IX and X should consequently be dismissed.

### iii.   Count XI for Negligent Supervision Fails to State a Cause of Action.

The Plaintiffs also purport to raise a cause of action for Negligent Supervision in Count XI of the Amended Complaint.  In support of this claim, the Plaintiffs allege that Steve Johnson ("Johnson") opened "most, if not all" of the accounts at issue.[12]  *See* Amended Complaint, ¶ 166. The Plaintiffs also claim that BankAtlantic employee Phil Fitzpatrick ("Fitzpatrick") served as Johnson's manager.  *Id.* at ¶¶ 168-69.  Without offering any substantiating allegations, the Plaintiffs then claim that Fitzpatrick and BankAtlantic knew or should have known: (1) about the close relationship between Johnson and Pro Sports; (2) that Johnson opened the Group "A" Accounts without the Group "A" Plaintiffs' knowledge or consent; (3) that Johnson did not contact the Group "A" Plaintiffs to notify them of the new accounts or to obtain legitimate signature cards; (4) that Johnson caused the statements for the Group "A" Accounts to be delivered to Pro Sports; and (5) that Johnson opened one or more of the Group "B" Accounts as a Power of Attorney account prior to obtaining a power of attorney form.[13]  *Id.* at ¶¶ 170-71.

To sustain a claim for negligent supervision, the Plaintiffs must allege facts that indicate an employee's "harmful propensity" to engage in the allegedly tortious conduct at issue.  *Blue v. Miami-Dade County*, No. 10-23599-CIV, 2011 WL 2447699, at *3-4 (S.D. Fla. June 15, 2011); *see also Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (applying Florida law).  The Plaintiffs bear the burden of showing that the employer had actual or constructive knowledge of the employee's <u>relevant</u> harmful propensities. *See Blue*, 2011 WL 2447699, at *3-4; *see also Stephenson v. School Bd. of Polk County*, 467 So. 2d 1112, 1112 (Fla. 2d DCA 1985). Consequently, the Plaintiffs cannot bring a claim for Negligent Supervision without first pleading sufficient underlying facts to establish that BankAtlantic had actual or constructive

---

[12] As in other parts of the Amended Complaint, the Plaintiffs failure to specify which of the Plaintiffs these allegations pertain to makes it uncertain whether this cause of action is truly applicable to all Plaintiffs or only a portion of the Plaintiffs.

[13] As discussed in detail below, the Depositor's Agreement does not require that a Power of Attorney form be executed simultaneously with the opening of the account. Rather, a Power of Attorney form could be executed at any time to add an attorney-in-fact to an account.

knowledge that Johnson had a propensity to commit the alleged wrongful acts at issue. *Mercado*, 407 F.3d at 1162; *see also Martinez v. Pavex Corp.*, 422 F. Supp. 2d 1284, 1298-99 (M.D. Fla. 2006) (granting defendant's motion for summary judgment when the plaintiff failed to demonstrate that employer had knowledge of an employee's propensity to assault co-workers).

Even assuming the Plaintiffs' allegations to be true, the Plaintiffs' Negligent Supervision claim fails to plead that BankAtlantic was on notice of any relevant "harmful propensity" on the part of Johnson to engage in fraud or the wrongful activity complained about; therefore, the Plaintiffs fail to properly state a cause of action for Negligent Supervision.  Plaintiffs do not allege that Johnson was ever disciplined, that BankAtlantic was aware that Johnson had ever previously engaged in similar activity, or the existence of any other warning signs with regard to Johnson.  In summation, the Plaintiffs have failed to allege the existence of any facts that would have put BankAtlantic on notice that Johnson had the relevant propensity to open fraudulent accounts or to fail to secure the proper documentation for the accounts.  It is a significant leap to assume that, simply because Johnson purportedly had a close relationship with Pro Sports, BankAtlantic should have known that Johnson would allegedly open accounts without the Plaintiffs' knowledge or consent.  Thus, to the extent this claim is not otherwise barred by the statute of limitations (and, as discussed below, it is), the Court should also dismiss the Plaintiffs' Negligent Supervision claim for failure to plead sufficient underlying facts establishing the claim.

Furthermore, even if the Plaintiffs' allegations were true, which they are not, the Plaintiffs have still not pled any wrongdoing on the part of Johnson.  As seen in the Depositor's Agreement attached to the Amended Complaint, a Power of Attorney form did not have to be executed at the time an account was opened, and a Power of Attorney form could be executed at any time to add an attorney-in-fact. *See* Exhibit "A" to the Amended Complaint, p. 10. Moreover, the funds from the Group "A" Plaintiffs' valid accounts were used to fund the supposed unauthorized accounts, and therefore, the Plaintiffs were on notice of the transfer and were required to give BankAtlantic notice of the same. Without establishing any wrongful actions on the part of Johnson, the Plaintiffs' claims for Negligence Supervision necessarily fails.

 **D.**  **THE GROUP "A" PLAINTIFFS' CLAIMS**

  *i.*  *The Group "A" Plaintiffs' Claims are Barred by the Statute of Limitations.*

**a.**     **The Applicable Statute of Limitations for the Claims Presented by the Group "A" Plaintiffs is Four Years, which Period has Expired.**

As seen above, the Group "A" Plaintiffs have asserted the following causes of action against BankAtlantic: (1) Negligence; (2) Refund of Unauthorized and Ineffective Funds Transfer; (3) Aiding and Abetting Breach of Fiduciary Duty; (4) Aiding and Abetting Fraud; (5) Breach of Fiduciary Duty; and (6) Negligent Supervision.  In turn, Florida Statutes § 95.11(3) provides that any action founded on negligence, fraud, and/or any action not specifically provided for must be brought within four years.  Every single one of the Group "A" Plaintiffs' claims fall under a four-year provision.

As both this Court and the Eleventh Circuit Court of Appeals have previously held, where the dates at issue are apparent from the face of a complaint, and the statute of limitations has run, any amendment would be futile, and a dismissal with prejudice is appropriate.  *See generally Brotherhood of Locomotive Engineers & Trainmen Gen. Comm. of Adjustment CSX Transp. v. CSX Transp., Inc.*, 522 F.3d 1190, 1192 (11th Cir. 2008) (dismissal on statute of limitations grounds is appropriate if it is apparent from the face of the complaint); *Danhi v. Charlotte County Sheriff's Dep't*, No. 2:03-cv-628-FTM-99DNF, 2006 WL 2226323, at *4 (M.D. Fla. Aug. 3, 2006); *Pisani v. Diener*, No. 09-20701-CV, 2009 WL 6621485, at *11 (S.D. Fla. Sept. 17, 2009) (dismissal with prejudice based on statute of limitations).  As will be seen below, all of the Group "A" Plaintiffs' claims are based on the opening of the allegedly unauthorized accounts and the subsequent transfers out of the same, and therefore, the statute of limitations for the Group "A" Plaintiffs ran on October 16 or 17, 2010—over three years before the Group "A" Plaintiffs brought their claims.[14]

**b.**     **The Causes of Action Accrued on October 16 or 17, 2006.**

It is clear that the statute of limitations begins to run when a cause of action accrues.  *Young v. Ball*, 835 So. 2d 385, 386 (Fla. 2d DCA 2003).  In turn, a cause of action accrues when the last element constituting the cause of action occurs.  *Olson v. Johnson*, 961 So. 2d 356, 359 (Fla. 2d DCA 2007) (citing Fla. Stat. § 95.031(1)).  The last element of most causes of action accrues when the purported plaintiff is allegedly damaged. *Kelly v. Lodwick*, 82 So. 3d 855, 857

---

[14] There were tolling agreements executed by the parties.  However, the tolling agreements were not executed until October of 2012, and therefore, the statute of limitations had already run.

(Fla. 4th DCA 2011) (addressing causes of action for negligence and breach of fiduciary duty). Accordingly, the date on which a plaintiff suffers damages will determine the date on which the statute of limitations related to his or her claims will begin to run.  *See HealthPrime, Inc. v. Smith/Packett/Med-Com, LLC*, 428 F. App'x 937, 942 (11th Cir. 2011) (finding claims for "breach of contract, misappropriation of funds, fraud, and conversion" all time barred from the initial date the funds were taken).

Here, the last element of each of the Group "A" Plaintiffs' causes of action would have been the occurrence of any damages to the Group "A" Plaintiffs.  As alleged in the Amended Complaint, on October 16 or 17, 2006, Pro Sports purportedly "took" the Group "A" Plaintiffs' funds from their valid BankAtlantic accounts without their knowledge.  *See* Amended Complaint, ¶ 40.  The Group "A" Plaintiffs further allege that they were unaware: (1) that these funds were taken; (2) that the funds were used to open new accounts; and/or (3) that subsequent transfers were being made from the newly opened accounts.  *See* Amended Complaint, ¶¶ 40, 54, 49, 54, 57.  Accordingly, any and all damages that the Group "A" Plaintiffs might have suffered were incurred on October 16 or 17, 2006, when the funds left their possession, custody, or control and were placed into allegedly unauthorized accounts of which they were unaware and which were allegedly being controlled and concealed by Pro Sports.  This is the date on which any alleged fraud, breach of duty, or ineffective transfer occurred.

The Group "A" Plaintiffs use a sleight of hand and attempt to circumvent the statute of limitations by citing certain undated, unidentified, and allegedly unauthorized transfers out of the new purportedly unauthorized Group "A" Accounts.  To view any of these subsequent transactions as the date of accrual, misses the point, which is that the loss and damage to the Group "A" Plaintiffs occurred when their funds left their valid, existing accounts and were transferred to the new accounts "without their knowledge and/or informed consent."  *Id*. at ¶ 40. The Plaintiffs admit that the funds were out of their control once this initial transfer occurred because the Group "A" Plaintiffs claim that the accounts were improperly opened and that none of them had any knowledge of the existence of the unauthorized accounts.  *Id*. at ¶ 49. Therefore, the reference to any subsequent transfers out of the purportedly unauthorized accounts is simply a red herring as the Plaintiffs had sustained their claimed loss when the funds were taken without their consent from the valid accounts and placed into unauthorized accounts unknown to the Plaintiffs.  It simply cannot be said that the subsequent transfers out of the

allegedly unauthorized accounts further harmed the Plaintiffs when they did not even know the accounts or the subsequent transfers existed.

Not only was the transfer from the valid accounts the moment of any alleged damage, but the Group "A" Plaintiffs knew or should have known about the initial transfer when it occurred (or shortly thereafter) as the valid accounts would have reflected the transfer, and the balance in the valid accounts would have been reduced accordingly.   Under Florida law, bank customers have a duty to discover and report unauthorized transactions from their accounts.   *See*, *e.g.*, *Sabra Int'l, Inc. v. Wells Fargo Bank, N.A.*, 10-22330-CIV, 2010 WL 3835233 (S.D. Fla. Sept. 30, 2010).   The Group "A" Plaintiffs have raised no allegations that would tend to support any claim that they were prevented from monitoring their original, valid accounts.   Therefore, there was simply nothing preventing the Group "A" Plaintiffs from realizing the unauthorized funding of the new accounts.   In fact, as discussed below, the initial transfer out of the valid accounts would have triggered the Plaintiffs' reporting obligations under the Depositor's Agreement and applicable statutes, as well as all of BankAtlantic's defenses to any subsequent transactions made by Pro Sports.   *See* Exhibit "A" to Amended Complaint.   Therefore, the initial transfer put Plaintiffs on notice as to any damages.

It is the initial loss funds itself that caused the damage and, consequently, the accrual of any cause of action.   Here, any loss or damage came from the allegedly unauthorized transfer of their funds from the valid accounts into the allegedly unknown and unauthorized accounts which were being fully controlled by Pro Sports by virtue of forged signature cards and Power of Attorney forms.   The Group "A" Plaintiffs admit that they had "no knowledge" of the allegedly unauthorized Group "A" Accounts whatsoever, and therefore, these subsequent transfers out of these accounts were of no event to the Group "A" Plaintiffs—the funds had already been purportedly taken from them.   As such, they cannot claim to have been further damaged by any activity that occurred relative to those accounts as they did not even know they existed, and the Plaintiffs Group "A" claims should consequently be dismissed with prejudice.

ii.     ***The Group "A" Plaintiffs' Claim for Negligence is Barred by Common Law Principles of Contract.***

In Count I of the Amended Complaint, the Group "A" Plaintiffs purport to state a cause of action for Negligence.   "Florida law is clear that when a breach of contract is attended by some additional conduct which amounts to an independent tort, such a breach can constitute negligence."   *Floyd v. Video Barn, Inc.*, 538 So. 2d 1322, 1324 (Fla. 1st DCA 1989).   However,

where a contract exists between the parties, they are typically limited to their contractual remedies and "[i]t is only when the breach of contract is attended by some additional conduct which amounts to an independent tort that such breach can constitute negligence." *Elec. Sec. Sys. Corp. v. S. Bell Tel. & Tel. Co.*, 482 So. 2d 518, 519 (Fla. 3d DCA 1986); *see also Sharpe v. Physicians Protective Trust Fund*, 578 So. 2d 806, 809 (Fla. 1st DCA 1991); *Strickland-Collins Const. v. Barnett Bank of Naples*, 545 So. 2d 476, 477 (Fla. 2d DCA 1989).

Under these common-law contractual principles, a plaintiff seeking to allege a cause of action for negligence must show that the defendant has breached a duty separate and independent of any contract between the parties. *See Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 408 (Fla. 2013) (Pariente, J., concurring); *see also Altenel, Inc. v. Millennium Partners, L.L.C.*, 11-22806-CV, 2013 WL 2363233 (S.D. Fla. Mar. 12, 2013) ("While the economic loss doctrine may no longer apply outside the product liability context, Justice Pariente's concurring opinion in the *Tiara Condominium Association* case makes clear that the ruling does not disturb the landscape of contract law; there remain other common law contract principles that may bar certain tort claims."); *Freeman v. Sharpe Res. Corp.*, 6:12-CV-1584-ORL-22T, 2013 WL 2151723 (M.D. Fla. May 16, 2013) (same); *Stonecreel-AAA, LLC v. Wells Fargo Bank, N.A.*, No. 1:12–cv–23850–MGC/TURNOFF, 2013 WL 5416970 (S.D. Fla. Sept. 26, 2013) ("Justice Pariente's concurrence emphasizes that Florida law still holds that parties to a contract are limited to the remedies that have specifically been negotiated and that tort law may not supplant contractual terms."). In short, if a contract contemplates remedies for specified actions or occurrences, the parties are bound by their contractual agreement and cannot attempt to seek a better result than what they bargained for by asserting tort-based remedies.

In this case, the Group "A" Plaintiffs admit that they all held valid accounts with BankAtlantic. *See* Amended Complaint, ¶¶ 43, 52, 83. In fact, it is the contractual relationship between themselves and BankAtlantic upon which the Group "A" Plaintiffs rely to establish the existence of a duty owed to them on the part of BankAtlantic, which element is necessary to state a cause of action for Negligence. The relationship between the parties is therefore contractual in nature, and their rights and responsibilities are set forth in the Depositor's Agreement associated with the Group "A" Plaintiffs' valid accounts.

A representative copy of the BankAtlantic Personal Account Depositor's Agreement & Disclosure Statement (the "Depositor's Agreement"), which governed the valid accounts, is

attached to the Amended Complaint as Exhibit "A."  A review of the Depositor's Agreement reflects that it specifically governs the rights and liabilities between the parties with regard to security and safety measures, including the requirement that the Plaintiffs "[p]romptly and carefully [review their] statements each month for unauthorized activity."  *See* Exhibit "A" to Plaintiffs' Amended Complaint, p. 6.  The Depositor's Agreement also specifically addresses the transfer of funds from one account to another and the circumstances under which such transfers may occur.  *Id.* at p. 15.  Similarly, the Depositor's Agreement addresses the duty of the customers (here, the Group "A" Plaintiffs) to review their statements and report any unauthorized activity.  *Id.* at pp. 15-16, 29.

In turn, the Group "A" Plaintiffs admit that "[a]ll of the Group A Accounts were opened using monies that were on deposit in accounts previously maintained by the Group A Plaintiffs." *See* Amended Complaint, ¶ 43.  Although the Group "A" Plaintiffs fail to disclose how this initial deposit or transfer occurred, it cannot be disputed that these transfers—which came from admittedly legitimate accounts—are governed by the respective Depositor's Agreements.  Even employing the Plaintiffs' claims that they were somehow unaware of or did not authorize the initial withdrawal or transfer from their valid account to the new allegedly unauthorized account, these transfer are still governed by the Depositor's Agreement in place as to the valid accounts because it specifically delineates BankAtlantic's responsibilities with regard to both unauthorized activity and the transfer of funds between accounts.

 Similarly, the Group "A" Plaintiffs' rights and responsibilities with regard to the allegedly unauthorized transfers from the valid accounts to the unknown and unauthorized accounts (which resulted in the Group "A" Plaintiffs' loss of funds) are also governed by the Depositor's Agreement.  Specifically, the Depositor's Agreement explicitly addresses the Group "A" Plaintiffs' duty to monitor and safeguard their accounts and to report any unauthorized transactions (such as the unauthorized transfer of funds to other accounts).  Simply put, the rights, remedies, and liabilities arising from the alleged withdrawal and transfer of funds from the valid accounts and subsequent deposit of said funds into the allegedly unauthorized accounts are governed by a contractual relationship between the parties and the Group "A" Plaintiffs cannot now resort to tort remedies relative to the transfers out of the valid accounts.

The Group "A" Plaintiffs insist on taking issue with the subsequent withdrawals from the unauthorized Group "A" Accounts as a means to support a Negligence claim.  This, again, is

nothing more than a red herring.  By the Plaintiffs' own pleadings, the claimed loss of funds came when the funds were transferred out of the valid accounts.  The Group "A" Plaintiffs cannot escape this fact by making assertions based on what happened to the funds *after* they were initially removed and taken from their valid accounts and placed into alleged unauthorized and illegitimate accounts.  Such a result would be counterintuitive—and patently improper— because this is the exact type of harm the Depositor's Agreement sought to prevent in the first place.  Specifically, had the Group "A" Plaintiffs complied with their contractual duties and obligations to monitor and safeguard the valid accounts and report unauthorized activity therefrom as required by the terms of the Depositor's Agreement, the allegedly unauthorized transfers and—and consequently the allegedly unauthorized accounts—would have been identified, and BankAtlantic would have been in a better position to prevent any further purported unauthorized activity from the outset.

The Group "A" Plaintiffs cannot now seek to hold BankAtlantic responsible for subsequent transfers out of the allegedly unauthorized accounts when they failed to abide by their contractual obligation to report the initial transfer and funding of the unauthorized accounts to begin with.  Similarly, the Group "A" Plaintiffs cannot attempt to circumvent the time limitations and contractual requirements to monitor their valid accounts and report unauthorized activity while simultaneously seeking to hold BankAtlantic responsible for Pro Sports' alleged subsequent wrongdoing which occurred *after* the Group "A" Plaintiffs failed to comply with their own contractual duties to monitor their accounts and to report the initial transfer out of their valid accounts to the unauthorized accounts.[15]  The Depositor's Agreement specifically sought to prevent this outcome, and it was the Group "A" Plaintiffs' failure to employ even the most

---

[15] For example, the Depositor's Agreement provides that Plaintiffs must notify BankAtlantic of any disputed transactions within thirty days after receipt of their statement and requires the Plaintiffs to commence any action based on such transaction within 180 days.  *See* Exhibit "A" to Amended Complaint, pp. 15-16. As to wire transfers, the Plaintiffs must notify BankAtlantic within twenty days and provide written notice within a year or else their claims are precluded. *Id.* at p. 29. Notably, the Depositor's Agreement also provides that unauthorized transactions committed by the same wrongdoer are barred to the extent that the initial transactions were not reported within thirty days. The Plaintiffs evidently failed to comply with these provisions with respect to the initial transfer out of the valid accounts to the new, unauthorized accounts.  This failure to comply with their contractual duties was the direct cause of Pro Sports' ability to open the accounts in October 2006. Therefore, the facts at issue here fall squarely within the four corners of the contract between the parties.

rudimentary monitoring procedures relative to their respective valid account and to report any unauthorized activity that provided Pro Sports with the purported opportunity to mishandle funds.  The Depositor's Agreement put in place procedures to avoid this outcome, and the Group "A" Plaintiffs failed to follow them.

Succinctly, the rights, liabilities, and responsibilities between the parties in the event of unauthorized withdrawals and transfers from the legitimate accounts are expressly addressed in the Depositor's Agreement.  The terms included therein seek to prevent fraud, unauthorized transfers, and unauthorized activity such as the unauthorized funding of illegitimate accounts.  The Group "A" Plaintiffs have not and cannot allege a breach of duty separate and independent from the terms of the Depositor's Agreement as it specifically contemplated unauthorized transfers and the opening of new accounts and also assigned liability for the failure to report unauthorized transfers and transactions.  The Depositor's Agreement  recognizes the proposition that the account holder is in the best position to identify unauthorized transactions and the Group "A" Plaintiffs cannot now disregard their responsibility to do so. Therefore, the Group "A" Plaintiffs' purported cause of action for Negligence is nothing more than an attempt to circumvent the contractual remedies negotiated by the parties and is barred by common law contract principles.  Count I of Plaintiffs' Amended Complaint should be dismissed accordingly.

### iii.    Count III Fails to State a Cause of Action for Unauthorized and Ineffective Funds Transfer as to Group "A" Plaintiffs.

Count III of the Amended Complaint also purports to state a cause of Action for Refund of Unauthorized and Ineffective Funds Transfer.  In support of this claim, the Group "A" Plaintiffs assert that BankAtlantic "permitted numerous unauthorized and ineffective funds transfers involving funds owed by Group A Plaintiffs."  *See* Amended Complaint, ¶ 99.  This Count fails, however, to provide any specificity as to the individual transfers at issue, as required by Rule 8.  This failure is especially significant in light of the allegations that "some" of the Plaintiffs were aware of the County Crossings Project and that "some" of the Plaintiffs were aware that some transactions in the form of "loans" might occur relative to the County Crossings Project, but that they did not appreciate the "nature" or "extent" of said transactions.  *See* Amended Complaint, ¶ 60.  Therefore, BankAtlantic has no way of identifying the unauthorized transactions upon which the Plaintiffs base their claim and Count III should be dismissed.

Moreover, although the specific transfers at issue are unclear, it is clear that the initial transfers came from valid accounts.  Under the explicit terms of the Depositor's Agreement

governing the valid accounts, the Plaintiffs had a duty to monitor their accounts and to report any unauthorized transactions.  *See*  Exhibit "A" to Amended Complaint, pgs. 6, 15-16, 13. Therefore, the Group "A" Plaintiffs cannot raise any cause of action based on unauthorized transfers because they had a contractual duty to report the initial transfers, and they are contractually barred from now asserting a claim based on any additional purported transfers resulting from their failure to  monitor their account and report the initial transfer as required by the Deposit Agreement.  This claim should be dismissed accordingly.

### E.        THE GROUP "B" PLAINTIFFS' CLAIMS FAIL.

#### i.        *Count II for Breach of Contract Fails to State a Cause of Action.*

The Group "B" Plaintiffs purport to state a cause an action against BankAtlantic for Breach of Contract.  To state a cause of action for Breach of Contract, the Group "B" Plaintiffs must allege: (1) the existence of a valid contract; (2) a material breach; and (3) damages.  *Kaloe Shipping Co. v. Goltens Serv. Co.*, 315 F. App'x 877, 880 (11th Cir. 2009).  In turn, the Group "B" Plaintiffs assert that BankAtlantic breached the terms of the Depositor's Agreement in the following three ways: (1) by opening "one or more" of the accounts as a Power of Attorney account(s) without having a Power of Attorney at the time account(s) were opened; (2) by occasionally accepting instructions relative to the Group "B" Accounts by one or more persons who were not named as the attorney-in-fact; and (3) by allowing improper transactions that exceeded the scope of the applicable Power of Attorney.[16]   Each of these allegations fails, however, and should be dismissed for the reasons addressed in detail below.

First, the Group "B" Plaintiffs fail to clarify or to identify the specific Group "B" Plaintiff(s) that are claiming that a Power of Attorney was not executed simultaneously with the opening of the account.  Regardless, there is simply nothing in the Depositor's Agreement which required that an executed Power of Attorney be provided at the time the Group "B" Accounts were opened.  To the contrary, a review of the Depositor's Agreement, which is attached to the Amended Complaint as Exhibit "A," specifically states as follows: "(8) **Power of Attorney Accounts** – We *may* require you to complete our Power of Attorney form applicable to *add* an attorney-in-fact to your Account." *See* Amended Complaint, Exhibit "A," p. 10 (emphasis added).  Therefore, by the explicit terms of the Depositor's Agreement, a Power of Attorney

---

[16] Notably, as seen above, the Group "B" Plaintiffs do not assert that the Power of Attorney forms associated with their accounts were unauthorized or illegitimate.

form was not required at the time the individual accounts were opened. Accordingly, there can be no breach because the Depositor's Agreement specifically contemplated the addition of an attorney-in-fact after the opening of an account.

Next, the Group "B" Plaintiffs state that BankAtlantic breached the Depositor's Agreement "with one or more" of the Group "B" Plaintiffs by "occasionally" acting upon instructions by individuals that were not named as the attorney-in-fact for the specific Group "B" Accounts.  *See* Amended Complaint, ¶ 94.  Again, the Group "B" Plaintiffs fail to offer any specific facts in support of this conclusory allegation, thereby falling woefully short of Rule 8's pleading standard.  BankAtlantic is left to guess as to which of the Plaintiffs are even raising this claim, the transactions which were purportedly made by individuals other than those listed on the respective Power of Attorney forms, and/or the identity of the individuals who instituted the subject transactions.  Therefore, this allegation, standing alone, is insufficient to state a cognizable breach of the Depositor's Agreement.

Lastly, the Group "B" Plaintiffs state that BankAtlantic breached "one or more" of the Plaintiff's Depositor's Agreement by allowing transactions that "exceeded the scope of the applicable power of attorney (if any)."[17]  *Id*. at ¶ 95.  The Group "B" Plaintiffs fail to specify the alleged breaches in any meaningful manner, as they neither identify the specific Group "B" Plaintiffs raising this claim nor the transactions which allegedly exceeded the scope of the applicable Power of Attorney.  A review of the Depositor's Agreement further cuts against these claims, stating:

> . . . If a Power of Attorney form is accepted by us, ***any action taken by us in reliance on your attorney-in-fact will be binding on you*** . . . ***You authorize and direct us to receive, accept, pay, and/or apply, without any duty of inquiry, without limit as to amount, and without regard to the application of the proceeds***, any check, draft, or other instrument for the payment of money drawn by your attorney-in-fact on or payable from your accounts including, but not limited to, those indorsed to the order of your attorney-in-fact or otherwise for the personal credit of your attorney-in-fact. ***We are not liable for the misapplication of funds from your attorney-in-fact***.

*See* Amended Complaint, Exhibit "A," p. 10 (emphasis added).  Likewise, the Power of Attorney form attached to the Amended Complaint states that the named attorney-in-fact could "[d]raw, accept, indorse or otherwise deal with any checks . . . including the right to make withdrawals

---

[17] By using the qualifier "if any" it even appears the Group "B" Plaintiffs are alleging that some of their accounts did not have an applicable Power of Attorney at all.

from and deposits  . . . ."  *See* Amended Complaint, Exhibit "B."  The Power of Attorney form further states that the named attorney-in-fact is authorized to "[d]o anything regarding my interest in such accounts as I could do myself, including the amendment or alteration of the title to any of the above-referenced accounts."  *Id.*

Given the broad grant of authority in this language, it is difficult to see how BankAtlantic could have possibly breached any provision of the Depositor's Agreement by permitting any transactions instituted by the attorney-in-fact for the respective accounts. The Group "B" Plaintiffs do not dispute the validity of the Powers of Attorney or assert that they were unauthorized—they simply argue that the "some" of the unidentified transactions "exceeded" the scope of the applicable Power of Attorney.  Despite this unsupported claim, the Depositor's Agreement makes it clear that BankAtlantic would not be held liable for the misapplication of any funds by the attorney-in-fact. The Power of Attorney forms similarly state that the attorney-in-fact could do anything in the accounts as the depositor himself could do.[18]  *See* Exhibit "B" to Amended Complaint. Therefore, it is entirely unclear as to how the attorney-in-fact as to each respective account could have possibly exceeded their authority as they were entitled to take any action that the depositors themselves could have taken. *See O'Halloran*, 350 F.3d at 1206 (finding that a bank cannot be held liable for improper withdrawals made by a wrongdoer who was authorized to make withdrawals).  In fact, if BankAtlantic refused to permit any transactions initiated by the attorney-in-fact, it could have been in violation of the Depositor's Agreement. *Id.*  Consequently, the Group "B" Plaintiffs cannot use this allegation to support their claim for Breach of Contract, and Count II should be dismissed as the Group "B" Plaintiffs have failed to state a cognizable breach of the Depositor's Agreement.

### ii.     Count IV Fails to State a Cause of Action for Refund of Unauthorized and Ineffective Funds Transfer as to the Group "B" Plaintiffs.

Count IV of the Amended Complaint purports to state a cause of Action for Refund of Unauthorized and Ineffective Funds Transfer on behalf of the Group "B" Plaintiffs.  In support of this claim, the Group "B" Plaintiffs assert that BankAtlantic "permitted numerous unauthorized and ineffective funds transfers out of the Group B Accounts which were in contradiction to the authority provided to the powers of attorneys in place on each Group B

---

[18] Based on these facts, it is difficult to discern how the Group "B" Plaintiffs could ever advance any cause of action based on any of the transactions instituted by the attorney-in-fact to the respective accounts.

Account, *if any*." *See* Amended Complaint, ¶ 106 (emphasis added).  This Count fails to provide any specificity as to the transfers at issue, however, as required by Rule 8.  This failure is especially significant in light of the Plaintiffs' acknowledgement that "some" of them were aware of the County Crossings Project and that some transactions might occur relative to the County Crossings Project, but that they were merely unclear as to the nature and extent of such transactions.  *See* Amended Complaint, ¶ 77.  Based on the Plaintiffs' allegations, it also appears that Powers of Attorney might only be associated with some of the Group "B" Accounts, but the Amended Complaint fails to identify the particular Plaintiffs making this claim.  *Id*. at ¶ 95.  The Group "B" Plaintiffs further claim that "persons making the funds transfers out of the Group B Accounts were not entrusted by Group B Plaintiffs with respect to making payment orders," but fail to identify the individual(s) allegedly effecting the transfers.  *Id*. at ¶ 107.

Similarly, the Group "B" Plaintiffs also assert that the transactions "were in contradiction to the authority provided to the powers of attorneys" but fail to explain how the transfer(s) contradicted the Powers of Attorney. This information is crucial because, as seen above, the Power of Attorney forms specifically authorized the attorney-in-fact to make transfers and to engage in any transaction the account holder could. As such, BankAtlantic has no way of identifying the unauthorized transactions, linking specific transactions to specific Plaintiffs, or framing a proper response to this claim.  Additionally, the Depositor's Agreement for the Group "B" Accounts requires them to notify BankAtlantic of any unauthorized transactions. As to wire transfers specifically, the Depositor's Agreement is clear that the Plaintiffs are precluded from bringing any cause of action based on wire transfers unless they provide written notification of any discrepancy within one year from the notification of the transfer. *See* Exhibit "A" to Amended Complaint, p. 29.  The Group "B" Plaintiffs have not alleged that they complied with this provision, warranting dismissal of Count IV.

WHEREFORE, Defendant, Branch Banking & Trust Company, as successor in interest to BankAtlantic, respectfully requests that this Court enter an Order dismissing the Amended Complaint or, in the alternative, directing the Plaintiffs to provide a more definite statement, and such further and additional relief as this Court deems appropriate.

Respectfully submitted,

*/s/ David S. Hendrix*
David S. Hendrix, Esq.
Florida Bar No. 827053
David.Hendrix@gray-robinson.com
Mark D. Schellhase, Esq.
Florida Bar No. 57103
Mark.Schellhase@gray-robinson.com
GRAY ROBINSON, P.A.
401 E. Jackson Street (33602)
Suite 2700
Post Office Box 3324
Tampa, Florida  33601-3324
(813) 273-5000
(813) 273-5145 (fax)

and

Alexandra de Alejo, Esq.
Florida Bar No. 43108
Alexandra.dealejo@gray-robinson.com
GRAY ROBINSON, P.A.
1221 Brickell Avenue
Suite 1600
Miami, Florida 33131
Phone: 305-416-6880
Fax: 305-416-6887
*Attorneys for BB&T*

34

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via CM/ECF electronic service on this 6th day of January, 2014 to:

Matthew G. Brenner
Ronald D. Edwards, Jr.
Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
215 North Eola Drive
Post Office Box 2809
Orlando, FL 32802
Matt.brenner@lowndes-law.com
Ronny.edwardsjr@lawndes-law.com
Tracy.kennison@lowndes-law.com
litcontrol@lowndes-law.com

Elizabeth P. Kagan
Andrew T. Kagan
8191 College Parkway, Suite 303
Fort Myers, FL 33919
liz@kagan-law.com
andrew@kagan-law.com

Laurence M. Landsman
Block & Landsman
33 North LaSalle Street
Suite 1400
Chicago, Illinois 60602
larry@block-landsman.com

*/s/ David S. Hendrix*
David S. Hendrix, Esq.