UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

Case No.: 0:13-cv-62381-WPD

JAMAAL ANDERSON, JACOB BELL,
DERRICK GAFFNEY, TAVARES
GOODEN, FRANK GORE, SANTONIO
HOLMES, JEVON KEARSE, KENARD
LANG, RAY LEWIS, BRANDON
MERIWEATHER, SANTANA MOSS,
CLINTON PORTIS, LITO SHEPPARD,
FRED TAYLOR, and GERARD WARREN,

        Plaintiffs,

vs.

BRANCH BANKING AND TRUST
COMPANY, as successor in interest to
BankAtlantic, LLC,

        Defendant,

_____/

## THIRD AMENDED COMPLAINT

Plaintiffs, JAMAAL ANDERSON, JACOB BELL, DERRICK GAFFNEY, TAVARES

GOODEN, FRANK GORE, SANTONIO HOLMES, JEVON KEARSE, KENARD LANG,

RAY LEWIS, BRANDON MERIWEATHER, SANTANA MOSS, CLINTON PORTIS, LITO

SHEPPARD, FRED TAYLOR, and GERARD WARREN (collectively, the "Plaintiffs"), by and

through their undersigned attorneys, sue Defendant, BRANCH BANKING AND TRUST

COMPANY, as successor in interest to BankAtlantic, LLC ("BB&T"), and allege as follows:

## PARTIES

1.     Plaintiff, Jamaal Anderson ("Anderson"), is a resident of Braselton, Georgia.

2.     Plaintiff, Jacob Bell ("Bell"), is a resident of St. Louis, Missouri.

3.     Plaintiff, Derrick Gaffney ("Gaffney"), is a resident of Duval County, Florida.

4.      Plaintiff, Tavares Gooden ("Gooden") is a resident of Broward County, Florida.

5.      Plaintiff, Frank Gore ("Gore"), is a resident of Dade County, Florida.

6.      Plaintiff, Santonio Holmes ("Holmes"), is a resident of Palm Beach County, Florida.

7.      Plaintiff, Jevon Kearse ("Kearse"), is a resident of Broward County, Florida.

8.      Plaintiff, Kenard Lang ("Lang"), a resident of Orange County, Florida.

9.      Plaintiff, Ray Lewis ("Lewis"), is a resident of Reisterstown, Maryland.

10.     Plaintiff, Brandon Meriweather ("Meriweather"), is a resident of Dade County, Florida.

11.     Plaintiff, Santana Moss ("Moss"), is a resident of Broward County, Florida.

12.     Plaintiff, Clinton Portis ("Portis"), is a resident of Dade County, Florida.

13.     Plaintiff, Lito Sheppard ("Sheppard"), is a resident of Orange County, Florida.

14.     Plaintiff, Fred Taylor ("Taylor"), is a resident of Broward County, Florida.

15.     Plaintiff, Gerard Warren ("Warren"), is a resident of Hillsborough County, Florida.

16.     Defendant, BB&T, is a North Carolina corporation having its principal place of business in the State of North Carolina.

17.     BB&T is registered to do business in the State of Florida, and maintains offices or facilities throughout the State of Florida, including in Broward County, Florida.

18.     BB&T is a successor in interest to BankAtlantic, LLC ("BankAtlantic") and has assumed the rights and liabilities associated with the accounts maintained by Plaintiffs at BankAtlantic.

0046479\159201\1621459v1

## VENUE AND JURISDICTION

19.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391.

20.     This Court has jurisdiction with respect to this matter under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship among the properly joined parties, and the matter in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00).

21.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction with respect to Counts III and IV, which arise from Federal Regulation J, Subpart B (to the extent that this Regulation preempts Chapter 670 of the Florida Statues), and would have supplemental jurisdiction over the remaining causes of action herein pursuant to 28 U.S.C. § 1367(a).

## COMMON ALLEGATIONS

22.     Each of the Plaintiffs is or was a professional football player employed by teams in the National Football League.

23.     Each of the Plaintiffs entered into a separate Client Service Agreement with Pro Sports Financial, Inc. ("Pro Sports") pursuant to which Pro Sports provided each Player with tax planning, business counseling and concierge services.

24.     Pro Sports was a financial management firm owned and operated by Jeffrey B. Rubin ("Rubin").

25.     BB&T developed a close business relationship with Pro Sports, Rubin and other Pro Sports employees.

26.     BB&T had a special division dedicated to targeting and servicing athletes and other high wealth individuals in the sports and entertainment industry.  BB&T advertised and offered this division as a specialized service to those who qualified.

27.     As a result of the relationship between BB&T, Pro Sports and Rubin, Pro Sports deposited tens of millions of dollars of Plaintiffs' money at BB&T.

3

28.     Money belonging to each Plaintiff was deposited into an account opened in the name of that Plaintiff.

29.     BB&T was provided with a copy of the Client Service Agreement between each Plaintiff and Pro Sports, each of which defined the scope of the services provided by Pro Sports to each Plaintiff, at or before the opening of each of the accounts at issue.

30.     Some accounts opened and maintained in one or more of the Plaintiffs' names were illegitimate accounts that were opened with signature cards containing signatures that were forged by one of Pro Sports' employees.

31.     BB&T directly benefited from the Plaintiffs' accounts merely by having the tens of millions of Plaintiffs' dollars on deposit with BB&T.

32.     BB&T had frequent and routine interactions with Pro Sports employees regarding the Plaintiffs' accounts.

33.     BB&T considered the Plaintiffs' accounts and accounts for other NFL players that Pro Sports established and could access (either with or without proper authorization) to be worthy of an increased level of specialized service, which it endeavored and pledged to provide.

34.     Upon opening the Plaintiffs' accounts, BB&T coded them in a unique manner so that BB&T could monitor the accounts for profitability and other purposes.

35.     Despite monitoring the Plaintiffs' accounts, BB&T allowed numerous unusual, suspicious and extraordinary withdrawals from accounts opened in the name of each Plaintiff that were neither within the scope of the service identified in the Client Services Agreement nor authorized by the Plaintiff in whose name the account was opened.  Further, BB&T failed to make any effort to contact the Plaintiffs to confirm authorization for any such withdrawals.

36.    BB&T had actual knowledge that certain transactions related to the Plaintiffs' accounts were unauthorized and exceeded the scope of the Plaintiffs' Client Service Agreements with Pro Sports.

37.    Such unauthorized transactions included "CashLink" or "internet" wire transfers that were made without the Plaintiffs' knowledge or consent, lacked appropriate safeguards and controls, were not in compliance with internal BB&T procedures, and were not properly tailored for personal accounts like those of the Plaintiffs.

38.    Attached as Exhibit "A" is a copy of a Cashlink System Services & License Agreement listing Pro Sports as "Customer" and executed by Peggy Lee, a Pro Sports employee, and Eric Boos, on behalf of BB&T, dated February 29, 2008.

39.    None of the Plaintiffs executed a Power of Attorney appointing Peggy Lee, a Pro Sports employee, as attorney in fact.

40.    Attached as Exhibit "B" is a copy of a CashLink Web Setup Form executed by Peggy Lee that appoints herself, Erick Carter and Tequilla Harris, other Pro Sports employees, as Users, but indicates that only Peggy Lee has the User/Wire Administrative function.  Moreover, only Peggy Lee is designated as a Composer, Approver and Administrator.   The form was accepted by Eric Boos, on behalf of BB&T.

41.    Composite Exhibit "C" (partially redacted by BB&T) consists of copies of printouts reflecting that the Plaintiffs' accounts that are the subject of this action were listed as accounts of Customer, Pro Sports, and more specifically, of Peggy Lee, Eric Carter, and Tequilla Harris.

42.    Attached as Exhibit "D" is a copy of a sample of a Funds Transfer Security Procedure Designation (FTSPD) that was required by BB&T to be executed in connection with

0046479\159201\1621459v1

every CashLink Account.  Exhibit "D" contains Plaintiff Gooden's account as one of the listed accounts but Gooden is not identified on the account, the document was not signed by Gooden, as there is no signature line for Mr. Gooden's signature.  Page 2 of the FTSPD states that, "[i]f Customer maintains a personal Account at Bank, all persons having signature authority on the Account must sign this document."

43.     None of the Plaintiffs ever signed an FTSPD authorizing CashLink wire transfers to be conducted in any manner.  Accordingly, none of the Plaintiffs were ever aware of or were able to select any of the Security Procedures set forth on the FTSPD for CashLink wire transfers.

44.     Many of the unauthorized wire transactions were loans or transactions made on behalf of the Plaintiffs in connection with a casino/bingo project in Alabama known as Center Stage a/k/a Country Crossing (the "Country Crossing Project").

45.     The casino style gaming, which was the primary and most lucrative aspect of the Country Crossing Project, was deemed illegal under Alabama law in July of 2012.  As a result, the Country Crossing Project failed.

46.     BB&T knew that significant sums of money were withdrawn from the Plaintiffs' accounts in connection with the Country Crossing Project (a non "bill pay" purpose), yet BB&T failed to make any attempt to contact any of the Plaintiffs to confirm that the Plaintiffs knew of and/or authorized these transactions.

47.     BB&T also allowed numerous additional withdrawals (by fax authorizations from Pro Sports and through automated checks) from Plaintiffs' accounts without Plaintiffs' knowledge and/or informed consent.

48.     Further, there are numerous transfers from the Plaintiffs' accounts to other accounts which may have been improper and unauthorized, and Plaintiffs therefore reserve the

right to further amend their Complaint if discovery reveals that such transfers resulted in actionable loss.

49.   As a result, the Plaintiffs lost millions of dollars from the loans, transactions and other withdrawals (most through automated checks) from their accounts at BB&T without Plaintiffs' knowledge and/or informed consent.

50.   All conditions precedent to the filing of this lawsuit have been satisfied.

## GROUP A PLAINTIFFS

51.   BB&T allowed accounts to be opened and maintained, and business to be transacted on accounts in the names of Gaffney, Gore, Kearse, Lang, Lewis, Moss, Portis, Sheppard, and Taylor (the "Group A Plaintiffs") without their knowledge and/or informed consent.

52.   Specifically, BB&T opened the following accounts in the names of the Group A Plaintiffs without their knowledge and/or informed consent:

(a)   On or about October 16, 2006, BB&T account ending in *7441 was opened in the name of Derrick Gaffney by virtue of a forged signature card.

(b)   On or about October 16, 2006, BB&T account ending in *7375 was opened in the name of Frank Gore by virtue of a forged signature card.

(c)   On or about October 16, 2006, BB&T account ending in *7797 was opened in the name of Jevon Kearse by virtue of a forged signature card.

(d)   On or about October 16, 2006, BB&T account ending in *7383 was opened in the name of Kenard Lang by virtue of a forged signature card.

(e)   On or about October 16, 2006, BB&T account ending in *7540 was opened in the name of Ray Lewis by virtue of a forged signature card.

(f)    On or about October 16, 2006, BB&T account ending in *7409 was opened in the name of Santana Moss by virtue of a forged signature card.

(g)    On or about October 17, 2006, BB&T account ending in *7532 was opened in the name of Clinton Portis by virtue of a forged signature card.

(h)    On or about October 16, 2006, BB&T account ending in *7821 was opened in the name of Lito Sheppard by virtue of a forged signature card.

(i)    On or about October 16, 2006, BB&T account ending in *7813 was opened in the name of Fred Taylor by virtue of a forged signature card.

(The accounts identified in this paragraph are hereinafter collectively referred to as the "Group A Accounts").

53.    All of the Group A Accounts were opened by BB&T employee Steve Johnson over the span of a few days.

54.    Mr. Johnson did not meet with or speak to any Group A Plaintiff at or near the time any of the Group A Accounts were opened.  Instead, Mr. Johnson and BB&T relied on the relationship and trust that he and it had placed in Pro Sports and its employees.

55.    All of the Group A Accounts were opened using monies that were on deposit in accounts previously maintained by the Group A Plaintiffs at BB&T.

56.    Any properly executed signature cards or Depositor's Agreements applicable to prior accounts of the Group A Plaintiffs were account specific only, and would not govern the Group A Accounts.

57.    When opening the Group A Accounts, and during the multiple years in which the Group A Accounts were maintained, BB&T identified Pro Sports' address as the mailing address

8

for each and every Group A Plaintiff without the knowledge or informed consent of any Group A Plaintiff.

58. BB&T subsequently delivered all statements and correspondence relating to the Group A Accounts to Pro Sports instead of to the individual Group A Plaintiff in whose name a particular account was opened.

59. BB&T's delivery of statements to Pro Sports and not to the Group A Plaintiffs ensured that the Group A Plaintiffs would not receive account-related documentation that would have alerted them to the opening, maintaining and misuse of the Group A Accounts.

60. Each of the Group A Accounts were opened and maintained as a "power of attorney account," and the documentation for each Group A Account designated one of three Pro Sports' employees as the holder of the power of attorney.

61. None of the Group A Plaintiffs had ever executed a power of attorney relating to his respective Group A Account on or prior to the date that the Group A Accounts were opened as "power of attorney accounts."

62. None of the Group A Plaintiffs had knowledge of or approved of the opening or maintaining of the Group A Accounts.

63. BB&T failed to properly verify the identity of each of the Group A Plaintiffs when it opened the Group A Accounts.

64. BB&T failed to properly verify the identity of each of the Group A Plaintiffs during the entire period of time it maintained the Group A Accounts.

65. Each of the Group A Plaintiffs had prior accounts with BB&T. Accordingly, BB&T had sufficient identification information (including prior signature cards) to determine that the Group A Accounts were not opened by the Group A Plaintiffs.

0046479\159201\1621459v1

66.    BB&T allowed the Group A Accounts to be opened and to be maintained without following its own protocols and without regard to reasonable or due care or concern for the authenticity of the signature cards associated with each Group A Account in order to promote its own self-interest.

67.    After allowing the Group A Accounts to be opened as power of attorney accounts without the Group A Plaintiffs' knowledge or consent, BB&T also occasionally accepted and acted upon wire transfer instructions from Pro Sports employees who were not even named as the attorney-in-fact for a particular account.

68.    BB&T failed to act in good faith and with reasonable care when opening and maintaining the Group A Accounts and in allowing unauthorized business to be transacted on the Group A Accounts.

69.    BB&T failed to take action to confirm with the Group A Plaintiffs that the opening or maintaining of the Group A Accounts was authorized, and that the transactions on the Group A Accounts were authorized.

70.    As a result of BB&T's lack of good faith and reasonable care, and its otherwise improper handling of the Group A Accounts, Pro Sports and Rubin were allowed to transfer monies out of each Group A Plaintiff's account without Group A Plaintiffs' knowledge and/or informed consent, and for an unauthorized or improper lending or business purpose.

71.    Group A Plaintiff, Kearse, did not become generally aware of the improper and unauthorized transactions for which he sues until approximately May 2012.  Gaffney, Lang, Moss, Portis, Sheppard and Taylor did not become generally aware of the improper and unauthorized transactions for which they sue until July 2012.  Gore did not become generally

aware of the improper and unauthorized transactions for which he sues until approximately April 2013.

72.     All of the Group A Plaintiffs, with the exception of Gore and Moss, executed Tolling Agreements with BB&T tolling the applicable statute of limitations on October 22, 2012. Gore executed his Tolling Agreement on April 16, 2013, and Moss executed his Tolling Agreement on October 24, 2012.

73.     Composite Exhibit "E" lists the transactions for which each Group A Plaintiff seeks relief and those transactions (which are specifically identified) for which each Group A Plaintiff needs more information (not yet produced) to properly evaluate them.

74.     The transactions set forth on Composite Exhibit "E" are herein referred to collectively as the "Group A Improper Withdrawals."[1]

75.     The Group A Improper Withdrawals generally consisted of even dollar amounts in excess of $10,000.00, and on many occasions equaled or exceeded $100,000.00.  Due to the size of these withdrawals, some of them would go to BB&T's regional management for review and approval.

76.     BB&T failed to take action to confirm with the owners of the Group A Accounts that any of the large, round-dollar and frequently occurring Group A Improper Withdrawals were authorized.

77.     While some of the Group A Plaintiffs may have heard of the Country Crossing Project, may have had general information about the nature of the project and/or may have been aware of the potential for making loans or transactions relating to the Country Crossing Project in exchange for a return on the loans or transactions, these Group A Plaintiffs did not approve of

---

[1] Discovery is ongoing that may result in the inclusion of additional transactions and/or the removal of certain transactions in the Group A Improper Withdrawals.  Group A Plaintiffs reserve the right to supplement or amend the Group A Improper Withdrawals after all relevant documentation is produced or determined not to exist.

0046479\159201\1621459v1

the extent or volume of any such transactions, did not understand the nature of or appreciate the risk associated with any such transactions and were prevented from discovering the extent, volume and nature of any such transactions that are reflected in the Group A Improper Withdrawals as a result of BB&T's wrongful actions and its failure to exercise good faith, act with ordinary care and engage in reasonable or prudent banking practices.

78.     BB&T substantially assisted in allowing and concealing the Group A Improper Withdrawals by improperly opening and maintaining the Group A Accounts, allowing the Group A Improper Withdrawals and sending statements and correspondence for the Group A Accounts to Pro Sports without the Group A Plaintiffs' knowledge and consent.

79.     Neither Pro Sports, nor Rubin, nor any Pro Sports employee had authority to open or maintain the Group A Accounts, and the opening and maintaining these unauthorized accounts in this manner was neither necessary nor incidental to the services provided by them to the Group A Plaintiffs under the terms of the applicable Client Services Agreements.

80.     Neither Pro Sports, nor Rubin, nor any Pro Sports employee had the authority to make the Group A Improper Withdrawals or any other transactions from any of the Group A Accounts without the Group A Plaintiffs' knowledge and/or informed consent, and the Group A Improper Withdrawals were neither necessary nor incidental to the services provided by them to the Group A Plaintiffs under the terms of the applicable Client Services Agreement.

81.     BB&T's actions, inactions, lack of good faith and lack of ordinary care in opening and maintaining the Group A Accounts based upon forged signature cards and without obtaining proper identification information from the Group A Players, allowed for the unauthorized transactions and investments to be made without the Group A Plaintiffs' knowledge and/or

12

informed consent, and otherwise substantially assisted Pro Sports and Rubin in diverting and using significant sums of money belonging to the Group A Plaintiffs without authorization.

### GROUP B PLAINTIFFS

82.     Subsequent to the establishment of its close business relationship with Pro Sports, BB&T allowed Pro Sports to open and maintain power of attorney accounts for Anderson, Bell, Gooden, Holmes, Meriweather and Warren (the "Group B Plaintiffs").

83.     Specifically, BB&T opened and maintained the following accounts in the names of the Group B Plaintiffs:

(a)     On or about June 22, 2007, BB&T account ending in *9343 was opened in the name of Jamaal Anderson.

(b)     On or about October 23, 2007, BB&T account ending in *8408 was opened in the name of Jacob Bell.

(c)     On or about March 27, 2008, BB&T account ending in *2112 was opened in the name of Tavares Gooden.

(d)     On or about June 25, 2007, BB&T account ending in *8733 was opened in the name of Santonio Holmes.

(e)     On or about August 7, 2007, BB&T account ending in *3742 was opened in the name of Brandon Meriweather.

(f)     On or about October 11, 2006, BB&T account ending in *9868 was opened in the name of Gerard Warren (collectively, the "Group B Accounts").

84.     The designated attorney in fact for each Group B Account was a Pro Sports employee. Pat "Tequilla" Harris was the sole attorney in fact for the Anderson, Bell, Gooden

13

and Meriweather accounts. Erick Carter was the sole attorney in fact for the Holmes and Warren accounts.

85.    Despite the fact that the Group B Accounts were power of attorney accounts, BB&T opened some of the Group B Accounts without having a power of attorney executed by the applicable Group B Plaintiff as of the date of the opening of the account.

86.    Each of the Group B Accounts was opened by BB&T employees with knowledge of the relationship between BB&T and Pro Sports, and between Pro Sports and the Group B Plaintiffs.

87.    BB&T knew that the Group B Accounts were to be used strictly for concierge or bill pay services pursuant to the terms of the Client Service Agreements in BB&T's possession.

88.    The Group B Accounts were not intended to be used for any other purpose.

89.    BB&T allowed unauthorized Pro Sports employees, including Peggy Lee, who is not the authorized the attorney in fact for any of the Plaintiffs' accounts, to wire significant sums of monies out of the Group B Accounts for unauthorized or improper lending or business purposes.

90.    Further, in processing automated checks out of the Group B Accounts for unauthorized or improper purposes, BB&T occasionally accepted and acted upon instructions from persons who were not the authorized or identified attorney-in-fact for the applicable Group B Account.

91.    As a result of BB&T's lack of good faith and reasonable care, and its otherwise improper handling of the Group B Accounts, Pro Sports and Rubin were allowed to transfer monies out of each Group B Plaintiff's Account without Group B Plaintiffs' knowledge and/or informed consent.

14

92.     Anderson, Gooden, Meriweather and Warren did not become generally aware of the improper and unauthorized transactions for which they sue until approximately July 2012. Bell and Holmes did not become generally aware of the improper and unauthorized transactions for which they sue until approximately October 2012

93.     All of the Group B Plaintiffs, with the exception of Holmes, executed Tolling Agreements with BB&T tolling the applicable statute of limitations on October 22, 2012. Holmes executed his Tolling Agreement on October 24, 2012.

94.     Composite Exhibit "F" lists for each Group B Plaintiff the transactions for which each Group B Plaintiff seeks relief and those transactions (which are identified) for which each Group B Plaintiff needs more information (not yet produced) to properly evaluate them.

95.     The transactions set forth on Composite Exhibit "F" are herein referred to collectively as the "Group B Improper Withdrawals."[2]

96.     The Group B Improper Withdrawals generally consisted of even dollar amounts in excess of $10,000.00, and on many occasions equaled or exceeded $100,000.00.

97.     BB&T failed to take action to confirm with the owners of the Group B Accounts that any of the large, round-dollar and frequently occurring Group B Improper Withdrawals were authorized.

98.     While some of the Group B Plaintiffs may have heard of the Country Crossing Project, may have had general information about the nature of the project and/or may have been aware of the potential for making loans or transactions relating to the Country Crossing Project in exchange for a return on the loans or transactions, these Group B Plaintiffs did not approve of the extent or volume of any such transactions, did not understand the nature of or appreciate the

---

[2] Discovery is ongoing that may result in the inclusion of additional transactions and/or the removal of certain transactions in the Group B Improper Withdrawals. Group B Plaintiffs reserve the right to supplement or amend the Group B Unauthorized Withdrawals after all relevant documentation is produced or determined not to exist.

risk associated with any such transactions and were prevented from discovering the extent, volume and nature of any such transactions that are reflected in the Group B Improper Withdrawals as a result of BB&T's wrongful actions and its failure to exercise good faith, act with ordinary care and engage in reasonable or prudent banking practices.

99.     BB&T substantially assisted in allowing the Group B Improper Withdrawals by knowingly allowing the transactions (by CashLink or internet wire or automated check) to be made even though they were (a) beyond the scope and not within the authority of the applicable power of attorney (if any), (b) beyond the scope of the applicable Client Service Agreement, (c) made by persons who were not authorized or even identified as the attorney-in-fact for the account from which the withdrawals were made, and (d) not in compliance with BB&T's internal procedures, safeguards and controls.

100.     Neither Pro Sports, nor Rubin, nor Peggy Lee, nor any Pro Sports employee had the authority to make the Group B Improper Withdrawals from any of the Group B Accounts without the Group B Plaintiff's knowledge and/or informed consent, and the Group B Improper Withdrawals were neither necessary nor incidental to the services provided by them to the Group B Plaintiffs under the terms of the applicable Client Services Agreement.

101.     BB&T's actions, inactions, lack of good faith and lack of ordinary care in maintaining the Group B Accounts in an improper manner and in allowing monies to be transferred out of the Group B Accounts without the Group B Plaintiffs' knowledge and/or informed consent, substantially assisted Pro Sports and Rubin in stealing significant sums of money from the Group B Plaintiffs.

## COUNT I – NEGLIGENCE AS TO GROUP A PLAINTIFFS

102.    Group A Plaintiffs reallege and incorporate paragraphs 1 through 81 above as if fully set forth herein.

103.    Each Group A Plaintiff was a BB&T customer prior to the opening of the Group A Accounts.

104.    BB&T owed each Group A Plaintiff a duty to exercise reasonable care with respect to the opening and maintaining of any and all accounts opened in the name of a Group A Plaintiff and with respect to the safekeeping of funds that were transferred into those accounts. Such duty included obtaining proper authorization for transactions involving funds being transferred from those accounts, including the Group A Improper Withdrawals, which were transactions for an illegitimate purpose and without the knowledge and/or informed consent of the Group A Plaintiffs.

105.    BB&T breached the duties it owed to the Group A Plaintiffs and was grossly negligent and conducted its duties in bad faith by opening and maintaining the Group A Accounts without the Group A Plaintiffs' knowledge and/or informed consent as outlined above, which allowed the Group A Improper Withdrawals to be removed from the Group A Accounts.

106.    BB&T actively concealed this breach from the Group A Plaintiffs.

107.    As a direct and proximate cause of BB&T's breach of its duties, Group A Plaintiffs suffered and incurred damages in at least the sum of the Group A Improper Withdrawals.

WHEREFORE, Group A Plaintiffs request that the Court enter a Judgment in favor of Group A Plaintiffs, and against Defendant, BRANCH BANKING AND TRUST COMPANY, for all damages incurred by Group A Plaintiffs, for punitive damages as appropriate and for such other and further relief as the Court deems just and proper.

## COUNT II – BREACH OF CONTRACT AS TO GROUP B PLAINTIFFS

108.    Group B Plaintiffs reallege and incorporate paragraphs 1 through 50 and 82 through 101 above as if fully set forth herein.

109.    Upon the opening of each Group B Account, the relevant Group B Plaintiff entered into a contractual relationship with BB&T.

110.    The written contracts between each Group B Plaintiff and BB&T include (or should include) a signature card, a Depositor's Agreement and the applicable power of attorney (if any, or at such time one was executed by a particular Group B Plaintiff).  Group B Plaintiffs do not have possession of all such documents at this time.

111.    BB&T has (or should have) in its possession the signature card, all applicable Depositor's Agreements (as amended from time to time to time) and the applicable powers of attorney (if any) for each of the Group B Accounts.

112.    Upon information and belief, the Depositor's Agreement for each Group B Plaintiff is similar to the Depositor's Agreement attached hereto as Exhibit "G."

113.    Upon information and belief, the powers of attorney that BB&T has for the Group B Plaintiffs (if any) are similar to the Limited Durable Power of Attorney attached hereto as Exhibit "H."

114.    BB&T breached the contractual agreements with one or more Group B Plaintiffs by occasionally accepting and acting upon instructions on the Group B Accounts that resulted in wire transfers, CashLink wire transfers or automated checks that were not properly authorized.

115.    If two wire transfers (dated June 18, 2008 and June 23, 2008) from Meriweather's account to Ronnie Gilley Properties, LLC, both in the amount of $400,000.00 are not CashLink wire transfers, then they appear, upon information and belief, to be based upon purported signatures of Tequilla Harris that are not genuine and authentic, and appear to be forged.

18

116.    None of the CashLink wire transfers listed on Composite Exhibit "F" were properly authorized by the Group B Plaintiffs or by their appointed attorneys in fact. Peggy Lee had no contractual or other authority to initiate, authorize or approve wire transfers from the Group B accounts and she was the only authorized "Composer," "Approver," and "Administrator" for the CashLink wire transfers from the Group B Accounts.

117.    Composite Exhibit "I" consists of copies of documents reflecting Group B Improper Withdrawals as a result of transfers (apparently by automated check) without proper authorization by the designated attorney in fact for the account in question. More specifically, three "fax authorizations" dated January 29, 2009, February 26, 2009 and June 3, 2010, authorizing transfers from Meriweather's account in the respective amounts of $3,800.00, $35,000.00 and $6,500.00 were signed by Peggy Lee, a Pro Sports employee who was not designated as the attorney-in-fact for Meriweather's account.

118.    As a direct and proximate result of BB&T's breach of the contractual agreements, Group B Plaintiffs have suffered and incurred damages in at least the sum of the Group B Improper Withdrawals which were not authorized or subsequently ratified by the Group B Plaintiffs.

WHEREFORE, Group B Plaintiffs request that the Court enter a Judgment in favor of Group B Plaintiffs, and against Defendant, BRANCH BANKING AND TRUST COMPANY, for all damages incurred by Group B Plaintiffs and for such other and further relief as the Court deems just and proper.

## COUNT III – REFUND OF UNAUTHORIZED AND INEFFECTIVE FUNDS TRANSFER (GROUP A PLAINTIFFS)

119.    Group A Plaintiffs reallege and incorporate paragraphs 1 through 81 above as if fully set forth herein.

120.     Chapter 670 of the Florida Statues and Federal Regulation J, Subpart B (to the extent that this Regulation preempts Chapter 670 of the Florida Statues) requires BB&T to make repayment for unauthorized or ineffective funds transfers.

121.     BB&T permitted numerous unauthorized and ineffective funds transfers involving funds owed by Group A Plaintiffs out of the Group A Accounts.

122.     Group A Plaintiffs had no agreement in place with BB&T regarding funds transfers or security procedures with respect to any funds transfers.

123.     BB&T accepted and acted upon the unauthorized and ineffective funds transfers in bad faith, and lacked reasonable and ordinary care in allowing the funds transfers.

124.     Group A Plaintiffs failed to timely receive actual notice that the unauthorized and ineffective funds transfers were occurring because BB&T concealed them from Group A Plaintiffs or otherwise prevented Group A Plaintiffs from discovering the transfers by delivering the statements for the Group A Accounts to Pro Sports instead of Group A Plaintiffs.

125.     Group A Plaintiffs suffered and incurred damages in at least the sum of the Group A Improper Withdrawals as a direct and proximate result of the unauthorized and ineffective funds transfers.

WHEREFORE, Group A Plaintiffs request that the Court enter a Judgment in favor of Group A Plaintiffs, and against Defendant, BRANCH BANKING AND TRUST COMPANY, for all damages incurred by Group A Plaintiffs and for such other and further relief as the Court deems just and proper.

## COUNT IV – REFUND OF UNAUTHORIZED AND INEFFECTIVE FUNDS TRANSFER (GROUP B PLAINTIFFS)

126.     Group B Plaintiffs reallege and incorporate paragraphs 1 through 50, 82 through 101, 115, 116 and 117 above as if fully set forth herein.

20

127.   Chapter 670 of the Florida Statues and Federal Regulation J, Subpart B (to the extent that this Regulation preempts Chapter 670 of the Florida Statues) requires BB&T to make repayment for unauthorized or ineffective funds transfers.

128.   BB&T permitted numerous unauthorized and ineffective funds transfers out of the Group B Accounts.

129.   The persons making, directing, and authorizing the funds transfers out of the Group B Accounts were not entrusted by Group B Plaintiffs to make such payments.

130.   BB&T accepted and acted upon the unauthorized and ineffective funds transfer requests in bad faith, and lacked reasonable and ordinary care in allowing the funds transfers.

131.   Group B Plaintiffs failed to timely receive actual notice that the unauthorized and ineffective funds transfers were occurring because BB&T mailed the statements reflecting those transfers to Pro Sports and those statements were not reviewed by Group B Plaintiffs.

132.   As a direct and proximate result of the unauthorized and ineffective funds transfers which were not authorized or subsequently ratified by the Group B Plaintiffs, Group B Plaintiffs suffered and incurred damages in at least the sum of the Group B Improper Withdrawals which occurred on or after October 22, 2008 for all of the Group B Plaintiffs except Holmes, which occurred on or after October 24, 2008 for Holmes, and which were not authorized or subsequently ratified by the Group B Plaintiffs.

WHEREFORE, Group B Plaintiffs request that the Court enter a Judgment in favor of Group B Plaintiffs, and against Defendant, BRANCH BANKING AND TRUST COMPANY, for all damages incurred by Group B Plaintiffs and for such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

133.   Plaintiff hereby demands a trial by jury on all issues so triable.

21

/s/ James S. Toscano
**MATTHEW G. BRENNER**
Florida Bar No. 515681
**JAMES S. TOSCANO**
Florida Bar No. 0899909
**RONALD D. EDWARDS, JR.**
Florida Bar No. 0053233
Lowndes, Drosdick, Doster, Kantor & Reed,
P.A.
215 North Eola Drive
Post Office Box 2809
Orlando, Florida 32802
Telephone:     (407) 843-4600
Fax No:         (407) 843-4444
matt.brenner@lowndes-law.com
james.toscano@lowndes-law.com
ronny.edwardsjr@lowndes-law.com
tracy.kennison@lowndes-law.com
patsy.wong@lowndes-law.com
litcontrol@lowndes-law.com
Attorneys for Plaintiffs

-AND-


**ELIZABETH P. KAGAN**
Florida Bar No. 330779
**ANDREW T. KAGAN**
Florida Bar No. 026291
Kagan Law Firm
8191 College Parkway, Suite 303
Fort Myers, Florida 33919
Telephone:     (239) 466-1161
Fax No.:        (239) 466-7226
Liz@kagan-law.com
Andrew@kagan-law.com
Attorneys for Plaintiffs

-AND-


**LAURENCE M. LANDSMAN**
Illinois Bar No. 6202411
Block & Landsman
33 North LaSalle Street

0046479\159201\1621459v1

Suite 1400
Chicago, Illinois 60602
Telephone:    (312) 251-1144
Fax No.:       (312) 251-1147
larry@block-landsman.com
Not currently admitted to practice in Florida or
in the Southern District of Florida
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the ___ day of _____, 2014, a true and correct copy of the foregoing has been electronically filed and served via CM/ECF which system will send notice to: **DAVID S. HENDRIX, ESQUIRE**, **ANDREW J. MAYTS, ESQUIRE, ALEX DE ALEJO**, ESQUIRE, and **MARK SCHELLHASE, ESQUIRE**, Post Office Box 3324, Tampa, Florida    33602    (david.hendrix@gray-robinson.com,  andrew.mayts@gray-robinson.com, Alexandra.dealejo@gray-robinson.com, mark.schellhase@gray-robinson.com).

/s/ James S. Toscano
**JAMES S. TOSCANO**

23



**EXHIBIT**

**"A"**

## CASHLINK SYSTEM SERVICES & LICENSE AGREEMENT

THIS SYSTEM SERVICES & LICENSE AGREEMENT (hereinafter referred to as "Agreement") is made and entered into as of the, 2/29/2008 by and between BankAtlantic, having its principal place of business at 2100 W. Cypress Creek Rd., Fort Lauderdale, FL 33309 (hereinafter referred to as "Bank") and Pro Sports Financial a corporation having its principal place of business at 6600 N ANDREWS AVE SUITE 130 Ft Lauderdale FL 33309 (hereinafter referred to as "Customer").

In consideration of the fees to be paid hereunder and other good and valuable consideration and the mutual covenants herein contained, Bank does hereby grant to Customer a limited term sublicense to internally use the standard CashLink System (hereinafter referred to as "CashLink System") and Users Manual (hereinafter referred to as "Manual") (the CashLink System and Manual together comprising the CashLink System as more fully described on the attached Schedule A and incorporated herein by reference) for the purpose of transmitting or receiving data files to or from Bank, subject to the following terms and conditions:

1.   THE CASHLINK SYSTEM.  The CashLink System is subject to a Marketing Representative and Distribution Agreement between Bank and M&I Data Services Inc. (M&I) dated as of the 4th day of April 1996, (the Master Agreement) and incorporated herein by reference. Notwithstanding anything in Section 9 to the contrary, this Agreement shall terminate upon the earliest to occur of (i) the termination of the Master Agreement, or any of the License Agreements described therein; or (ii) the date Customer ceases to maintain its account relationships with Bank; or (iii) the date that Bank ceases to obtain data processing services from M&I.  Customer agrees to utilize the CashLink System, as modified by Bank or Bank from time to time, in accordance with the terms of this Agreement.

2.   RIGHTS IN SYSTEM.  Customer acknowledges that the CashLink System is the original, confidential, valuable and proprietary product of M&I and/or Bank as a licensee of M&I, or a licensor of M&I which has licensed the CashLink System to the Bank with the right to sublicense to Customer, and Customer has only the right to use the CashLink System consistent with the terms of this Agreement. Customer further acknowledges that the CashLink System shall remain the property of M&I exclusively; that Customer does not have and shall not acquire, by virtue of this Agreement, any proprietary rights, contract rights, or liens on the CashLink System.

3.   INDEMNITY.  Customer shall indemnify and save harmless Bank and M&I from and against any and all loss, damage, claim, liability, or expense, including without limitation, reasonable attorneys' fees, including fees for appellate work and/or bankruptcy proceedings, asserted against Bank or M&I by third parties and arising out of this Agreement, or the CashLink System, including but not limited to any errors or omissions with respect to the information provided to Bank by Customer, or by officers, employees, or agents of Customer, or arising out of the use of such information when furnished to Customer, to parties affiliated with Customer, to other third persons at Customer's request, or to officers, employees, or agents of Customer provided that any such loss, damage, expense, claim, or liability shall not have occurred by reason of the gross negligence or wilful misconduct of Bank.

Neither Bank nor M&I shall be liable to Customer or to any third parties for any claims, loss or damage, special, incidental, indirect, consequential, or otherwise, even if any of Bank or M&I have been advised of the possibility of such damage.

Customer shall indemnify and hold harmless Bank and M&I from and against any and all loss, damage, claim, or liability expense including without limitation, reasonable attorneys' fees, including fees for appellate work and bankruptcy proceedings incurred by Bank or M&I to enforce collection of any monies due Bank or M&I under this Agreement.

4.   WARRANTY AND REMEDY.  Bank warrants to Customer that the CashLink System when used in a pre-approved equipment configuration is capable of operating in accordance with the written specifications defining the CashLink System for a period of three (3) months after delivery. Bank's sole obligation, and Customer's sole remedy for breach of the warranty, shall be to use reasonable efforts to correct any problems of which Bank is advised. If the problems cannot be resolved during the three (3) month warranty period, Customer shall have the right to cancel the CashLink System and receive the refund specified below. Customer acknowledges that it has tested the CashLink System to its satisfaction and has determined on the basis of such testing that the CashLink System is suitable. EXCEPT AS SET FORTH IN THIS PARAGRAPH 4, BANK AND M&I MAKE NO WARRANTIES, AND CUSTOMER HEREBY WAIVES ALL WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR USE FOR A PARTICULAR PURPOSE.

Neither Bank nor M&I guarantees or warrants the absence of breakdowns, operations failures, unavoidable delays, or similar malfunctions and neither Bank nor M&I shall have any liability for loss, expense or damages, ordinary, special, or consequential resulting directly or indirectly from such cause.

The sole and exclusive remedy for Customer for any breach of this Agreement by Bank or otherwise with respect to any claim involving Bank, M&I or the System, shall be the cancellation of the CashLink System to Bank in exchange for a refund of monthly fees paid to Bank for the CashLink System Services for the previous three (3) months, but in no event to exceed $500.00.

5.   PROTECTION OF TRADE SECRETS, CONFIDENTIAL INFORMATION, AND PROPRIETARY INTERESTS.  Customer acknowledges that the CashLink System and related materials are valuable trade secrets and are strictly confidential, material, and important, and that such confidentiality substantially affects the effective and successful conduct of the business of Bank and M&I. Customer therefore agrees to hold such material and information in the strictest confidence, and to limit use and access as provided in Section 6. Customer further acknowledges that any breach or threatened breach with respect to this Section or Section 6 will cause immediate irreparable injury to Bank and M&I and that the remedies at law for such breach will be inadequate and the Customer agrees not to assert to the contrary in any action for preliminary or other injunctive relief brought by Bank or M&I.

6.   USE.  Customer will provide the necessary equipment. The CashLink System has been designed for use on an IBM or IBM-compatible equipment, using Microsoft Windows and Internet Explorer 6.0 and above. The Customer represents and warrants that the CashLink System will be used solely on such equipment, or other IBM-compatible equipment and that Customer, not Bank, shall be liable for incorrect use of the CashLink System.

Customer, its officers, employees and agents shall take all reasonable precautions to maintain the confidentiality of the CashLink System, and in particular, Customer covenants that it : (i) will implement security measures to safeguard the CashLink System from theft, misuse, or from access by persons other than its own authorized employees; and (ii) will not (and will instruct its employees not to) make any disclosures concerning the CashLink System to any third party.

Customer agrees that Bank, at its sole option, may act on any files purporting to come from Customer through the CashLink System.

7.   CASHLINK SYSTEM SERVICE PROVISIONS.  In addition to the CashLink System License, Bank will also provide access to CashLink for reporting to the Customer its account balances and other cash management data and such other services as specified in Schedules A and E, or subsequent Schedules.

Bank will enter into the CashLink System, as requested by Customer, balance information and/or itemized debit and credit information for Customer's bank account(s) on a daily or monthly basis. Bank shall provide to User's information (available on-line help) and a CashLink User Guide which fully explains the operation and servicing of the CashLink System.

In order to enable Customer to access the System, Bank shall issue to Customer a security code(s), which shall be confidential. Customer agrees to disclose such code(s) only to persons authorized to access the System and further agrees to establish and maintain procedures to safeguard any such

Page 1 of 4                                                                                                      rev. 02/29/2008

code(s) furnished by Bank. Customer agrees to notify Bank at once if it believes that any code has been learned by an unauthorized person. If Bank believes that security has been breached, it may change the code(s) without prior notice. Customer authorizes Bank to consider any access to the CashLink System to be Customer's authorized access until advised to the contrary in writing by Customer.

The ability of Bank to provide access to the CashLink System is conditioned upon the continued operation and availability of the computer which houses the CashLink System and of the telecommunications network connecting Customer's equipment to the CashLink System. In the event access to this computer or network is suspended or terminated for any reason, Customer agrees that Bank will not be responsible for Customer's lack of access. Subject to the deadlines established by M&I for certain services, access to the CashLink System normally will be available from 7 a.m. until 9 p.m.; Eastern Standard Time at Ft. Lauderdale, Florida, Monday through Friday and such additional times as are announced from time to time by Bank. Deadlines for Account/Book Transfers are 5:00 P.M. Eastern Standard Time at Ft. Lauderdale, Florida, and all transfers that are received prior to such deadline will be posted the same day subject to funds availability.

Notwithstanding any provision of hereof to the contrary, Customer agrees that transactions using the CashLink System shall constitute fund transfers within the meaning of UCC Article 4A and that as such, Bank's liability shall be limited as provided by UCC Article 4A. Customer further acknowledges that certain transfers under the System may be made using the Federal Reserve wire transfer system (via the Money Transfer Module), and that in such case, Bank shall have no liability with respect to such transfers other than to the extent of the Federal Reserve Bank's indemnification, if any, under Regulation J or as provided by UCC Article 4A, whichever is less. The final deadline for Wire Transfer processing is 5:00 P.M. Eastern Standard Time at Ft. Lauderdale, Florida, for a wire to go out the same day. Customer's account will be debited the same day that the wire is forwarded.

If Customer uses the CashLink System to initiate Automated Clearing House (ACH) transactions, the transactions shall be subject to the ACH Processing Agreement between Bank and Customer applicable to those transactions.

A stop payment order must be given in the manner required by law and must be received in time to give Bank a reasonable opportunity to act on it before the stop payment cut-off time, which is 5:00 P.M. Eastern Standard Time at Ft. Lauderdale, Florida. Additional limitations on Bank's obligation to stop payment are provided by law. A stop payment order must precisely identify the number, date and amount of the item, and the payee. Bank will honor a stop payment request only by the CashLink System users authorized by the Customer as specified on Schedule A, or Subsequent Schedules to this Agreement. A release of the stop payment request may be made by the person who initiated the stop payment or other authorized users of the System. All stop payments successfully entered into the CashLink System become effective immediately once they have been given a confirmation number.

Subject to availability of actually and finally collected funds or equivalent in your account, and the terms of this Agreement, Bank will accept payorders sent through the CashLink System. Each pay order must be completed in full, cover only a single transaction, not be postdated, and be payable in U.S. Dollars. Bank may accept payorders to be paid in foreign currency, but only if paid to Bank in U.S. Dollars on deposit in Customer's account. Customer authorizes Bank to debit its account for the amount stated on all payorders received on the CashLink System which meet the factors agreed upon to verify that a payorder is authorized and correct. Bank will not accept a payorder until it deducts funds covered by such payorder from Customer's account. Until that time, Bank may reject any payorder that does not comply with this Agreement. When Bank accepts a payorder, it will send its own payorder to the bank whose routing number ("ABA Number") appears on the payorder as the payee's bank number, for the account number designated as the payee's account number. Customer will normally choose one of two available paths for funds to travel: (a) the FedWire System, or (b) through the Automated Clearing House Association ACHA ("ACH"). However, if payee's bank is neither a member of FedWire System, nor ACH, Customer agrees that Bank may (i) reject the payorder, or (ii) no matter which route Customer chooses, send the payorder to payee's bank by any banking route which Bank selects at its sole discretion, so long as Bank's choice is not manifestly unreasonable. In such a case, the transfer may take longer than usual and there may also be an extra fee charged to Customer.

**8.     CHARGES AND PAYMENT.**   Customer acknowledges that the CashLink System shall be used solely in connection with banking services provided by Bank for which fees are charged, pursuant to the pricing schedule hereto known as Cash Management Schedule of Charges, as amended, from time to time by Bank. If Bank elects to increase any fee payable pursuant to the Cash Management Schedule of Charges, Customer shall be given thirty (30) days advance notice of such change unless the change involves a reduction in fees in which case no notice shall be required. Customer agrees to pay all such charges when and as due and if not paid when due, Customer hereby authorizes Bank to debit Customer's account(s) for the payment of such monthly fees. In addition, Customer agrees to pay all monthly fees and related charges to Bank in accordance with its then current Pricing Schedule and upon failure to pay such fees, Bank may debit Customer's account(s) for payment of such fees and charges.

If Bank agrees to cause enhancements to be made to the CashLink System at the request of Customer, Customer agrees to reimburse Bank for reasonable charges covering the cost of any enhancement or additional computer programming to the standard CashLink System provided to the Customer and upon failure of Customer to so reimburse Bank, Bank may debit Customer's account(s) for such charges.

**9.     IDENTIFICATION OF PAYEE AND ACCOUNT NUMBERS.**   Payorders given under the CashLink System require Customer to identify (i) the payee by name, (ii) the account number of the payee's account at payee's bank, (iii) the name of payee's bank, and (iv) the ABA Number of payee's bank. Because the CashLink System is mostly computerized, these numbers must be exactly correct; any mistake, even a single incorrect, omitted, or extra digit, may cause the funds covered by the payorder to be lost or sent to the wrong person. If any payorder is erroneous in any particular, Customer must tell the Bank as soon as Customer learns of the error and upon notifying Bank, Bank will request the receiving Bank to return the funds, but cannot assure Customer that Bank will be successful in retrieving the funds erroneously sent. To the fullest extent allowed by law, Customer has full responsibility for having all numbers relating to the payee's account, the payee's bank and the dollar amount of a payorder, exactly correct. By execution of this Agreement, Customer acknowledges that if any of the numbers are wrong, Customer will bear the loss or recover the funds themselves, if Bank is unsuccessful in obtaining a refund from the receiving bank. The security procedures described in this Agreement are designed to avoid erroneous payorders. Customer agrees that the security procedures set forth in this Agreement are commercially reasonable given Customer's business circumstances and Customer agrees to follow and be bound by the security procedures as to accuracy of information as well as authorization. Customer agrees to the terms of whatever ACH Agreement Bank enters into to expedite the process of executing payorders, so long as such agreements are not manifestly unreasonable as to the rights of Customer thereunder. Both Customer and Bank will also be subject to the rules and regulations of the Federal Reserve Board of Governors and the operating circulars of the local Federal Reserve Bank.

**10.    DAILY CUT-OFF TIMES.**   Pay orders and stop payments will not be effective until actually received by Bank and Bank having a reasonable time to act. All transactions received by Bank after its daily cut-off time during its normal business day, or on a day when Bank is not open for substantially all of it business, will be treated  and recorded as if made on the next full business day. Cash concentrations and/or disbursements have cutoff times of 2:00 P.M. Eastern Standard Time at Ft. Lauderdale, Florida. Customer's remote locations have until these times to make their deposits and enter the deposit data; changes or modifications may be made until the deadline occurs.

**11.    STOP PAYMENTS.**

         (a)     Payorders.     Customer cannot stop payment on a payorder once it is executed by Bank. In most cases, Bank will execute the payorder within several hours or less after transmittal by Customer.

         (b)     Checks.     Bank will honor a stop payment request by the person who signed the particular item or by another authorized signer with a right to withdraw sums equal to or greater than the person signing the item. Because the CashLink System is computerized, the stop payment of the check must contain all of the correct numbers and digits exactly as called for. Even a single digit, which is incorrect, omitted or added, will cause the stop payment to fail. Stop payments on checks will automatically expire in six (6) months if not renewed.

         (c)     Indemnity.     In the case of any stop payment request, either payorders or checks, Customer agrees to indemnify and hold harmless Bank against any and all damages costs and expenses including reasonable attorney's fees incurred at the trial level, appellate level, or in bankruptcy as a result of attempting to honor a stop payment request initiated by Customer.

**12.    SECURITY PROCEDURES.**   Bank has adopted certain security procedures to verify that a payorder received for Customer's account has, in fact, been authorized by Customer and is not erroneous. The security procedures include "Normal Procedures" and "Optional Procedures" which Customer may elect to have Bank follow. The Optional Procedures will provide Customer with additional security and may avoid unauthorized or erroneous transfers, but may in some cases restrict the flexibility of Customer's account. If Customer does not choose an Optional Procedure, Customer assumes all risks of unauthorized and erroneous transfers which appear to comply with Bank's Normal Procedures and those remaining Optional Procedures chosen by Customer.

rev. 02/29/2008

CONFIDENTIAL                                                                                               BA0072348

(a)    The Normal Procedures are the following:

Personal Identification Numbers ("PIN").    Customer's PIN is a secret code which enables anyone who knows it, in effect, to initiate a payordor on Customer's behalf. Customer agrees that it will not reveal this PIN to anyone who is not an authorized signer on Customers account; should an authorized signer cease to be associated with Customer, or cease to be an authorized signer on the account, Customer agrees to change the PIN immediately and notify Bank, and Customer agrees to use every effort possible to keep its PIN a secret.

Payordor Confirmation.    Bank will first attempt to execute the payordor without prior notification to Customer. Confirmation will then be sent to Customer during the next communication with Bank session. Confirmation will consist of notification of a successful execution of the payordor, or, in the event the payordor cannot be executed, notification to the Customer that the payordor has not been executed due to uncollected funds, not sufficient funds, invalid payordor instructions, or similar reasons shall be included in the notification. When Bank accepts a payordor in compliance with the payordor confirmation process and the other applicable security procedures, Customer will be bound by any payordor issued in its name, whether or not authorized or erroneous, as if it were fully authorized and correct.

(b)    The Optional Procedures are as follows:

Limited Merchant List.    Bank and Customer may agree upon a list of restricted payordors whereby payordors will be issued only to a written list of payee's separately provided to Bank by Customer on Bank's forms. In such situation, Bank will not accept payordors directed to any other persons and the list may only be updated in writing on a document executed by both Bank and Customer.

Maximum Payordor Amount.    Bank and Customer may agree to limit the maximum amount of a single payordor by Customer designating same on a Wire Transfer Instruction Form, accepted by Bank. This limit will not be changed except by a separate writing executed by Bank and Customer..

13.    TERMINATION.  Either party may terminate this Agreement at any time with or without cause upon thirty (30) days written notice to the other party. Notwithstanding any termination, the provisions of Sections 3 and 5 of this Agreement shall survive any such termination. Upon termination of this Agreement, Customer shall immediately discontinue use of the CashLink system.

14.    MISCELLANEOUS PROVISIONS.  Neither party to this Agreement may assign its rights or obligations hereunder without the express written consent of the other party, except that the obligations of Bank may be provided or fulfilled by any subsidiary or affiliate of Bank.

Nothing in this Agreement shall be construed as making either party an agent or employee of the other. Each party undertakes performance of this Agreement as an independent party.

This Agreement has been entered into and shall be governed by the laws of the State of Florida  and the parties agree that appropriate jurisdiction for any action brought as a result of this Agreement shall be in a State Court or appropriate Federal Court within the State of Florida.

This Agreement constitutes  the entire Agreement and contract between the parties and supersedes any and all prior agreements, proposals, negotiations and representations pertaining to the obligations and duties to be performed under this Agreement. No amendments or modifications of this Agreement shall be valid unless evidenced in writing and signed by or on behalf of both parties hereto.

Except as otherwise provided in the Agreement, all notices required to be given pursuant to this Agreement, the Schedules attached hereto and any amendments thereto shall be effective when received and shall be sufficient if given in writing, hand delivered, sent by telex, or First Class United States mail, postage prepaid and addressed as follows:

To Bank:    BankAtlantic
Treasury Management Operations
2100 W. Cypress Creek Rd.
Ft. Lauderdale, FL. 33309

To Customer:    Pro Sports Financial
Attn.:  Peggy Lee
Address:  6600 N ANDREWS AVE SUITE 130 Ft Lauderdale FL 33309

The parties hereto may change the name and address of the person(s) to whom all notices or other documents required under this Agreement must be sent at any time by giving written notice to the other party, which notice will not be effective until received by the other party.

If any of the provisions or portions of this Agreement are declared to be invalid under any applicable statute or rule of law, they are to that extent to be deemed omitted, and the validity of the remaining portions of this Agreement shall not thereby be affected.

15.    GOVERNING LAW.  This agreement is governed by and is to be interpreted under the laws of the State of Florida. All payordors and messages created pursuant to this Agreement, whether in electronic form or paper and payordors sent by Bank to payee's bank as agent for Customer, are governed by Article 4A of Florida's Uniform Commercial Code and same may be amended except as changed by this Agreement.

EACH PARTY TO THIS AGREEMENT DOES HEREBY AGREE THAT ANY AND ALL DISPUTES HEREUNDER SHALL BE SUBMITTED TO BINDING ARBITRATION TO BE DECIDED BY ONE ARBITRATOR TO BE SELECTED BY CUSTOMER, ONE ARBITRATOR TO BE SELECTED BY BANK AND THE SAID TWO ARBITRATORS TO SELECT A THIRD ARBITRATOR TO HEAR THE DISPUTE. THE DECISION OF SAID ARBITRATORS SHALL BE FINAL. THE PARTIES RECOGNIZING THAT THIS CONTRACT INVOLVES HIGHLY TECHNICAL EQUIPMENT AND SERVICES RENDERED HEREUNDER MAY BEST BE DECIDED BY EXPERTS IN THE FIELD TO SERVE AS ARBITRATORS. THE COSTS OF SUCH ARBITRATION PROCEEDING SHALL BE SHARED EQUALLY BETWEEN CUSTOMER AND BANK.

APR 2 1 2008

rev. 02/29/2008

CONFIDENTIAL

BA0072349

IN WITNESS WHEREOF, Bank and Customer have executed this Agreement in a manner appropriate to each effective as of the date and year first above written.

Customer understands and agrees that Bank may require full financial disclosure from Customer and may perform a credit check including the obtaining of credit reports both individually and on the business entity in conjunction with the execution of this Agreement. A full credit application may be required by Bank.

**CUSTOMER:**

By: _____

<u>Peggy Lee</u>
Print Name of Signer

_____
Print Title of Signer

**BANKATLANTIC**

By: _____

<u>Eric Boos</u>
Print Name of Signer

<u>VP</u>
Print Title of Signer

APR 21 2008

rev. 02/29/2008

CONFIDENTIAL

BA0072350

**EXHIBIT**

**"B"**
_____

# BankAtlantic
**Florida's Most Convenient Bank**

**CashLink Web Setup Form**
**Schedule A**

## COMPANY INFORMATION / ASSIGNED SERVICES

| | |
|---|---|
| Company Name: | Peggy Lee, Erick Carter, and Tequilla Harris |
| Street Address: | 1205 N. Andrews Ave | Suite: | 130 |
| City: | Ft Lauderdale | State: Fl | Zip: 33309 |
| Primary Phone: | 954 - 634-0996 | Fax: |
| Contact Name: | Peggy Lee |

TIN #: [    ]0454

| User Admin? ☒ | ☒ Balance Reporting | ☐ Current Day Trans | ☐ Account Transfers | ☒ Stop Payment |
| Wire Admin? ☒ | ☒ Wire Transfers | ☐ Lock Box | ☐ Control Disb. | ☐ Bill Payment |
| | ☐ ACH | ☐ Loan Module | ☒ Bank Reports: DDA | |

## USER INFORMATION / ASSIGNED SERVICES

**Note:** Only 1 user can have the User/Wire Administration function, but multiple users can have the ACH Administration.

| User's Name: | Peggy Lee | User's ID: PEGGYLEE |
|---|---|---|
| Mother's Maiden Name: | | Email (Required): leepassports@aol.com |
| User/Wire Admin? ☒ | ☒ Balance Reporting | ☐ Current Day Trans | ☐ Account Transfers | ☒ Stop Payment |
| | ☒ Wire Transfers | ☐ Lock Box | ☐ Control Disb. | ☐ Bill Payment |
| | ☒ Bank Reports: DDA | ☐ Loan Module | ☐ ACH: | |
| | | ☐ Composer | ☒ Approver | ☒ Administrator |

| User's Name: | Erick Carter | User's ID: ERICCART |
|---|---|---|
| Mother's Maiden Name: | | Email (Required): leepsf5744@aol.com |
| User/Wire Admin? ☐ | ☒ Balance Reporting | ☐ Current Day Trans | ☐ Account Transfers | ☒ Stop Payment |
| | ☒ Wire Transfers | ☐ Lock Box | ☐ Control Disb. | ☐ Bill Payment |
| | ☒ Bank Reports: DDA | ☐ Loan Module | ☐ ACH: | |
| | | ☐ Composer | ☐ Approver | ☐ Administrator |

| User's Name: | Tequilla Harris | User's ID: TEQUHARR |
|---|---|---|
| Mother's Maiden Name: | | Email (Required): tharrispassports@aol.com |
| User/Wire Admin? ☐ | ☒ Balance Reporting | ☐ Current Day Trans | ☐ Account Transfers | ☒ Stop Payment |
| | ☒ Wire Transfers | ☐ Lock Box | ☐ Control Disb. | ☐ Bill Payment |
| | ☒ Bank Reports: DDA | ☐ Loan Module | ☐ ACH: | |
| | | ☐ Composer | ☐ Approver | ☐ Administrator |

| User's Name: | | User's ID: |
|---|---|---|
| Mother's Maiden Name: | | Email (Required): |
| User/Wire Admin? ☐ | ☒ Balance Reporting | ☐ Current Day Trans | ☐ Account Transfers | ☐ Stop Payment |
| | ☐ Wire Transfers | ☐ Lock Box | ☐ Control Disb. | ☐ Bill Payment |
| | ☒ Bank Reports: DDA | ☐ Loan Module | ☐ ACH: | |
| | | ☐ Composer | ☐ Approver | ☐ Administrator |

| User's Name: | | User's ID: |
|---|---|---|
| Mother's Maiden Name: | | Email (Required): |
| User/Wire Admin? ☐ | ☐ Balance Reporting | ☐ Current Day Trans | ☐ Account Transfers | ☐ Stop Payment |
| | ☐ Wire Transfers | ☐ Lock Box | ☐ Control Disb. | ☐ Bill Payment |
| | ☒ Bank Reports: DDA | ☐ Loan Module | ☐ ACH: | |
| | | ☐ Composer | ☐ Approver | ☐ Administrator |

## CUSTOMER AUTHORIZATION

| | |
|---|---|
| Customer's Name (Print): | Date: |
| Customer's Signature: | |
| Customer's Title: | |

## BANK'S USE ONLY

| | | |
|---|---|---|
| Application Taken By (Print): | Eric Boos | Signature: |
| Cash Mgmt Approval (Print): | Eric Boos | Signature: |
| Account # to Charge: | [    ]9241 | ☐ HARD CHARGE   ☒ ANALYSIS |
| Officer Code: | | User Code: G |

APR 21 2008

Date Funds Transfer Security Agreement On File (Only if using Wire Transfer Module): _____

## CASH MGMT USE ONLY

| | | |
|---|---|---|
| Customer Code: | Implemented By: | |
| Date Received: | Verified By: | |
| Date Processed: | Date Trained/Mailed: 05-30-08 | |

Special Notes:

Rev. 9/8/2005

CONFIDENTIAL

**BankAtlantic**
Florida's Most Convenient Bank

# Customer Detail Report

Business Online Banking
Customer Database

## Peggy Lee, erick Carter, Tequilla Harris (Pro Sports)

| | |
|---|---|
| Customer Code: PEGGY1049 | |
| Date Received: 3/10/2008 | |
| Setup Started: 3/10/2008 | |
| Setup Completed: 3/10/2008 | |
| Date Cancelled: 9/28/2011 | |

Special Notes:
Pro Sports accts are closed -no charge acct waiting on Dwight.-replacement opened Infinity Planning

Treasury Mgmt Officer: Dwight McKey

Primary Tax ID:

Billing Account: ███999

Billing Charge Type: Analysis

Total Accounts: 50

### Services:

- ☑ Balance Reporting
- ☑ Online Statements
- ☐ Book Transfers
- ☑ Stop Payments
- ☑ Wire Transfers
- ☐ ACH
- ☐ ERD Reports

- ☐ Bill Pay
- Subscriber ID:
- ☐ Control Disb
- ☐ Positive Pay
- ☐ Loan Module
- ☐ Direct Connect

### ACH Information:

| | |
|---|---|
| ACH Enroll Date: | |
| ACH Transaction Type: | |
| Overall ACH Credit Limit: | $0 |
| Credit Limit Audit Date: | |
| Overall ACH Debit Limit: | $0 |
| Debit Limit Audit Date: | |
| ACH Cancel Date: | |
| Collateral: ☐ | |
| Collateral Account: | |
| Collateral Amount: | |

Transmission Types:
- ☐ Batch
- ☐ Import
- ☐ Pass-Thru

### ERD Reports:

### Contacts:

### Accounts:

| Account Number | Tax ID | Account Name | Account Nickname |
|---|---|---|---|
| REDACTED - CONFIDENTIAL | | | |
| ██5486 | ██7741 | Fred Taylor Andrea Taylor | Fred Taylor |
| REDACTED - CONFIDENTIAL | | | |
| ██7375 | ██1743 | Frank Gore Rodney L Best | Frank Gore |
| ██7383 | ██6445 | Kenard Lang | Kenard Lang |
| ██409 | ██583 | Santana Moss | Santana Moss |
| ██7441 | ██2431 | Derrick Jabar Gaffney | Derrick Gaffney |
| REDACTED - CONFIDENTIAL | | | |
| ██7797 | ██0544 | Jevon Kearse | Jevon Kearse |
| ██7813 | ██7741 | Fred Taylor | Fred Taylor |
| ██7821 | ██6367 | Lito D Sheppard Nichole A Sheppard | Lito Sheppard |
| REDACTED - CONFIDENTIAL | | | |



COMPOSITE
EXHIBIT
"C"

Peggy Lee, erick Carter, Tequilla Harris (Pro Sports) Customer Detail Report run on: 10/29/2012

CONFIDENTIAL

Page 1 of 3

BA0072343

**BankAtlantic**
Florida's Most Convenient Bank

# Customer Detail Report

Business Online Banking
Customer Database

## Peggy Lee, erick Carter, Tequilla Harris (Pro Sports)

| | | | |
|---|---|---|---|
| 9868 | 088 | Gerard Warren C/o Pro Sports Financial | Gerald Warren |

**REDACTED - CONFIDENTIAL**

| | | | |
|---|---|---|---|
| 8259 | 1743 | Frank Gore | Frank Gore |
| 8408 | 0384 | Jacob Bell | Jacob Bell |
| 0842 | 1583 | Santana Moss Erick Jay Carter | Santana Moss |

**REDACTED - CONFIDENTIAL**

| | | | |
|---|---|---|---|
| 0909 | 2640 | Santonio Holmes | Santonio Holmes |

# REDACTED - CONFIDENTIAL

| | | | |
|---|---|---|---|
| 3742 | 4007 | William Brandon Meriweather | William Brandon Meriweather |

# REDACTED - CONFIDENTIAL

| | | | |
|---|---|---|---|
| 8733 | 2640 | Santonio Holmes | Santonio Holmes |

# REDACTED - CONFIDENTIAL

| | | | |
|---|---|---|---|
| 9343 | 9353 | Jamaal G Anderson | Jamaal Anderson |

# REDACTED - CONFIDENTIAL

| | | | |
|---|---|---|---|
| 1882 | 6499 | Greg Jones Dana Jones | Greg Jones |
| 2112 | 701 | Tavares Gooden | Tavares Gooden |

# REDACTED - CONFIDENTIAL

| | | | |
|---|---|---|---|
| 5302 | 0384 | Jacob Bell Spending Acct | Jacob Bell |



**Florida's Most Convenient Bank**

## Customer Detail Report

Business Online Banking
Customer Database

Peggy Lee,erick Carter,Tequilla Harris (Pro Sports)

# REDACTED - CONFIDENTIAL

5185          8138          Santonio Holmes Enterprises Llc          Santonio Holmes Enterprises Llc

# REDACTED - CONFIDENTIAL

**ACH Company Detail:**

**ACH Limits:**

CONFIDENTIAL

BA0072345



# CashLink WebPlus Customer Records

**Record #** 542

**Customer Name** PEGGY LEE,ERICK CARTER,TEQUILLA HARRIS(PRO SPORTS)

| Date Received | Setup Started | Setup Completed | Date Verified |
| --- | --- | --- | --- |

| # of Accounts | Charge Account | Charge Type | Monthly Fee | Package Type | BFS Conversion Date | Date Cancelled |
| --- | --- | --- | --- | --- | --- | --- |
| 82 | 2241 | ANALYSIS | $0.00 | MIDDLE MARKET PKG | 4/4/2011 | |

## Account List

| Account Number | Account Name |
| --- | --- |
| REDACTED - CONFIDENTIAL | REDACTED - CONFIDENTIAL |

| | |
| --- | --- |
| 7532 | CLINTON PORTIS |
| 7441 | DERRICK GAFFNEY |
| 3518 | DERRICK J GAFFNEY |

| | |
| --- | --- |
| 8259 | FRANK GORE |
| 7375 | FRANK GORE |
| 7813 | FRED TAYLOR |
| 5486 | FRED TAYLOR |
| | REDACTED - CONFIDENTIAL |
| 3868 | GERALD WARREN |

## SERVICES

### SMALL BUSINESS PACKAGE

| WIRES | BRF | IRSUM | CNTDISB | BOOKS | EFTPS | LKBOX | ESP | BILLPAY | IRTRAN | LOAN | ACH | STOPS |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| X | X | X | | X | | | X | | X | | | X |

CONFIDENTIAL

BA0072351

CONFIDENTIAL

| Account Number | Account Name | C |
|---|---|---|
| 882 | GREG JONES | PE |
| 9319 | GREG OLSEN | PE |
| | REDACTED - CONFIDENTIAL | |
| 797 | JEVON KEARSE | PE |
| 3343 | JAMAAL ANDERSON | PE |
| 5302 | JACOB BELL | PE |
| 8408 | JACOB BELL | PE |

**REDACTED - CONFIDENTIAL**

| 7383 | KENARD LANG | PE |

**REDACTED - CONFIDENTIAL**

| 2542 | LITO SHEPPARD | PE |
| 7821 | LITO SHEPPARD | |
| | REDACTED - CONFIDENTIAL | |
| 8594 | MARCUS HARRISON | |
| 8596 | MARCUS HARRISON | PE |

**REDACTED - CONFIDENTIAL**

| 9241 | PRO SPORTS FINANCIAL | PE |
| 0831 | PRO SPORTS TRAVEL ACCOUNT | PE |
| 7540 | RAY LEWIS | PE |

**REDACTED - CONFIDENTIAL**

BA0072352



| Account Number | Account Name |
|---|---|
| 0842 | SANTANA MOSS |
| 7409 | SANTANA MOSS |
| 7386 | SANTANA MOSS |
| 8733 | SANTONIO HOLMES |
| 0909 | SANTONIO HOLMES |
| 5185 | SANTONIO HOLMES ENTERPRISES LLC |
| 3742 | WILLIAM BRANDON MERIWEATHER |
| 2112 | TAVARES GOODEN |

REDACTED - CONFIDENTIAL

Message:

Customer Code
REDACTED - CONFIDENTIAL

Customer Name
REDACTED - CONFIDENTIAL

Account List
REDACTED - CONFIDENTIAL

# of Accounts

Date Received
REDACTED - CONFIDENTIAL

Setup Started
REDACTED - CONFIDENTIAL

Setup Completed
REDACTED - CONFIDENTIAL

Charge Account
REDACTED - CONFIDENTIAL

Charge Type
WAIVED

Monthly Fee
$0.00

Date Verified
REDACTED - CONFIDENTIAL

Date Cancelled
REDACTED - CONFIDENTIAL

BFS Conversion Date

ESP Report Type

Package Type

Record # 283

CONFIDENTIAL

BA0072353



EXHIBIT
"D"



Florida's Most Convenient Bank

**Funds Transfer Security Procedure Designation**
**Page 1 of 2**

**DATE:** 5/12/2008

**CUSTOMER:** Pro Sports Financial (Peggy Lee, Erick Carter, Tequilla Harris)

**BRANCH #:** 1010   **ACCOUNT NUMBER(S):** [ REDACTED - CONFIDENTIAL ]

[ REDACTED - CONFIDENTIAL ] 2112   [ REDACTED - CONFIDENTIAL ]

In this Funds Transfer Security Procedure Designation, the undersigned Customer will select the Security Procedure that best suits the Customer, given the Customer's requirements and the type and frequency of funds transfer activity that the Customer wants to use for his/her account(s) at BankAtlantic ("Bank").  The Customer hereby acknowledges and agrees that Bank offered to Customer the procedures described below and that the Customer determined that the procedure selected by Customer is a COMMERCIALLY REASONABLE procedure for the Customer.  Unless otherwise defined herein, terms shall have the same meaning given to them in the Depositor's Agreement which was previously delivered by Bank to, and received by, the Customer, the terms and conditions of which are incorporated herein by reference.  By placing a mark next to a particular designation, Customer selects that designation as the Security Procedure Customer desires to use and agrees to be bound by all Payment Orders issued in his/her name and received and executed by Bank in accordance with such selected Security Procedure and the provisions of the Depositor's Agreement.  If more than one procedure is selected, compliance with any selected alternative is sufficient.

1.   ☒ **CashLink Web Plus (INIT)**           ☐ **CashLink Web (CM)**

a. Payment Orders will be communicated to Bank via BankAtlantic's CashLink.  Customer acknowledges that CashLink can be accessed by any Authorized Person who is in possession of a Customer Identification and Customer Password known only to Customer.  Each Authorized Person may access CashLink only by using his or her own Authorized Identification and user Password.  The Authorized Person's Identification and Password establish an Authorized Person profile which can be used to restrict the authority, dollar amount and account access available to each Authorized Person.  Customer acknowledges that it fully understands the use of CashLink and the nature of the security procedures offered by CashLink.  Customer also acknowledges that the Customer Identification, Customer Password, Authorized Person Identification and Authorized Person Password for access and use of CashLink are strictly confidential and cannot be disclosed by Customer or its Authorized Persons to anyone else.  Customer agrees that it is solely responsible for the establishment and maintenance of adequate procedures to safeguard the CashLink passwords, identifications and other information related thereto and that Customer is solely responsible for the supervision and conduct of its Authorized Persons who are in possession of the Customer Identification, Customer Password, Authorized Person Identification and Authorized Person Password.  Customer covenants that if Customer has reason to believe that any of the CashLink identifications or passwords have become known to any unauthorized person, Customer will immediately notify Bank of such disclosure.

b. Bank will assign a token device to each Authorized Person when the Authorized Person is added to the CashLink system.  The token device generates a random security code which, in turn, creates a unique Passcode that is used when each Authorized Person first logs in.  This Passcode must be presented with each log in request to begin a user session.

**Wire Transfer Amount Limit**

The amounts below indicate the maximum amount in US funds for each wire transfer and the maximum daily amount in US funds that can be sent daily through the CashLink system:

| | Full Written Amount (i.e., Two Hundred Thousand Dollars) | Numerical Amount (i.e., $200,000.00) |
|---|---|---|
| Maximum Single Wire Authorization Amt: (in US Funds) | ONE MILLION DOLLARS | $1,000,000.00 |
| Maximum Daily Wire Authorization Amt: (in US Funds) | ONE MILLION DOLLARS | $1,000,000.00 |

2.   ☐ **Fax Verified Through Telephone Callback and PIN**

Customer will communicate Payment Orders in writing, via fax to the Bank.  Bank will verify each such Payment Order via telephone communication directed to any of the telephone number(s) designated on the PIN Issue Maintenance Form, with a person identifying himself/herself as the Customer or an Authorized Person who shall confirm the authenticity of the Payment Order by reciting Customer's PIN Number.  Customer consents and agrees as follows with reference to the call-back procedure:  (i) Bank's ability to verify a Payment Order will be subject to the availability of telephone link-up; (ii) any telephone charges for the call-back verification may be charged to Customer's Account(s); and (iii) Bank may, at its sole discretion, record the telephone call-back with the Customer who shall confirm the consent to such recording during the communication.

Rev 8



**Florida's Most Convenient Bank**

**Funds Transfer Security Procedure Designation**
Page 2 of 2

**DATE:**    5/12/2008

**CUSTOMER:**    Pro Sports Financial (Peggy Lee, Erick Carter, Tequilla Harris)

**BRANCH #:**    1010    **ACCOUNT NUMBER(S):**    REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL ████2112    REDACTED - CONFIDENTIAL

**SIGNATURE**
If Customer maintains a personal Account at Bank, all persons having signature authority on the Account must sign this document. If Customer maintains a corporate or partnership Account, the signature of an authorized officer, partner, or sole proprietor of the entity with signature authority on the Account must sign this document. Customer agrees to the terms set forth in this document.

By (*Signature*):                          By (*Signature*):

Name (*Print*):    Peggy Lee              Name (*Print*):    Erick Carter

Title:                                    Title:

Date:                                     Date:    5|13|08

By (*Signature*):                         By (*Signature*):

Name (*Print*):    Tequilla Harris         Name (*Print*):

Title:                                    Title:

Date:                                     Date:

This document may be notarized OR the signature can be witnessed by a BankAtlantic associate at the time of signing.

**NOTARY**    State of _____    County of _____

The foregoing instrument was acknowledged before me by _____, this _____ day of _____,
20____. He/She is personally known to me or has produced _____ (describe
the type of photo ID and ID number) as identification.

Notary Name: _____

My Commission Expires: _____

Commission No. _____

Witness my hand and official seal. _____
                                   Notary Public

**OR**

Signature witnessed by _____    at    1020    on    5/14/08
                        Bank Associate           Branch          Date

Bank associate name (printed)    Eric Boos .

Rev 9



**EXHIBIT**

**COMPOSITE**
**"E"**

**Derrick Gaffney**
**\*\*\*\*7441**

| Date | Amount | Type | Payee |
|------|--------|------|-------|
| 12/17/2008 | $80,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 7/13/2009 | $25,000.00 | Official Check | Pro Sports Financial |
| 7/30/2009 | $400,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 7/30/2009 | $50,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 8/5/2009 | $15,000.00 | Withdrawal | Unknown/TBD |
| 8/13/2009 | $50,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 8/13/2009 | $50,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 9/3/2009 | $75,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 9/17/2009 | $250,000.00 | Wire | Blue Devil Partners LLC |
| 10/9/2009 | $170,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 11/4/2009 | $100,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 11/10/2009 | $150,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 11/10/2009 | $75,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 11/23/2009 | $75,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 11/30/2009 | $250,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 1/20/2010 | $7,500.00 | Withdrawal | Unknown/TBD |
| 9/29/2010 | $25,000.00 | Official Check | Pro Sports Financial |
| 12/27/2010 | $35,000.00 | Official Check | Pro Sports Financial |

0046479\159201\1621457v1

**Frank Gore**
**\*\*\*\*7375**

| Date | Amount | Type | Payee |
|---|---|---|---|
| 4/2/2009 | $307,901.00 | Withdrawal/Check | Unknown/TBD |
| 6/2/2009 | $150,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 8/28/2009 | $75,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 9/10/2009 | $100,000.00 | Withdrawal/Check | Unknown/TBD |
| 9/17/2009 | $50,000.00 | Withdrawal/Check | Unknown/TBD |
| 9/18/2009 | $100,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 10/2/2009 | $225,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 10/15/2009 | $350,000.00 | Withdrawal/Check | Unknown/TBD |
| 11/13/2009 | $350,000.00 | Withdrawal/Check | Unknown/TBD |
| 11/18/2009 | $130,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 11/30/2009 | $150,000.00 | Wire | Houston Economic Dev Assoc |
| 12/18/2009 | $200,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 12/18/2009 | $50,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 2/8/2010 | $5,807.10 | Withdrawal/Check | Unknown/TBD |
| 2/19/2010 | $6,432.00 | Withdrawal/Check | Unknown/TBD |
| 4/28/2010 | $40,000.00 | Withdrawal/Check | Unknown/TBD |
| 5/12/2010 | $5,000.00 | Withdrawal/Check | Unknown/TBD |
| 9/16/2010 | $50,000.00 | Check | Brandon Meriwether |
| 9/16/2010 | $50,000.00 | Withdrawal/Check | Unknown/TBD |
| 11/24/2010 | $650,000.00 | Withdrawal/Check | Unknown/TBD |
| 11/30/2010 | $700,000.00 | Withdrawal/Check | Unknown/TBD |
| 12/15/2010 | $200,000.00 | Withdrawal/Check | Unknown/TBD |

0046479\159201\1621676v1

**Jevon Kearse**
**\*\*\*\*7797**

| Date | Amount | Type | Payee |
|------|--------|------|-------|
| 10/24/2008 | $100,000.00 | Wire | Ronnie Gilley Properties |
| 11/10/2008 | $150,000.00 | Wire | Ronnie Gilley Properties |
| 11/12/2008 | $10,500.00 | Withdrawal/Check | Unknown/TBD |
| 11/18/2008 | $80,000.00 | Wire | William Graham |
| 12/1/2008 | $141,528.32 | Withdrawal/Check | Unknown/TBD |
| 12/29/2008 | $25,000.00 | Withdrawal/Check | Pro Sports Financial |
| 1/2/2009 | $20,000.00 | Withdrawal/Check | Pro Sports Financial |
| 2/2/2009 | $44,113.00 | Wire | Troy Bank & Trust |
| 2/2/2009 | $500,000.00 | Wire | Troy Bank & Trust |
| 2/2/2009 | $500,000.00 | Wire | Jevon Kearse |
| 2/4/2009 | $23,154.00 | Withdrawal/Check | Unknown/TBD |
| 2/18/2009 | $12,936.00 | Withdrawal/Check | Unknown/TBD |
| 3/25/2009 | $5,000.00 | Withdrawal/Check | Unknown/TBD |
| 3/31/2009 | $6,000.00 | Check | Julio Araliz |
| 4/10/2009 | $63,229.36 | Withdrawal/Check | Unknown/TBD |
| 5/5/2009 | $9,370.62 | Withdrawal/Check | Unknown/TBD |
| 7/13/2009 | $5,000.00 | Withdrawal/Check | The Network |
| 8/21/2009 | $49,700.00 | Withdrawal/Check | Pro Sports Financial |
| 8/26/2009 | $10,000.00 | Withdrawal/Check | Paradise Enterprises Ltd. |
| 9/24/2009 | $4,880.00 | Withdrawal/Check | Unknown/TBD |
| 9/26/2009 | $4,199.56 | Withdrawal/Check | Unknown/TBD |
| 101/6/2009 | $12,500.00 | Withdrawal/Check | Unknown/TBD |
| 10/21/2009 | $30,000.00 | Withdrawal/Check | Pro Sports Financial |
| 11/6/2009 | $100,000.00 | Wire | JJ&B Group, LLC |
| 2/5/2010 | $5,500.00 | Withdrawal/Check | Unknown/TBD |
| 3/5/2010 | $63,229.36 | Check | Premier Protection Ins. |
| 3/5/2010 | $4,372.11 | Check | CPM Builders LLC |
| 6/14/2010 | $20,000.00 | Check | Pro Sports Financial |
| 6/25/2010 | $10,000.00 | Check | Pro Sports Financial |
| 10/1/2010 | $5,000.00 | Withdrawal/Check | Unknown/TBD |
| 2/11/2011 | $26,089.00 | Check | Siva Kanakamedala |
| 4/13/2011 | $67,818.93 | Withdrawal/Check | Unknown/TBD |

**Kenard Lang**
**\*\*\*\*7383**

| Date | Amount | Type | Payee |
|---|---|---|---|
| 2/2/2009 | $160,362.00 | Wire | Troy Bank & Trust |
| 9/17/2010 | $50,000.00 | Wire | Unknown/TBD |

0046479\159201\1621688v1

**Ray Lewis**
**\*\*\*\*7540**

| Date | Amount | Type | Payee |
|---|---|---|---|
| 10/29/2008 | $200,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 11/18/2008 | $79,940.24 | Withdrawal/Check | Unknown/TBD |
| 11/19/2008 | $125,000.00 | Wire | Pro Sports Capital Mgmt |
| 11/20/2008 | $250,000.00 | Wire | William Graham |
| 12/17/2008 | $250,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 1/15/2009 | $100,000.00 | Wire | William Graham |
| 2/11/2009 | $6,696.78 | Withdrawal/Check | Unknown/TBD |
| 3/11/2009 | $9,000.00 | Withdrawal/Check | Unknown/TBD |
| 3/27/2009 | $5,813.32 | Withdrawal/Check | Unknown/TBD |
| 4/6/2009 | $6,441.71 | Withdrawal/Check | Unknown/TBD |
| 5/5/2009 | $5,237.00 | Withdrawal/Check | Unknown/TBD |
| 6/4/2009 | $25,074.68 | Withdrawal/Check | Unknown/TBD |
| 11/23/2009 | $80,324.52 | Withdrawal/Check | Unknown/TBD |
| 11/24/2009 | $7,269.51 | Withdrawal/Check | Unknown/TBD |
| 2/22/2010 | $5,540.00 | Withdrawal/Check | Unknown/TBD |
| 3/8/2010 | $117,318.13 | Wire | Raymond A. Lewis |

**Santana Moss**
**\*\*\*\*7409**

| Date | Amount | Type | Payee |
|---|---|---|---|
| 11/12/2008 | $50,000.00 | Check | Pro Sports Financial |
| 4/3/2009 | $100,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 5/26/2009 | $500,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 5/26/2009 | $500,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 2/22/2010 | $30,000.00 | Check | Pro Sports Financial |
| 4/9/2010 | $40,000.00 | Wire | Clinton Portis |

0046479\159201\1621694v1

**Clinton Portis**
**\*\*\*\*7532**

| Date | Amount | Type | Payee |
|---|---|---|---|
| 4/14/2009 | $300,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 4/14/2009 | $65,000.00 | Wire | Pro Sports Capital Mgmt |

0046479\159201\1621698v1

**Lito Sheppard**
**\*\*\*\*7821**

| Date | Amount | Type | Payee |
|---|---|---|---|
| 10/29/2008 | $100,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 11/10/2008 | $15,000.00 | Wire | Lit Sheppard |
| 11/26/2008 | $60,000.00 | Wire | William Graham |
| 2/3/2009 | $87,932.00 | Wire | Troy Bank & Trust |
| 10/28/2009 | $250,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 11/4/2009 | $100.000.00 | Wire | Ronnie Gilley Properties, LLC |
| 12/17/2009 | $150,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 12/18/2009 | $150,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 1/19/2010 | $7,500.00 | Wire | Lito Sheppard |
| 1/22/2010 | $40,000.00 | Check | Pro Sports Financial |
| 5/24/2010 | $170,000.00 | Check | CWG Trust |
| 9/27/2010 | $25,000.00 | Check | Pro Sports Financial |
| 1/28/2011 | $18,000.00 | Check | Pro Sports Financial |
| 1/28/2011 | $12,500.00 | Check | Pro Sports Financial |

**Fred Taylor**
**\*\*\*\*7813**

| Date | Amount | Type | Payee |
|---|---|---|---|
| 10/31/2008 | $500,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 2/2/2009 | $500,000.00 | Withdrawal/Check | Unknown/TBD |
| 2/2/2009 | $500,000.00 | Withdrawal/Check | Unknown/TBD |
| 2/2/2009 | $319,460.00 | Withdrawal/Check | Unknown/TBD |
| 12/1/2009 | $200,000.00 | Wire | Houston Economic Development Assoc. |
| 3/6/2009 | $12,500.00 | Check | Pro Sports Financial |
| 10/26/2009 | $39,000.00 | Check | Ronnie Gilley Properties, LLC |
| 1/13/2011 | $40,000.00 | Check | Pro Sports Financial |

0046479\159201\1621704v1



**Jamaal Anderson**
**\*\*\*\*9343**

| Date | Amount | Number or Type | Payee |
|---|---|---|---|
| 12/5/2007 | $ 10,000.00 | Withdrawal/Check | Unknown/TBD |
| 12/20/2007 | $ 25,000.00 | Withdrawal/Check | Unknown/TBD |
| 12/20/2007 | $ 25,000.00 | Withdrawal/Check | Unknown/TBD |
| 3/26/2008 | $ 8,000.00 | Withdrawal/Check | Unknown/TBD |
| 3/26/2008 | $ 8,000.00 | Withdrawal/Check | Unknown/TBD |
| 4/21/2008 | $ 10,800.00 | Withdrawal/Check | Unknown/TBD |
| 5/22/2008 | $ 30,000.00 | Withdrawal/Check | Unknown/TBD |
| 6/13/2008 | $ 300,000.00 | Withdrawal/Check | Unknown/TBD |
| 7/3/2008 | $ 10,460.02 | Withdrawal/Check | Unknown/TBD |
| 7/14/2008 | $ 6,700.00 | Withdrawal/Check | Unknown/TBD |
| 9/10/2008 | $ 100,000.00 | Wire | Ronnie Gilley Properties |
| 9/16/2008 | $ 6,319.15 | Withdrawal | Unknown/TBD |
| 9/18/2008 | $ 40,874.80 | Withdrawal/Check | Unknown/TBD |
| 10/10/2008 | $ 8,000.00 | Withdrawal/Check | Unknown/TBD |
| 10/20/2008 | $ 6,427.78 | Withdrawal/Check | Unknown/TBD |
| 12/22/2008 | $ 6,615.00 | Withdrawal/Check | Unknown/TBD |
| 4/17/2009 | $ 12,000.00 | Withdrawal/Check | Unknown/TBD |
| 4/24/2009 | $ 300,000.00 | Wire | Ronnie Gilley Properties |
| 4/24/2009 | $ 200,000.00 | Wire | Ronnie Gilley Properties |
| 4/24/2009 | $ 150,000.00 | Wire | Unknown/TBD |
| 4/29/2009 | $ 8,000.00 | Wire | Unknown/TBD |
| 4/29/2009 | $ 79,000.00 | Withdrawal | Unknown/TBD |
| 4/29/2009 | $ 21,000.00 | Withdrawal | Unknown/TBD |
| 4/30/2009 | $ 150,000.00 | Wire | Unknown/TBD |
| 4/27/2009 | $ 7,200.00 | Withdrawal | Unknown/TBD |
| 4/29/2009 | $ 8,000.00 | Wire | Unknown/TBD |
| 5/29/2009 | $ 100,000.00 | Wire | Ronnie Gilley Properties |
| 6/2/2009 | $ 500,000.00 | Wire | Ronnie Gilley Properties |
| 7/29/2009 | $ 12,000.00 | Withdrawal/Check | Unknown/TBD |
| 9/29/2009 | $ 7,000.00 | Withdrawal/Check | Unknown/TBD |
| 11/18/2009 | $ 200,000.00 | Wire | Ronnie Gilley Properties |
| 12/1/2009 | $ 10,000.00 | Withdrawal/Check | Unknown/TBD |
| 12/18/2009 | $ 20,000.00 | Withdrawal/Check | Unknown/TBD |
| 12/18/2009 | $ 100,000.00 | Wire | Ronnie Gilley Properties |
| 1/22/2010 | $ 10,000.00 | Withdrawal/Check | Unknown/TBD |
| 2/5/2010 | $ 20,000.00 | Check | CASH for pickup by Matthew Culjar |
| 2/12/2010 | $ 10,000.00 | Withdrawal/Check | Unknown/TBD |
| 3/24/2010 | $ 8,000.00 | Withdrawal/Check | Unknown/TBD |
| 4/5/2010 | $ 12,000.00 | Withdrawal/Check | Unknown/TBD |
| 9/21/2010 | $ 20,000.00 | Withdrawal/Check | Unknown/TBD |

1

| 10/5/2010 | $ | 20,000.00 | Withdrawal/Check | Unknown/TBD |
|---|---|---|---|---|
| 10/13/2010 | $ | 11,300.00 | Wire | Pankas Holdings |
| 10/25/2010 | $ | 15,000.00 | Withdrawal/Check | |
| 11/15/2010 | $ | 515,980.33 | Withdrawal/Check | |
| 11/19/2010 | $ | 20,000.00 | Withdrawal/Check | |
| 12/13/2010 | $ | 20,000.00 | Withdrawal/Check | |
| 3/25/2011 | $ | 45,000.00 | Wire | Unknown/TBD |
| 4/21/2011 | $ | 250,000.00 | Wire | KT Capital |

2

**Jacob Bell**
**\*\*\*\*8408**

| Date | Amount | Number or Type | Payee |
|------|--------|----------------|-------|
| 10/31/2008 | $ 15,000.00 | Check | Pro Sports Financial (no authorization produced) |
| 11/4/2008 | $ 75,000.00 | Check | Pro Sports Financial (no authorization produced) |
| 11/5/2008 | $ 500,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 12/9/2008 | $ 60,000.00 | Withdrawal/ Check | Unknown/TBD |
| 9/17/2009 | $ 250,000.00 | Wire | Blue Devil Partners, LLC |
| 10/2/2009 | $ 250,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 10/21/2009 | $ 250,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 11/13/2009 | $ 50,085.00 | Withdrawal/ Check | Unknown/TBD |
| 11/13/2009 | $ 50,085.00 | Withdrawal/ Check | Unknown/TBD |
| 12/18/2009 | $ 200,000.00 | Wire | Ronnie Gilley Properties, LLC |

0046479\159201\1621717v1

**Tavares Gooden**
******2112**

| Date | Amount | Type | Payee |
|---|---|---|---|
| 11/5/2008 | $  20,000.00 | Check | Jose Anabor (no authorization produced) |
| 11/7/2008 | $  20,000.00 | Check | Jose Anabor (no authorization produced) |
| 12/18/2008 | $    5,000.00 | Wire | Unknown/TBD |
| 2/9/2009 | $    8,000.00 | Wire | Unknown/TBD |
| 4/7/2009 | $  20,000.00 | Wire | Unknown/TBD |
| 7/20/2009 | $ 100,000.00 | Wire | Ronnie Gilley Properties LLC |

1

**Santonio Holmes**
**\*\*\*\*8733**

| Date | Amount | Type | Payee |
|---|---|---|---|
| 7/18/2008 | $ 400,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 1/5/2009 | $ 100,000.00 | Wire | Ronnie Gilley Properties, LLC |
| 11/10/2009 | $ 125,000.00 | Wire | Ronnie Gilley Properties, LLC |

**Brandon Meriweather**
**\*\*\*\*3742**

| Date | Amount | Number or Type | Payee |
|---|---|---|---|
| 6/18/2008 | $ 400,000.00 | Wire | Ronnie Gilley Properties LLC |
| 6/23/2008 | $ 400,000.00 | Wire | Ronnie Gilley Properties LLC |
| 9/12/2008 | $ 100,000.00 | Wire | Ronnie Gilley Properties LLC |
| 10/29/2008 | $ 20,000.00 | Withdrawal/ Check | Unknown/TBD |
| 12/23/2008 | $ 15,340.63 | Withdrawal/ Check | Unknown/TBD |
| 1/29/2009 | $ 3,800.00 | Withdrawal/ Check | Jeff Rubin |
| 2/26/2009 | $ 35,000.00 | Check | Pro Sports Financial |
| 3/3/2009 | $ 100,000.00 | Wire | Ronnie Gilley Properties LLC |
| 3/12/2009 | $ 250,000.00 | Wire | William Graham |
| 3/24/2009 | $ 100,000.00 | Wire | Ronnie Gilley Properties LLC |
| 9/25/2009 | $ 40,000.00 | Withdrawal/ Check | Pro Sports Financial |
| 10/29/2009 | $ 20,000.00 | Withdrawal/ Check | Pro Sports Financial |
| 6/3/2010 | $ 13,500.00 | Wire | Pankas Holdings LLC |
| 6/3/2010 | $ 6,500.00 | Withdrawal/ Check | Jeff Rubin |
| 8/10/2010 | $ 25,000.00 | Wire | Jeff Rubin |
| 9/16/2010 | $ 32,605.00 | Wire | Pankas Holdings LLC |
| 10/1/2010 | $ 10,000.00 | Wire | Pankas Holdings LLC |
| 10/8/2010 | $ 5,000.00 | Wire | Jeff Rubin |
| 4/19/2011 | $ 1,000.00 | Wire | Jeff Rubin |
| 4/19/2011 | $ 1,000.00 | Wire | Pankas Holdings LLC |

**Gerard Warren**
**\*\*\*\*9869**

| Date | Amount | Type | Payee |
|---|---|---|---|
| 2/19/2006 | $ 7,000.00 | Withdrawal | Unknown/TBD |
| 12/20/2007 | $ 43,998.87 | Withdrawal/Check | Unknown/TBD |
| 12/28/2007 | $ 5,033.83 | Withdrawal/Check | Unknown/TBD |
| 1/16/2008 | $ 9,000.00 | Withdrawal/Check | Unknown/TBD |
| 7/23/2008 | $ 400,000.00 | Withdrawal/Check | Unknown/TBD |
| 9/17/2008 | $ 100,000.00 | Withdrawal/Check | Unknown/TBD |
| 1/5/2009 | $ 8,000.00 | Withdrawal/Check | Unknown/TBD |
| 1/12/2009 | $ 5,000.00 | Withdrawal/Check | Unknown/TBD |
| 1/26/2009 | $ 300,000.00 | Wire | US Bank |
| 1/28/2009 | $ 400,000.00 | Wire | Ronnie Gilley Properties |
| 1/29/2009 | $ 40,000.00 | Wire | US Bank |
| 2/11/2009 | $ 6,000.00 | Withdrawal | Unknown/TBD |
| 2/20/2009 | $ 200,000.00 | Wire | Ronnie Gilley Properties |
| 4/20/2009 | $ 5,000.00 | Withdrawal | Unknown/TBD |
| 4/27/2009 | $ 11,005.00 | Withdrawal | Unknown/TBD |
| 7/3/2009 | $ 8,000.00 | Withdrawal | Unknown/TBD |
| 10/23/2009 | $ 250,000.00 | Wire | Ronnie Gilley Properties |
| 11/12/2009 | $ 100,000.00 | Wire | Ronnie Gilley Properties |
| 2/1/2010 | $ 15,000.00 | Withdrawal | Unknown/TBD |
| 5/21/2010 | $ 8,000.00 | Withdrawal | Unknown/TBD |
| 4/11/2011 | $ 10,000.00 | Withdrawal | Unknown/TBD |
| 4/15/2011 | $ 10,000.00 | Withdrawal | Unknown/TBD |
| 4/22/2011 | $ 5,000.00 | Withdrawal | Unknown/TBD |
| 5/2/2011 | $ 5,000.00 | Withdrawal | Unknown/TBD |
| 5/13/2011 | $ 8,000.00 | Withdrawal | Unknown/TBD |
| 5/27/2011 | $ 5,000.00 | Withdrawal | Unknown/TBD |

# Personal Account Depositor's Agreement & Disclosure Statements

Effective August 15, 2006

**Open 7 days a week.**

**BankAtlantic**

Florida's Most Convenient Bank

EXHIBIT

"G"

# Table of Contents

GENERAL INFORMATION ........................................................................ 3
  Amendment and Termination .................................................................. 3
  Legal Process Against Account ................................................................ 3
  Our Liability .......................................................................................... 4
  Setoff ................................................................................................... 4
  Mediation .............................................................................................. 4
  Applicable Law and Forum ...................................................................... 4

OPENING AN ACCOUNT/OWNERSHIP ......................................................... 5
  Date Account Opened ............................................................................ 5
  Deposit Accounts .................................................................................. 5
  Important Information About Procedures
    for Opening a New Account .................................................................. 5
  Notice of Negative Information ............................................................... 5
  Security and Safety Measures ................................................................ 6
  Identity Theft Assistance ....................................................................... 6
  ATM Safety ........................................................................................... 7
  Ownership of Accounts and Beneficiary Designation .................................. 8
  Death or Incompetency .......................................................................... 10
  Transferring Ownership .......................................................................... 11

ACCOUNT ACTIVITY ................................................................................ 11
  Your Liability ........................................................................................ 11
  Deposits ............................................................................................... 11
  Foreign Currency .................................................................................. 12
  Return of Direct Deposit ........................................................................ 12
  Remotely Created Checks ...................................................................... 12
  Withdrawals, Checks and Other Items ..................................................... 12
  Items Resulting from Voluntary Disclosure ............................................... 13
  Restrictive Legends ............................................................................... 13
  Signatures ............................................................................................ 13
  Freezing Your Account ........................................................................... 14
  Multiple Signers .................................................................................... 14
  Stop Payments ..................................................................................... 14
  Transfer of Funds ................................................................................. 15
  Dormant Accounts ................................................................................ 15
  Closing an Account ................................................................................ 15
  Fees ..................................................................................................... 15
  Statements ........................................................................................... 15
  Notice of Withdrawal ............................................................................. 16

DISCLOSURE STATEMENTS ...................................................................... 17
  Funds Availability Policy ........................................................................ 17
  Substitute Checks and Your Rights ......................................................... 18
  Insufficient Funds & Overdrafts .............................................................. 19
  Electronic Funds Transfers ..................................................................... 20
  Wire Transfer Transactions .................................................................... 25
  ACH Transactions .................................................................................. 29
  Miscellaneous ....................................................................................... 30
  Important Tax Information ...................................................................... 31
  BankAtlantic Privacy Policy for Customers ............................................... 32

OPT OUT FORM ..................................................................................... 35

## GENERAL INFORMATION

This Deposit Account Agreement and Disclosure contains the terms and conditions governing all of your deposit accounts with BankAtlantic ("Accounts"), or any of our predecessors and replaces and supersedes any previous Agreements pertaining to the same subject matter. As used in this document, the term "Agreement" means this document, the signature card, a rate and fee schedule (which may be in the form of a Rate and Fee Schedule, Time Certificate of Deposit, or Confirmation of Time Deposit, hereinafter called the "Schedule of Charges"), Truth in Savings Disclosures, ACH Transactions Disclosures, Website Terms and Conditions, Online Banking and Bill Pay Terms and Conditions, as applicable. Unless it would be inappropriate to do so, words and phrases used in this document should be construed so that the singular includes the plural and the plural includes the singular. The words "we", "our", "us," or "the bank" mean BankAtlantic, and the words "you," "your," "customer" or "customers" mean the account holder(s). Each of you signing the signature card for an Account acknowledges receipt of the Agreement, and agrees to the terms and conditions set forth in the Agreement, as amended from time to time. You agree that we may waive, in our sole discretion, any fee, charge, term, or condition set forth in this Agreement at the time the Account is opened or subsequent thereto, or on a one-time basis or for any period of duration, without changing the terms of the Agreement or your obligation to be bound by the Agreement, and we are not obligated to provide similar waivers in the future or waive our rights to enforce the terms of this Agreement. Most of the relationship with you is regulated by state and Federal law, especially the laws relating to:

1. Negotiable instruments;
2. Methods of transferring property upon death and the rights of surviving spouses and dependents;
3. Estate and other succession taxes;
4. Electronic funds transfer;
5. Availability of deposited funds; and
6. Clearing House operating rules for National Automated Clearing House Association (NACHA) and the local Automated Clearing House (ACH).

This body of law is too large and complex to be reproduced here. The purpose of the following information is to:

1. Summarize and establish the rules applicable to the more common transactions or circumstances which the law does not regulate, and
2. Establish rules for certain events or transactions which the law already regulates but permits variation by agreement.

### Amendments and Termination

We may amend the terms and conditions in the Agreement, including our Schedule of Charges. Unless otherwise required by law, we may amend the Agreement without prior notice to you. If we choose to notify you or we are required by law to notify you of changes to the Agreement, we may post notice in our branches, on our Website, or mail or deliver a notice, a statement message, or an electronic message to you at the last address we have for you on file. Your continued use of your Account after the effective date of any amendment will constitute your acceptance of the terms of the amendment. You may terminate the Agreement and your Account at any time upon notice to us. We may require such notice be given in writing or in person. We may terminate this Agreement and close your Account at any time by giving notice and mailing the account balance to you. Notice from us to any one of you is notice to all of you. We will have no responsibility for items which we do not pay after an Account has been closed.

### Legal Process Against Account

If we are served with any court order or similar process, or if we are required to suspend payment by any law or regulation including, but not limited to, those issued by the Office of Foreign Assets Control or FinCEN, we may

3

## Our Liability

## Setoff

## Mediation

## Applicable Law and Forum

## OPENING AN ACCOUNT; OWNERSHIP

### Date Account Opened

### Deposit Accounts

### Important Information About Procedures for Opening a New Account

### Notice of Negative Information

## Security and Safety Measures

## Identity Theft Assistance

## ATM Safety

## Ownership of Accounts and Beneficiary Designation

### Freezing Your Account

### Multiple Signers

### Stop Payments

14

### Transfer of Funds

### Dormant Accounts

### Closing an Account

### Fees

### Statements

15

## Substitute Checks and Your Rights

### A. What is a substitute check?

### Insufficient Funds and Overdrafts

more information.
(3) Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within ten (10) business days.

We will determine whether an error occurred within ten (10) business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to forty-five (45) days to investigate your complaint or question. If we decide to do this, we will credit your account within ten (10) business days for the amount you believe is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within ten (10) business days, we may not credit your account.

For errors involving new accounts, point-of-sale, or foreign-initiated transactions, we may take up to ninety (90) days to investigate your complaint or question. For new accounts, we may take up to twenty (20) business days to credit your account for the amount you believe is in error.

We will tell you the results within three (3) business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

L. Foreign Currency Conversion
If you use your card to obtain cash or to purchase goods or services in a foreign currency, the amount of the charge in foreign currency will be converted into a U.S. dollar amount by the applicable network using the network's procedures in effect at the time the transaction is processed. Conversion to US dollars may occur on a date other than the date of the transaction or the posting date; therefore the currency conversion rate may be different from the conversion rate in effect on the transaction date or the posting date. You understand that we do not determine the currency conversion rate that is used, and we do not receive any portion of the currency conversion rate.

M. Preauthorization of Holds
When you use your card at a point of sale location or when you use your BankAtlantic Debit Card or other network enhancement features of the card to obtain goods or services or to obtain cash, the merchant may attempt to obtain preauthorization from us for the transaction. We will place a hold on available funds in your account for the amount of the preauthorization request (which may vary in some cases from the actual purchase depending on the merchant's request). If the preauthorization request varies by more than 20% from the amount of the actual transaction, payment of the transaction may not remove the hold, which may remain on the account until three (3) business days have expired. This hold may affect the availability of funds from your deposit account to pay checks or for other electronic funds transfers. We will not be responsible for damages for wrongful dishonor if any item is not paid because of the hold.

N. Other EFT Transactions
You may access certain account(s) you maintain with us by other EFT transaction types as described below.

Electronic Check Conversion. You may authorize a merchant to use your check as a source of information to initiate an EFT from your account. Electronic check conversion is a payment process in which a merchant (after obtaining your authorization) uses your check to gather routing, account, and check number information to initiate a one-time EFT from your Account or to process the payment as a check transaction. This type of EFT transaction involving a consumer account is covered by the Electronic Funds Transfer Act and this disclosure. A description of the transaction will appear on your statement.

Re-presented Check Transaction and Fees. You may authorize a merchant to electronically collect a fee associated with the re-presentment of a check that is returned due to insufficient or unavailable funds. The resulting fee transaction if debited as an EFT from a consumer account is covered by the Electronic Funds Transfer Act and this disclosure. When a merchant re-presents a check electronically, that transaction is not covered by the Electronic Funds Transfer Act or this disclosure. A description of the transaction will appear on your statement.

## Wire Transfer Transactions

This section applies to any Transfer of funds through FedWire or through a similar wire transfer system that is used primarily for transfers between financial institutions or between businesses. For these transactions, this section sets forth those rules and conditions which shall, at all times, govern all wire transfer transactions effectuated by customers (the "Customer[s]") of BankAtlantic ("Bank") through Customer accounts at Bank. This section does not apply to transactions governed by the Electronic Funds Transfer Act, Federal Reserve Board Regulation E, or transfers by check, draft or other written item.

1. Definitions. Except as otherwise defined below, the terms used herein shall have the meaning assigned to them by Uniform Commercial Code, Article 4A, Funds Transfer, Chapter 670, Florida Statutes, or if none, by the Federal Reserve Board's Regulation J.

(a) "Authorized Person" means an authorized signatory on the Account as reflected by the Agreement and signature card for the Account who is authorized to initiate Transfers from the Account and who is authorized to confirm Payment Orders given to us subject to the applicable security procedure.

(b) "Available Funds" means funds on deposit in an Account and available for withdrawal pursuant to the Agreement.

(c) "CashLink" means BankAtlantic's browser based service which provides business customers with an array of cash management services. CashLink is connected to BankAtlantic's wire transfer system and is a method of transmitting Payment Orders. CashLink is available only to certain of BankAtlantic's corporate business customers.

(d) "PIN Number" means a confidential personal identification number provided by Bank to Customer for use in verifying payment orders transmitted by Customer to Bank.

(e) "Payment Order" means a request (written or electronic) from an Authorized Person directing Bank to initiate a Transfer, or cancellation or amendment from an Account.

(f) "Standing Payment Order" means a Payment Order instructing that a certain amount be Transferred to a certain Beneficiary at regular intervals without any variation in the amount of funds transmitted, the identity of the beneficiary to whom the funds are transmitted or the interval at which the funds are transmitted.

(g) "Transfer" means a transfer of funds from an Account by FedWire, SWIFT, telex, computer terminal, electronic or other means, but excluding transfers made through the ACH system, as defined by the operating rules of the National Automated Clearing House Association.

2. Disclaimers. NOTHING SET FORTH HEREIN SHALL OBLIGATE BANK TO ACCEPT AND EXECUTE A PAYMENT ORDER, OR THE CANCELLATION OR AMENDMENT THEREOF, AND BANK SHALL ONLY BE DEEMED TO HAVE ACCEPTED A PAYMENT ORDER, OR THE CANCELLATION OR AMENDMENT THEREOF, UPON ITS EXECUTION THEREOF. BANK SHALL HAVE NO OBLIGATION OR RESPONSIBILITY TO DETECT ERRORS CONTAINED IN A PAYMENT ORDER, AND CUSTOMER CONFIRMS THAT THE SECURITY PROCEDURE (HEREINAFTER DESCRIBED) IS NOT DESIGNED TO ALLOW THE BANK TO DETECT ERRORS.

you believe we have failed to properly credit a transfer to you, you agree to promptly notify in writing your account officer, a banking representative at the banking center where you do your principal business or our Sales & Customer Service Center of all the relevant facts.

(b) Any credit we give you resulting from an ACH credit entry is provisional until we receive final payment. If we do not receive final payment of the credit to your Account by midnight, you agree that we may reverse the credit to your Account or that you will otherwise reimburse us if funds in your Account are not sufficient. If we receive satisfactory documentation that a credit was made in error or for an erroneous amount, we may debit your account for the amount erroneously credited, or you agree to otherwise reimburse us if funds in your Account are insufficient. In the event that the payment does not become final, the originator will not be deemed to have paid you the amount of the credit.

(c) If you are entitled to compensation for the delay or improper completion of an ACH entry as a result of our error, our liability will be limited to the payment of interest which shall be calculated on the basis of the average Federal Funds rate of the Federal Reserve Bank of New York, computed on the basis of a 365-day year and shall be remitted for a period not exceeding the lesser of sixty (60) days or the period between the date of the error and the date of correction. Any such compensation will be paid at our discretion by either (1) providing a balance earnings credit to your authorized account; or (2) making a direct payment to your authorized account. If the withdrawable credit balance during this period falls below the amount of the ACH entry, the amount of interest will be adjusted accordingly. Notwithstanding the foregoing, no compensation will be due if the authorized account is an interest bearing account in the event the bank rejects or fails to execute a request.

(d) You agree that payment for ACH may be made solely by reference to the account number of the recipient. Neither we nor any other financial institution making or receiving such payments are obligated to determine whether a discrepancy exists between the name and the account number shown on the transfer information.

## Miscellaneous

1. Force Majeure. Without limiting the generality of other provisions of this Agreement, Bank shall not be liable to Customer for any failure, omission, delay, interruption or error in the performance of the terms, covenants, and conditions of this Agreement, due to any causes or circumstances beyond the control of Bank, including, without limitation, bank moratoriums, currency restrictions, acts of God, public enemy, or superior governmental authority, mechanical, computer, telecommunication or electrical failures, etc. The obligations, if any, of Bank with respect to any funds transfer, or the return of funds to the originator or sender thereof, shall be suspended while any of the conditions or circumstances described above exist.

2. Authority and Enforceability. Customer confirms to Bank that (a) it is duly organized and in good standing under the laws of its jurisdiction; (b) it has the power and authority to enter into this Agreement and to perform all of its obligations hereunder; and (c) this Agreement has been duly authorized and is the legal, valid and binding obligation of the Customer.

3. Modification. The provisions of this Agreement may, at any time or times, be unilaterally modified or supplemented by Bank after providing Customer with such notice thereof as may be required by applicable law; otherwise, no modification of this Agreement or any covenant or condition therein shall be valid unless in writing, duly signed by all of the parties hereto.

4. Other Agreements. The terms and conditions of this Agreement are in addition to and do not modify or otherwise affect the terms and conditions of any other Agreement between the parties hereto. However, if this Agreement conflicts with any provisions of any prior Agreement between the parties, then the terms of this Agreement shall prevail.

5. Severability. The inapplicability or unenforceability of any provision of this Agreement shall not limit or impair the operation or validity of any other provision hereof.

6. Captions. The use of captions and/or headings in this Agreement are for convenience only and are not part of this Agreement; accordingly, they shall not affect the meaning or interpretation of any provisions hereof.

7. Waiver. A waiver by Bank of any of the provisions of this Agreement shall not be effective unless it is in writing and signed by Bank. Any such waiver shall pertain only to the particular circumstances for which it is given and shall not constitute a future waiver of the same or any other provisions of this Agreement.

8. Completeness. This Agreement constitutes the entire Agreement between the parties hereto on the matters set forth herein, and it supersedes all other prior or contemporaneous Agreements or understanding on such matters.

9. Successors & Assignment. This Agreement shall be binding upon the heirs, successors in interest and assigns of the parties hereto; Notwithstanding the foregoing, the rights and privileges of the Customer under this Agreement shall not be assignable by the Customer without the prior written consent of Bank, and any assignment by the Customer without such prior written consent shall be null and void.

10. Binding Effect/Signatures. This Agreement shall remain in full force and effect unless subsequently terminated by either of the parties hereto in accordance with the provisions of this Agreement. Neither the signature of Bank nor that of the Customer shall be required on this Agreement to give force and effect thereto.

11. Waiver of Trial by Jury. The parties hereto hereby knowingly, voluntarily and intentionally waive any rights they may have to a trial by jury in any suit, action, proceeding or litigation in any court with respect to, or in connection with, arising out of, or otherwise related to, this Agreement and its subject matter, any funds transfer transaction effectuated by Customer through Bank, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party hereto or relevant to the transactions contemplated hereby. This provision is a material inducement for all the parties hereto to enter this Agreement.

## Important Tax Information

The Internal Revenue Service (IRS) requires us to obtain the Taxpayer Identification Number (TIN) applicable to an account. For individuals, this is your Social Security Number (SSN) if you are eligible for an SSN. If you are not eligible for an SSN, this is your Individual Taxpayer Identification Number (ITIN).

For legal entities, this is your Employer Identification Number (EIN). IRS regulations require us to certify under penalty of perjury that the TIN provided is correct and they are not subject to backup withholding. This certification is completed on our signature card, a similar substitute W-9 or on an IRS Form W-9 Request for Taxpayer Identification Number and Certification. If this information is not provided, we are required to withhold a percent of the interest earned on the account, referred to as "backup withholding."

Additionally, the IRS may assess a fine for not complying with its requirements. Nonresident Aliens – For an account to be classified as a nonresident alien account, all owners of the account must certify their foreign status at the time the account is opened on a substitute W-8 BEN or on IRS Form W-8 BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding. Nonresident aliens must re-certify their foreign status every third (3) years. If all owners do not re-certify, we are required to withhold a percent of the interest earned on the account. Funds remitted to the IRS as backup withholding are non-refundable.

## OPT OUT FORM

We may share information about you among the BankAtlantic family of companies and/or outside the BankAtlantic family of companies, unless you instruct us otherwise. BankAtlantic offers you the opt out choices listed below concerning this sharing of information. If you decide that you want to choose either or both of these options, please complete the appropriate selection(s) below. If, at a later time, you wish to change these opt out selections, you may do so. Please include your identifying information and notify us as follows:

BankAtlantic
P.O. Box 8097
Fort Lauderdale, Florida 33310-8097

Opting out may cause you to no longer receive exclusive offers and other promotional materials that may be of interest to you. We will process your opt out selection as soon as reasonably practical. If you have multiple BankAtlantic accounts, we will follow your instructions for each personal account covered by this Notice. Your opt out choices will also apply to other individuals who are joint account holders. If these individuals have separate accounts, your opt out will apply to those separate accounts.

Note: If you opt out, you may still receive offers with your account statements, when you contact us and in connection with the maintenance and servicing of your account relationship.

*Please Print Clearly*

_____
Name

_____
Address

_____
City State Zip Code

_____
Account Number (please provide one valid account number)

### Opt Out Selection(s):

Please print clearly in blue or black ink, if any information on this form is inaccurate, incomplete, or illegible, we may not be able to process your request. Remember, by opting out, you may not receive information about new services or special promotions for which you may be eligible.

❑ Do not share nonpublic personal information about me with nonaffiliated third parties, except as provided in this Privacy Policy.

❑ Do not share nonpublic personal information about me among BankAtlantic's family of companies, except as provided in this Privacy Policy.

35

For more information, call 1-888-7-DAY-BANK,
visit BankAtlantic.com or stop by a branch near you.

Hearing/Speech Impaired
Florida Relay 1-800-955-8771

Open 7 days a week.



Florida's Most Convenient Bank



© 2006 BankAtlantic

**BankAtlantic**

Florida's Most Convenient Bank

**LIMITED DURABLE POWER OF ATTORNEY**

By this Limited Power of Attorney, I _Santana Moss_ of _Broward_ County, Florida do hereby this _12_ day of _April_, 2007 appoint _Erick Jay Carter_ as my attorney-in-fact to manage my affairs as set forth below.

This Limited Durable Power of Attorney shall not be affected by any physical or mental disability that I may suffer except as provided in Section 709.08, Fla. Stat. and shall be exercisable from this date. All acts done by my attorney-in-fact pursuant to this power, shall bind me, my heirs, devisees and personal representatives. This Power of Attorney is non-delegable.

Only the following property and interest in property are subject to this durable Power of Attorney. I authorize my attorney-in-fact to:

1. Enter any safe deposit box or other place of safekeeping standing in my name alone or jointly with another at any BankAtlantic office and to remove the contents, to make additions, substitutions and replacements.

2. Draw, accept, indorse or otherwise deal with any checks or other commercial or mercantile instruments specifically including the right to make withdrawals from and deposits to the following accounts maintained by me at BankAtlantic:

Account Number _OC_ _____ Account Number _____ Account Number _____

3. Do anything regarding my interest in such accounts as I could do myself, including the amendment or alteration of the title to any of the above-referenced accounts.

4. This Power of Attorney shall not extend to any matter or account not specifically set forth herein. The powers conferred upon my attorney-in-fact extend only to all of my right, title and interest in the above-referenced safe deposit boxes and accounts in which I may have an interest jointly with any other person whether by an estate, by the entirety, joint tenancy and trusts or tenancy in common.

5. I hereby confirm all acts of my attorney-in-fact pursuant to this power. Any act that is done under this power between the revocation of this instrument and the time notice of such revocation is received by my attorney-in-fact shall be valid unless the person(s) claiming benefit of the act or has actual notice of such revocation.

IN WITNESS WHEREOF I have set my hand and seal this _12_ day of _April_, 2007.

Witness _____    Witness _____
Print Name _Steven Johnson_    Print Name _Shari Tingling_

_____
Grantor's Signature

STATE OF FLORIDA, COUNTY OF _Broward_

The foregoing instrument was acknowledged before me this _2_ day of _May_, 20_07_ by _____ who is personally known to _TEQUILA HARRIS_ as identification.

Comm# DD537297
Expires 2/24/2011
Florida Notary Assn., Inc.

_____
NOTARY PUBLIC
My Commission Expires:

**REVOCATION**

I _____ hereby revoke the above Power of Attorney and hereby terminate the authority of my attorney-in-fact to act on my behalf. IN WITNESS WHEREOF I set my hand and seal this ____ day of _____, 2___.

_____
Grantor's Signature

STATE OF FLORIDA COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2___ by _____ who is personally known to me or has produced _____ as identification.

_____
NOTARY PUBLIC
My Commission Expires:

10/27/2006

**EXHIBIT**

"H"



# PRO SPORTS FINANCIAL, INC

## FACSIMILE TRANSMITTAL SHEET

| TO:<br>Dawn | FROM:<br>Peggy Lee |
|---|---|
| COMPANY:<br>Bank Atlantic | DATE:<br>1/29/09 |
| FAX NUMBER:<br>954-523-2217 | PAGES INCLUDING COVER:<br>1 |
| PHONE NUMBER:<br>954-733-0907 | SENDER'S PHONE NUMBER:<br>954-834-0996 |
| RE:  BRANDON MERIWEATHER | SENDER'S FAX NUMBER:<br>954-834-0126 |

Nikki or Cliff

Please transfer from the account of Brandon Meriweather, A/C# ▇▇3742, $3800, to the account of Jeff
Rubin # ▇▇1464.

Ref: "reimb for tuition"
THANKS

Peggy



**EXHIBIT**

tabbies

**COMPOSITE
"I"**

CONFIDENTIAL



# PRO SPORTS FINANCIAL, INC

## FACSIMILE TRANSMITTAL SHEET

| TO:<br>Dawn | FROM:<br>Peggy Lee |
|---|---|
| COMPANY:<br>Bank Atlantic | DATE:<br>2/26/09 |
| FAX NUMBER:<br>954-523-2217 | PAGES INCLUDING COVER:<br>1 |
| PHONE NUMBER:<br>954-733-0907 | SENDER'S PHONE NUMBER:<br>954-834-0996 |
| RE:  BRANDON MERIWEATHER | SENDER'S FAX NUMBER:<br>954-834-0126 |

Nikki or Cliff

Please transfer from the account of Brandon Meriweather, A/C# ▮▮▮3742, $35,000, to the account of Pro Sports, A/C# ▮▮▮9241.

Ref:  Prof Mgmt Fee

THANKS

Peggy

CONFIDENTIAL



# PRO SPORTS FINANCIAL, INC

---

### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: Dawn | FROM: Peggy Lee |
| COMPANY: Bank Atlantic | DATE: 6/3/10 |
| FAX NUMBER: 954-523-2217 | PAGES INCLUDING COVER: 1 |
| PHONE NUMBER: 954-733-0907 | SENDER'S PHONE NUMBER: 954-834-0996 |
| RE:  BRANDON MERIWEATHER | SENDER'S FAX NUMBER: 954-834-0126 |

Nikki,

Please transfer from the account of Brandon Meriweather, A/C# ████ 03742, $6500, to the account of Jeff Rubin, A/C# ████ 1464.

Thanks

Peggy

*P Lee*

```
TR:65  29-16       06/03/10  04:25 PM
Chk to Chk
From Checking ######3742    $6,500.00
To Checking ######1464      $6,500.00
```

Thank you for banking with BankAtlantic.

CONFIDENTIAL