**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 13-CIV-62381-BLOOM/Valle**

JAMAAL ANDERSON, *et al.*,

      Plaintiffs,

v.

BRANCH BANKING AND TRUST COMPANY,
as successor in interest to BankAtlantic, LLC,

      Defendant.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon Defendant Branch Banking and Trust Company's Motion for Summary Judgment, ECF No. [143], ("BB&T Motion") and Plaintiffs' Motion for Partial Summary Judgment on Defendant's Fifth, Sixth, Thirty-Eighth, and Thirty-Ninth Affirmative Defenses, ECF No. [138] ("Plaintiffs' Motion") (collectively, the "Motions"). The Court has reviewed the Motions, all supporting and opposing filings thereto, and the record in this case. For the reasons that follow, BB&T's Motion is granted in part and denied in part. Plaintiffs' Motion is denied.

## I. BACKGROUND AND FACTS

This action stems from a series of allegedly illicit and unauthorized transactions conducted by a now-defunct concierge service organization on behalf of twelve (12) current and former players in the National Football League (collectively, "Plaintiffs"). *See* Fourth Amended Complaint, ECF No. [89] (hereinafter, "FAC"). Without proper authorization, the concierge

services corporation purportedly diverted in excess of $50 million from Plaintiffs' accounts for improper purposes. *See id.* Plaintiffs now seek redress for their monetary injuries.

**A.**     **Background and Nature of Claims**

Plaintiffs in this matter are Derrick Gaffney ("Gaffney"), Jevon Kearse ("Kearse"), Ray Lewis ("Lewis"), Santana Moss ("Moss"), Clinton Portis ("Portis"), Lito Sheppard ("Sheppard"), Fred Taylor ("Taylor"), Jamaal Anderson ("Anderson"), Jacob Bell ("Bell"), Tavares Gooden ("Gooden"), Santonio Holmes ("Holmes"), and Brandon Meriweather ("Meriweather"). *See id.* At some point prior to 2007, each individual Plaintiff retained Pro Sports Financial, Inc. ("Pro Sports") to provide "concierge" financial services. *See* Defendant's Statement of Material Facts, ECF No. [142] at ¶ 2 (hereinafter, "BB&T SOF"); Plaintiffs' Response to Defendant's Statement of Material Facts, ECF No. [163] at ¶ 2 (hereinafter, "Pl. Resp. SOF").[1] In order to facilitate Pro Sports' ability to provide such services, each Plaintiff opened a checking account at BankAtlantic, LLC ("BankAtlantic"). Seven of the twelve Plaintiffs opened accounts prior to October 2006 (the "Prior Authorized Accounts"):

- Gaffney opened an account ending 1451 on July 18, 2002, and executed a Power of Attorney on June 22, 2004 in favor of Pro Sports' employee Erick Carter.

- Kearse opened an account ending in 7745 on March 19, 2001, and executed a Power of Attorney on April 24, 2002 in favor of Pro Sports' employee Peggy Lee.

- Lewis opened an account ending in 0488 on November 12, 2002, and simultaneously executed a Power of Attorney in favor of Pro Sports' employee Peggy Lee.

- Moss opened an account ending in 6244 on January 23, 2006, and executed a Power of Attorney in favor of Pro Sports' employee Erick Carter.

- Portis opened an account ending in 4291 on April 21, 2004, and executed a Power of Attorney in favor of Pro Sports' employee Erick Carter.

---

[1] Where a fact is uncontroverted, reference is made to the parties' respective statements.

- Sheppard opened an account ending in 9612 on July 26, 2002, and executed a Power of Attorney on August 7, 2002, in favor of Pro Sports' employee Peggy Lee.

- Taylor opened an account ending in 0202 on June 22, 2004, and executed a Power of Attorney in favor of Pro Sports' employee Peggy Lee.

BB&T SOF at ¶¶ 4, 5; Pl. Resp. SOF at ¶¶ 4, 5.  Before opening any account, BankAtlantic required customers to execute "Signature Cards," which included information about the customer and the account.  *See* Affidavit of Jacquelyn Orrizzi, ECF No. [141] ("Orrizzi Affidavit") at ¶ 8. In opening the aforementioned accounts, these Plaintiffs do not dispute that they executed a valid Signature Card.   BB&T SOF at ¶ 6; Pl. Resp. SOF at ¶ 6.  Indeed, Plaintiffs Lewis and Taylor designated Pro Sports' address, 800 Fairways Drive, #370, Deerfield Beach, Florida, as the mailing address for their respective Prior Authorized Accounts.  BB&T SOF at ¶ 7; Pl. Resp. SOF at ¶ 7.  Thereafter, Pro Sports moved locations to 6600 N. Andrews Ave., Suite 130, Fort Lauderdale, Florida.  BB&T SOF at ¶ 8; Pl. Resp. SOF at ¶ 8.  After the move, nearly all statements for the Prior Authorized Accounts— save for Taylor's—were delivered to Pro Sports' Fort Lauderdale location.  BB&T SOF at ¶ 9; Pl. Resp. SOF at ¶ 9; *see also* February 24, 2009 Email from Erick Carter, ECF No. [163-1] (indicating that Pro Sports did not receive statements for Taylor and Gooden at some point).  On October 15, 2006, a burglary incident occurred at Pro Sports' headquarters where a window was broken and a computer server was stolen.  *See* Deposition of Erick Carter, BB&T's Ex. 13 (hereinafter, "Carter Depo.") at 20:1-25, 23:3-18; *see also* October 15, 2006 Police Report ("Police Report"), BB&T's Ex. 14 (indicating that several servers were stolen from the office).[2]  According to BB&T and Pro Sports, the theft imperiled the Plaintiffs' sensitive financial information.  *See* BB&T SOF at ¶ 10; Police Report at 5.[3]

---

[2] Plaintiffs contend that the Police Report is inadmissible hearsay.  However, the Report is likely admissible under Fed. R. Evid. 803(8), and, accordingly, may be considered at summary judgment.  *See King v. Cessna Aircraft Co.*, No. 03-20482-CIV, 2010 WL 1839266, at *4 (S.D.

Allegedly, as a result of the data compromise, Pro Sports opened new accounts for Gaffney, Kearse, Lewis, Moss, Portis, Sheppard, and Taylor (the "Group A Plaintiffs"). BB&T SOF at ¶ 11. Specifically, the following accounts were opened on the Group A Plaintiffs' behalf in October 2006 (the "Disputed Accounts"):

- An account ending in 7441 on behalf of Gaffney on October 17, 2006.

- An account ending in 7797 on behalf of Kearse on October 16, 2006.

- An account ending in 7540 on behalf of Lewis on October 17, 2006.

- An account ending in 7409 on behalf of Moss on October 17, 2006.

- An account ending in 7532 on behalf of Portis on October 16, 2006.

- An account ending in 7821 on behalf of Sheppard on October 16, 2006.

- An account ending in 7813 on behalf of Taylor on October 17, 2006.

BB&T SOF at ¶ 12; Pl. Resp. SOF at ¶ 12. The Disputed Accounts were initially funded by monies on deposit with BankAtlantic from the Prior Authorized Accounts. BB&T SOF at ¶ 18; Pl. Resp. SOF at ¶ 18. Various Pro Sports' employees were designated as Powers of Attorney on the Disputed Accounts, including Peggy Lee, Tequilla Harris, and Erick Carter. BB&T SOF at ¶ 12; Pl. Resp. SOF at ¶ 12.

---

Fla. May 6, 2010) (noting that "reports of police officers conducting criminal investigations have routinely been admitted into civil proceedings through [former] Rule 803(8)(C)"); *see also Hill v. Lazarou Enterprises, Inc.*, No. 10-61479-CIV, 2011 WL 124630, at *1 (S.D. Fla. Jan. 14, 2011) (finding that police report, if authenticated, would be admissible). Plaintiffs do not challenge the trustworthiness of the document. Even the statement of Peggy Lee contained therein may be considered despite the fact that it is clearly hearsay. A district court reviewing a motion for summary judgment may consider a hearsay statement "if the statement could be reduced to admissible evidence at trial or reduced to an admissible form," such as, "hav[ing] the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (citing *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)). Ms. Lee is clearly identified and Plaintiffs have offered no indication that she will be unavailable to testify at trial if needed.

[3] *See supra* note 3.

With the exception of Kearse, the Group A Plaintiffs challenge the validity of the Signature Cards associated with the Disputed Accounts, contending that Signature Cards contain their forged signatures. *See* FAC at ¶¶ 51-52. Kearse, on the other hand, did not dispute the validity of his signature on the Signature Card for his Disputed Account. *See* Deposition of Jevon Kearse, BB&T's Ex. 6 (hereinafter, "Kearse Depo.") at 43:2-44:12. The Signature Cards for the Disputed Accounts listed Pro Sports' address at 6600 N. Andrews Ave., Suite 130, Fort Lauderdale, Florida, as the designated mailing address. BB&T SOF at ¶ 16; Pl. Resp. SOF at ¶ 16; Orrizzi Aff. at ¶ 14. Thus, all correspondence for the accounts was mailed to Pro Sports. BB&T SOF at ¶ 16; Pl. Resp. SOF at ¶ 16; Orrizzi Aff. at ¶ 14.

Despite the Group A Plaintiffs' nescience regarding the existence of the Disputed Accounts, Pro Sports began conducting the Group A Plaintiffs' financial activity, which had previously been relegated to the Prior Authorized Accounts, through the Disputed Accounts. BB&T SOF at ¶ 18; Pl. Resp. SOF at ¶ 18. Among other things, the Disputed Accounts were utilized to pay the Group A Plaintiffs' expenses, including mortgage and utilities payments, and were also the recipient accounts for certain Group A Plaintiffs' checks from their respective NFL teams. BB&T SOF at ¶ 18; Pl. Resp. SOF at ¶ 18. Nonetheless, the Group A Plaintiffs were generally unaware that this business was being conducted out of a new account and not their respective Prior Authorized Accounts. *See* BB&T SOF at ¶ 18; Pl. Resp. SOF at ¶ 18 (correctly portraying BB&T's cited deposition testimony).

Unlike the other Group A Plaintiffs, Sheppard later executed an uncontested Signature Card for his Disputed Account. *See* Orrizzi Aff., at Ex. C, 24. At some point in October or November 2009, Sheppard added his wife as a signatory, executed a new Signature Card, and designated Tequilla Harris as Power of Attorney. *See* Deposition of Lito Sheppard, BB&T's Ex.

5

11 (hereinafter, "Sheppard Depo.") at 58:13-59:10.  However, it remains unclear as to whether Sheppard was aware that this account was not the Prior Authorized Account he had opened at BankAtlantic.

The remaining Plaintiffs—Anderson, Bell, Gooden, Holmes, and Meriweather (the "Group B Plaintiffs")—present a different situation.  Other than Gooden, the Group B Plaintiffs opened the following undisputed accounts:

- Anderson opened an account ending in 9343 on June 22, 2007.

- Bell opened an account ending in 8408 on October 23, 2007.

- Holmes opened an account ending in 8733 on June 25, 2007.

- Meriweather opened an account ending in 3742 on August 8, 2007.

BB&T SOF at ¶ 21; Pl. Resp. SOF at ¶ 21; Orrizzi Aff. at ¶ 16.  Pursuant to BankAtlantic's procedures, Signature Cards were executed for these accounts.  BB&T SOF at ¶ 23; Pl. Resp. SOF at ¶ 23.  The Group B Plaintiffs designated Pro Sports' employees as the Powers of Attorney and listed Pro Sports' headquarters as the mailing address.  BB&T SOF at ¶¶ 25-27; Pl. Resp. SOF at ¶¶ 25-27.  Unlike the Group A Plaintiffs, the Group B Plaintiffs do not dispute the authenticity of their signatures, save for Gooden.  BB&T SOF at ¶ 23; Pl. Resp. SOF at ¶ 23.

On March 27, 2008, an account ending in 2112 was opened in Gooden's name; however, Gooden disputes the validity of this account.  As pled in the FAC, Gooden's allegations conform to those of the other Group B Plaintiffs, to wit, the admitted opening of the account and authentic signature.  *See* FAC at ¶¶ 82-83.  It was not until his deposition on February 25, 2015 that the true nature of Gooden's claim was discovered.  *See* Deposition of Tavares Gooden, BB&T's Ex. 4 (hereinafter, "Gooden Depo.") at 31:22-33:1.  Gooden now disputes the opening of his account

ending in 2112 and challenges the authenticity of the associated Signature Card.  *See* Gooden

Depo. at 21:4-16, 30:12-31:3.

Regardless, all Group B Plaintiffs, including Gooden, intended that the account

statements for their accounts be sent to Pro Sports.  BB&T SOF at ¶ 28; Pl. Resp. SOF at ¶ 28.

Subject to the following exceptions, all statements for both the Group A and Group B Plaintiffs

were mailed to 6600 N. Andrews Ave., Suite 130, Fort Lauderdale, Florida:

- The October 2008 and February 2009 statements for Taylor's Disputed Account ending in 7813 were sent to Taylor's address in Southwest Ranches, Florida.[4]

- The November and December 2008 account statements for Gooden's account ending in 2112 were sent to an address in Dania, Florida.[5]

- Regarding Sheppard's Disputed Account ending in 7821, duplicate statements were sent to an address in Jacksonville, Florida.

BB&T SOF at ¶ 37; Pl. Resp. SOF at ¶ 37.

Based on the foregoing facts, the Group A Plaintiffs and the Group B Plaintiffs assert

differing causes of action.  Save for Kearse, the Group A Plaintiffs contend that BankAtlantic

was negligent in the opening and maintaining the Disputed Accounts by allowing Pro Sports to

open and conduct transactions out of the Disputed Accounts absent the Group A Plaintiffs'

knowledge and/or informed consent.  *See* FAC at ¶¶ 104-05; BB&T SOF at ¶ 14; Pl. Resp. SOF

at ¶ 14.  Thus, the Group A Plaintiffs' seek recovery under a theory of negligence (Count I).

FAC at ¶¶ 104-05.  On the other hand, the Group B Plaintiffs, with the exception of Gooden, do

not dispute the opening of their accounts and, therefore, assert a claim for breach of contract

(Count II).  FAC at ¶¶ 109-21.  In short, the Group B Plaintiffs allege that BankAtlantic breached

---

[4] These account statements incorporate wire transfers on 10/31/08 and 2/2/09, as well as a check on 2/2/09.  BB&T SOF at ¶ 37.

[5] Gooden stated that he never inquired as to why he was not receiving statements because he had delegated the responsibility to "somebody who [he] trusted."  Gooden Depo at 101:8-23.

the contractual agreements with the respective Plaintiffs by "accepting and acting upon instructions . . . that resulted in wire transfers, CashLink wire transfers or checks that were not properly authorized by the Group B Plaintiffs or the named attorney-in-fact (if any) for the relevant Group B Plaintiff." *Id.* at ¶ 116. As noted, exceptions exist. While Kearse is classified as a Group A Plaintiff who challenges the legitimacy of his signature on the Signature Card of his Disputed Account, he failed to do the same at his deposition. *Compare* FAC at ¶¶ 51-52 *with* Kearse Depo. at 43:2-44:12. Similarly, Gooden has also altered his claims, converting from Group B to Group A: as pled, Gooden has not disputed the validity of his signature, but at deposition he has done the exact opposite. *Compare* FAC at ¶¶ 82-83 *with* Gooden Depo. at 31:22-33:1. Additionally, both the Group A and Group B Plaintiffs assert causes of action for refund of unauthorized and ineffective funds transfer pursuant to Chapter 670 of the Florida Statutes (Counts III and IV). *See* FAC at ¶¶ 122-36.

## B.     The Disputed Transactions

During the relevant time period, BankAtlantic's default business practice was to deliver monthly account statements for all deposit accounts via U.S. mail to the address listed in its records. BB&T SOF at ¶¶ 44-45; Pl. Resp. SOF at ¶¶ 44-45. However, Plaintiffs dispute whether all the account statements were actually received; indeed, Pro Sports contacted BankAtlantic in February 2009 due to the fact that it had not been receiving account statements for Gooden's account ending in 2112 and Taylor's account ending in 7813. *See* February 24, 2009 Email from Erick Carter, ECF No. [163-1]. Regardless, the totality of the disputed transactions were included in Plaintiffs' respective monthly account statements and Plaintiffs had the right to examine the statements at either BankAtlantic or Pro Sports at any time. BB&T SOF at ¶¶ 40, 47; Pl. Resp. SOF at ¶¶ 40, 47.

Ultimately, Plaintiffs do not dispute all transactions from their respective accounts but, rather, have isolated a number of transactions that they deem improper and unauthorized.  *See* BB&T SOF at ¶ 43; Pl. Resp. SOF at ¶ 43.[6]  In fact, the vast majority of the transactions emanating from the accounts were for valid purposes.  *See* BB&T SOF at ¶ 18; Pl. Resp. SOF at ¶ 18.

The disputed transactions are comprised of a variety of large-sum, rounded-digit wires and checks to various individuals and businesses, the overwhelming majority of which include wires to "Ronnie Gilley Properties, LLC" (hereinafter, the "Ronnie Gilley Wires").  *See* Composite Exhibits "G" and "L" to Plaintiffs' Proposed Fifth Amended Complaint, ECF No. [105-1] at 80-86, 120-24.  The Ronnie Gilley Wires relate to a casino project in Alabama known as Country Crossing.  BB&T SOF at ¶ 36; Pl. Resp. SOF at ¶ 36.  In 2007 or 2008, several of the Plaintiffs attended a meeting where developer Ronnie Gilley proposed to the attending Plaintiffs a private placement investment in Country Crossing.   BB&T SOF at ¶ 36; Pl. Resp. SOF at ¶ 36.  The attending Plaintiffs visited the site in Alabama to view the potential investment, some making multiple trips.  BB&T SOF at ¶ 36; Pl. Resp. SOF at ¶ 36.  Despite engaging in the meetings and visiting the property, the Plaintiffs deny ever authorizing investment into the project.  BB&T SOF at ¶ 36; Pl. Resp. SOF at ¶ 36.

Additionally, Kearse, Sheppard, and Taylor dispute a variety of debits for transfers to Troy Bank & Trust in February 2009 (hereinafter, the "Troy Bank Transactions").  BB&T SOF at ¶ 50; Pl. Resp. SOF at ¶ 50.

---

[6] The Group A disputed transactions can be found in Composite Exhibit "E" to the FAC, ECF No. [89-5], and the Group B disputed transactions are located in Composite Exhibit "F" to the FAC, ECF No. [89-6].  Amended versions of the same can be found at Composite Exhibits "G" and "L" to Plaintiffs' Proposed Fifth Amended Complaint, respectively, ECF No. [105-1] at 80-86, 120-24.

## C.    The Depositor's Agreement

By signing a Signature Card, a BankAtlantic customer agrees to the following language:

> You acknowledge receipt of and agree to the terms of the Depositor's Agreement and Disclosure Statements, Truth in Savings Disclosure and Schedule of Charges.[7]

BB&T SOF at ¶ 29; Pl. Resp. SOF at ¶ 29; Orrizzi Aff. at ¶ 20.  The Depositor's Agreement and Disclosure Statements (hereinafter, "Depositor's Agreement")[8] contains a variety of provisions, most of which are fit to quote in full.   Regarding the delivery of account statements, the Depositor's Agreement provides:

> Periodic statements will be provided on all Accounts, excluding Time Deposit Accounts.  Unless we are otherwise instructed, the statements will be mailed by us via U.S. mail to your last known address as shown on our records.  . . . If you request us to mail or deliver your statements to another party, such as your bookkeeper or accountant, or if you request we hold your mail, you agree that we have made your statements and items available to you when the statement is issued.

Depositor's Agreement at 15.  The Depositor's Agreement continues, advising the customer regarding "items" and limitations related thereto:

> You should promptly and carefully examine the statement and cancelled checks (including front and back), if included in the statement, immediately upon receipt.  Notify us in writing via U.S. mail or email of any dispute or difference for any reason, including unauthorized signature, lack of signature, unauthorized Electronic

---

[7] On or about July 17, 2009, BankAtlantic changed from Personal Signature Cards to Universal Signature Cards, which bear substantially the same language:

> You acknowledge receipt of and agree to the terms of the Depositor's Agreement, Truth in Savings Disclosure and Schedule of Charges.

Orrizzi Aff. at ¶ 21.

[8] A copy of the Depositor's Agreement can be found as Composite Exhibit "F" to Orrizzi Aff.

> Identifier including but not limited to remotely created checks,
> alternation or other irregularity promptly and in no event later than
> thirty (30) calendar days after your statement and items were
> received or otherwise made available to you. Failure to report such
> irregularity within thirty (30) calendar days shall preclude you
> from recovering any amounts from us.

Depositor's Agreement at 15. Similarly, the Depositor's Agreement places notification

requirements with respect to payment orders initiating wire transfers:

> Bank shall provide Customer with an advice of debit of Account
> and/or a statement of Account, which advice and/or statement will
> provide Customer with sufficient information to identify a
> Payment Order. Customer agrees to examine each advice and/or
> statement promptly upon it being received or made available and to
> notify Bank immediately via written communication of any error
> or discrepancy in any such records. . . . Furthermore, the Customer
> shall be precluded from asserting any claim against Bank with
> respect to a Payment Order (or from otherwise objecting to any
> debit thereof to the Customer's Account), unless Bank has received
> written notification from the Customer of any error or discrepancy
> with regard to the Payment Order within one (1) year from the date
> of Customer's earliest receipt of notification of the Payment Order.

Depositor's Agreement at 29. Thus, the language of the Depositor's Agreement imposes two

notification requirements and the customer's failure to abide by either will, ostensibly, preclude

the customer from asserting a claim against the bank for the pertinent transaction.[9] *See id.* at 15,

29.

## II. SUMMARY JUDGMENT STANDARD

A party may obtain summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

---

[9] The latest check or withdrawal being disputed is a transaction made on behalf of Kearse dated
April 13, 2011. BB&T SOF at ¶ 38; Pl. Resp. SOF at ¶ 38. The latest wire transfer disputed by
a Plaintiff is asserted by Meriweather, occurring on April 19, 2011. BB&T SOF at ¶ 39; Pl.
Resp. SOF at ¶ 39. According to BB&T, the first notice of the disputed debits occurred in
February 2013 when counsel delivered a spreadsheet of the challenged transactions to counsel
for BB&T. *See* BB&T SOF at ¶ 42; *see also* BB&T's Ex. 27 (containing aforementioned
spreadsheet of disputed transactions).

R. Civ. P. 56(a). The parties may support their positions by citation to the record, including inter alia, depositions, documents, affidavits, or declarations. Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Further, the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the

12

pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

In resolving issues presented under Fed. R. Civ. P. 56(c), "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993))). In particular, summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston*, 9 F.3d at 919; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); *Gary v. Modena*, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Fed. R. Civ. P. 56 precludes summary judgment

where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez v. Nicholas*, 2013 WL 5596114, at \*4 (S.D. Fla. Oct.11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

### III. DISCUSSION

The parties' respective Motions raise issues primarily implicating the Depositor's Agreement and relevant provisions of the Uniform Commercial Code under Articles 4 and 4A, as codified in the Florida Statutes. As will become clear, see *infra* Section III.B., the arguments presented in Plaintiffs' Motion mimic those presented in BB&T's and, therefore, resolution of BB&T's Motion necessarily resolves all issues presented in Plaintiffs' Motion. Accordingly, the Court addresses the Motions in turn, beginning with BB&T's Motion.

**A.      BB&T's Motion for Summary Judgment**

**1.      The Contract Plaintiffs (Group B)**

BB&T contends that the claims asserted by Anderson, Bell, Holmes, and Meriweather, the majority of the Group B Plaintiffs, as well as Kearse, who has admitted to the validity of his signature (collectively, the "Contract Plaintiffs"), are barred by the terms of the Depositor's Agreement. Further, according to BB&T, the claims are precluded under Articles 4 and 4A of the Uniform Commercial Code ("U.C.C."). The Court addresses these arguments in turn.

***a.      The Depositor's Agreement and Timely Notice***

The Depositor's Agreement establishes a two-part burden-shifting framework for challenges to items and funds transfers. First, the burden falls on BankAtlantic[10] to render account statements to the customer at the designated address:

---

[10] BB&T operates as BankAtlantic's successor in interest in this litigation. As previously noted, see *supra* Section I, Plaintiffs relationship was with BankAtlantic. Therefore, reference is made to BankAtlantic, not BB&T, where appropriate.

> Periodic statements will be provided on all Accounts, excluding Time Deposit Accounts.  Unless we are otherwise instructed, the statements will be mailed by us via U.S. mail to your last known address as shown on our records.  . . . If you request us to mail or deliver your statements to another party, such as your bookkeeper or accountant, or if you request we hold your mail, you agree that we have made your statements and items available to you when the statement is issued.

Depositor's Agreement at 15.  After BankAtlantic has satisfied its obligation to provide account statements, the burden then falls on the customer to review the statements and provide BankAtlantic with written notice of any objectionable activity.  *See id.* at 15, 29.  Where the activity relates to "items" or checks,[11] the Depositor's agreement provides a thirty (30) day notice period:

> Notify us in writing via U.S. mail or email of any dispute or difference for any reason, including unauthorized signature, lack of signature, unauthorized Electronic Identifier including but not limited to remotely created checks, alternation or other irregularity promptly and in no event later than thirty (30) calendar days after your statement and item s were received or otherwise made available to you.  *Failure to report such irregularity within thirty (30) calendar days shall preclude you from recovering any amounts from us.*

*Id.* at 15 (emphasis added).  With respect to payment orders or wire transfers,[12] the Depositor's Agreement imposes a more protracted notice period of one (1) year:

---

[11] An "item" is defined under the Florida Statutes as "an instrument or a promise or order to pay money handled by a bank for collection or payment."  Fla. Stat. § 674.104(i).  "'[I]tems' include (a) 'instruments' and (b) 'promises' or 'orders' to pay money that are handled by a bank for collection or payment."  7 Anderson U.C.C. § 4-102:5 [Rev.] (3d. ed.).  In general, a check is an "instrument."  *See* U.C.C. § 3-104; *see also id.* cmt. 8 ("'Item' is defined broadly to include an instrument, as defined in Section 3-104, as well as promises or orders that may not be within the definition of 'instrument.'").  However, "[t]he term does not include a payment order governed by chapter 670 or a credit or debit card slip."  Fla. Stat. § 674.104(i).

[12] A funds transfer is initiated via a "payment order."  Fla. Stat. § 670.103(1)(c); *see also* Fla. Stat. § 670.102 cmt. 1.  As noted by the Official Comment to Fla Stat. § 670.102, a funds transfer is "commonly referred to in the commercial community as a wholesale wire transfer."

> Customer agrees to examine each advice and/or statement promptly upon it being received or made available and to notify Bank immediately via written communication of any error or discrepancy in any such records. . . . *Furthermore, the Customer shall be precluded from asserting any claim against Bank with respect to a Payment Order (or from otherwise objecting to any debit thereof to the Customer's Account), unless Bank has received written notification from the Customer of any error or discrepancy with regard to the Payment Order within one (1) year from the date of Customer's earliest receipt of notification of the Payment Order.*

*Id.* at 29 (emphasis added).   Failure to notify BankAtlantic within the requisite time period precludes the customer from asserting a claim for recovery of the amount of the disputed debit. *See id.* at 15, 19.

Where an item is properly mailed, there exists a rebuttable presumption that the item is received by the addressee.   *In re Farris*, 365 F. App'x 198, 199 (11th Cir. 2010).[13]   This "'presumption of receipt' arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail."   *Id.* at 199-200 (quoting *Konst v. Fla. E. Coast Ry. Co.*, 71 F.3d 850, 851 (11th Cir. 1996)); *see also Rivera v. AT & T Corp.*, 420 F. Supp. 2d 1312, 1320 (S.D. Fla. 2006) (citing *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1239 (11th Cir. 2002) ("[T]he common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee.")).   Mere denial is insufficient to rebut the presumption.   *Farris*, 365 F. App'x at 200 (citation omitted).   "The presumption so arising is not a conclusive presumption of law, but a mere inference of fact[.]"   *Konst*, 71 F.3d at 852 n.1.

BB&T's regular business practice of mailing account statements to the address designated on the account is undisputed.   Pl. Resp. SOF at ¶¶ 44-45, thereby creating a rebuttable

---

[13] The Eleventh Circuit in *Farris* was concerned with a bankruptcy debtor's receipt of notice of a hearing.   *See* 365 F. App'x at 198-99.

presumption that the account statements were delivered.  As noted, the presumption is created by the proper mailing of the statement.  *Konst*, 71 F.3d at 852.  Indeed, Plaintiffs have explicitly pled that the statements for the accounts at issues were sent, albeit to Pro Sports.  *See* FAC at ¶¶ 58 ("BB&T subsequently delivered all statements and correspondence relating to the Group A Accounts to Pro Sports . . . ."), 135 ("BB&T mailed the [Group B Plaintiffs'] statements reflecting those transfers to Pro Sports . . . .").[14]  Accordingly, the presumption of receipt is created and, absent a genuine issue of material fact, Pro Sports received the account statements.

Plaintiffs characterize the record regarding delivery of the account statements to be sufficiently uncertain to warrant a finding that the presumption has been rebutted.  Specifically, Taylor's account statements for October 2008 and February 2009 were not received by Pro Sports, the address noted on his disputed Signature Card.  In addition, Plaintiffs claim that Meriweather's account statements continued to go to Pro Sports even after a new Signature Card was executed on March 10, 2008, which designated a different address.  Finally, as to Gooden, Plaintiffs claim that his November and December 2008 statements were sent to the wrong address.  Relying on this evidence pertaining exclusively to Plaintiffs Taylor, Meriweather and Gooden, and only to certain statements, Plaintiffs casually infer that this alone "creates sufficient doubt regarding BB&T's delivery of statements to Pro Sports," and extrapolate that "there are likely other statements that Pro Sports did not receive of which Pro Sports was unaware."  Pl. Resp., ECF No. [162] at 6.  Based on this evidence, the Court finds that only Gooden and Taylor have introduced a material fact which precludes a finding that delivery to Pro Sports occurred.

---

[14] Additionally, in their own Motion, Plaintiffs concede that BB&T sent the statements to Pro Sports.  *See* Pl. Mot., ECF No. [132] at 5 ("Plaintiffs will concede for purposes of this Motion that BB&T did send Plaintiffs' statements to Pro Sports.").

First, BB&T concedes that there is an issue of fact with respect to Gooden's November and December 2008 account statements.  *See* BB&T Reply, ECF No. [177] at 6.  Second, the delivery of Taylor's account statements to an address different than the one designated on his Signature Card creates an issue of fact regarding delivery irrespective of whether the alternate address belonged to Taylor.  Taylor's October 2008 and February 2009 account statements were sent to his home in Southwest Ranches, Florida.  For all intents and purposes, this was the incorrect address: Taylor's Signature Card designated 6600 N. Andrews Ave., Suite 130, Fort Lauderdale, Florida.  *See* Composite Exhibit "C" to Orrizzi Aff.  Because Taylor's account statements for October 2008 and February 2009 were not "properly addressed," the presumption of receipt is not raised and Taylor need not offer evidence to rebut it.  *Konst*, 71 F.3d at 851.  Lastly, Plaintiffs have failed to introduce evidence to rebut the presumption as to Meriweather.  Meriweather points to the fact that a March 10, 2008 Signature Card in Meriweather's name designated a different address but BankAtlantic continued sending the statements to Pro Sports.  Notably, Meriweather disputes the validity of this same March 10, 2008 Signature Card, averring that it is a forgery.  *See* Meriweather Depo. Excerpt, ECF No. [178-1].  Now, for unknown reasons, Meriweather professes that BankAtlantic should have been sending his statements to the address on the forged Signature Card and that their failure to do so yields an issue of fact as to the proper delivery of the pertinent account statements.  Yet at no point does Meriweather contend that his account statements were *not* sent to Pro Sports.  Given that Meriweather disputes the authenticity of this March 2008 Signature Card, BankAtlantic properly continued to send the statements to Pro Sports, the address on Meriweather's *valid* Signature Card.  Thus, this argument is a red herring.  The case would be different had the March 2008 Signature Card been Meriweather's attempt to revoke Pro Sports' designated receipt of the account statements.  Under

that hypothetical, an issue of fact would arise as the account statements were no longer being sent to the appropriate location.   This is not the case, however.   It is not disputed that BankAtlantic continued to mail Meriweather's account statements to Pro Sports at their Fort Lauderdale headquarters.

Plaintiffs have introduced absolutely no evidence with respect to the account statements of Gaffney, Lewis, Moss, Portis, Sheppard, Anderson, Bell, Holmes, or Kearse, or the remaining statements of Gooden and Taylor.   Rather, these remaining Plaintiffs have nonchalantly assumed that limited discrepancies with respect to the aforementioned Plaintiffs should be expanded to the remaining nine and, most notably, the remaining four Contracts Plaintiffs.   Although all inferences must be drawn in Plaintiffs' favor, see *Davis*, 451 F.3d at 763, a mere scintilla of evidence will not support denial of BB&T's claim; "there must be evidence on which a jury could reasonably find for the plaintiff," *Anderson*, 477 U.S. at 252.   "[I]n order to create a genuine issue of material fact, an inference must be reasonable viewing the record as a whole[.]" *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1360 (11th Cir. 1986).   Simply put, when viewing the record as a whole and in the light most favorable to Plaintiffs, the requested inference is untenable and unsupported by the record.   The Court will not extrapolate the isolated instances of non-receipt with respect to the account statements of Gooden and Taylor to the remaining account statements of other individuals absent at least a semblance of factual support.   Thus, Plaintiffs have rebutted the presumption, but only with respect to Taylor's October 2008 and February 2009 account statements and Gooden's November and December 2008 account statements. *See Chavez v. Mercantil Commercebank, N.A.*, No. 10-23244-CIV, 2014 WL 2158417, at *14 (S.D. Fla. May 23, 2014) *rev'd in part on other grounds*, 601 F. App'x 814 (11th Cir. 2015) (based on lack of evidence regarding "affirmative proof of non-

receipt," plaintiff could not rebut presumption that monthly statements were received); *Rivera*, 420 F. Supp. 2d at 1320 (presumption of delivery not rebutted where plaintiffs did not "introduce[] evidence to substantiate their denial" of receipt); *Covina 2000 Ventures Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 06 CIV. 15497 (DLC), 2008 WL 1821738, at *5 (S.D.N.Y. Apr. 21, 2008) *aff'd sub nom. Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84 (2d Cir. 2010) (granting defendant's motion for summary judgment where plaintiffs "offered no evidence" to rebut presumption).

Plaintiffs contend that the evidence related to Gooden, Taylor, and Meriweather "is just a sampling of the evidence that will be presented at trial." Pl. Resp., ECF No. [162] at 7. It appears that Plaintiffs have lost sight of their burden on summary judgment. Metaphysical doubt as to a material fact is not sufficient to defeat summary judgment. Rather, a non-moving party must produce *evidence* and advance specific, supported facts which would suggest that a reasonable factfinder could find in the non-movant's favor. *See Ray*, 327 F. App'x at 825; *Shiver*, 549 F.3d at 1343. Rule 56 of the Federal Rules of Civil Procedure explicitly notes that "[a] party asserting that a fact cannot be or is genuinely disputed *must* support the assertion by," most notably, "citing to particular parts of materials *in the record*." Fed. R. Civ. P. 56(c)(1) (emphasis added). The Rule gives the district court permission to consider facts undisputed where the party fails to properly support or address the pertinent assertion. *Id.* at (e). Apart from the select account statements of Gooden and Taylor, Plaintiffs have failed to engage this requirement. Accordingly, while a fact question exists with respect to Gooden's November and December 2008 statements, and Taylor's October 2008 and February 2009 statements, no such doubt has been introduced with respect to the remaining nine Plaintiffs. The presumption of receipt renders the account statements delivered to Pro Sports. If delivery to Pro Sports was

20

appropriate under the Depositor's Agreement, then Plaintiffs' obligation to object was triggered. Indeed, the Court finds that it was.

The Court begins its next inquiry by noting that Plaintiffs' interpretation of the Depositor's Agreement with respect to the delivery of "items" and "funds transfers" is untenable in both regards.

The Depositor's Agreement requires an objection to be made no later than thirty days "after your statement *and items* were received or otherwise made available to you."  Depositor's Agreement at 15 (emphasis supplied).  Based on this language, Plaintiffs assert that BB&T has not set forth that it made the items available to Plaintiffs.  *See* Pl. Resp., ECF No. [162] at 8. However, the plain language of the Depositor's Agreement negates Plaintiffs' argument.  The Agreement states that "[c]ancelled checks and other items will be deemed to be made available to you when your statement is made available."  Depositor's Agreement at 16.  Regarding the delivery of account statements, the Agreement provides that if a customer requests BankAtlantic to deliver statements to "another party," as the Contract Plaintiffs have done here, the customer agrees that BankAtlantic has "made [the customer's] statements and items available to [the customer] when the statement is issued."  *Id.* at 15.  Thus, when the statement was issued, the items were available, and Plaintiffs cannot now assert that the disputed items were never made available to them.

With respect to funds transfers, the Depositor's Agreement requires the Bank to "provide *Customer* with an advice of debit of Account and/or a statement of Account, which advice and/or statement will provide *Customer* with sufficient information to identify a Payment Order."  *Id.* at 29 (emphasis added).  Further, the objection period is triggered "from the date of *Customer's* earliest receipt of notification of the Payment Order."  *Id.* (emphasis added).  Emphasizing the

use of the word "customer," Plaintiff contends that the Depositor's Agreement explicitly required statements to be sent to the "Customer," and, therefore, delivery to Pro Sports was insufficient. *See* Pl. Resp., ECF NO. [162] at 8-9. While BB&T wholly fails to address this point in its Reply, the Court, nevertheless, considers the issue on its merits and finds Plaintiffs' construction to be unpersuasive.

The term "customer" is defined by the Depositor's Agreement as the "accountholder(s)." *See* Depositor's Agreement at 3. "Accountholder," as the term is used in the Agreement, makes no reference to an agent or other individual with actual or apparent authority. However, this provision, as with many other provisions in the Depositor's Agreement, requires BankAtlantic to provide the customer with a statement of account and, as soon as this has been accomplished, the customer's duties to review the statement are triggered. Statements are provided via U.S. mail to the customer's "last known address as shown on [BankAtlantic's] records." Depositor's Agreement at 15. If the customer designates another party to receive the statement, the customer explicitly agrees that the statements are available when issued. *Id.* ("If you request us to mail or deliver your statements to another party . . . you agree that we have made your statements and items available to you when the statement is issued."). With respect to funds transfers, the customer "agrees to examine each advice and/or statement promptly upon it being received *or made available*." *Id.* at 29 (emphasis supplied). The Court views the contract in its entirety. *See Southern-Owners Ins. Co. v. Hayden*, 413 F. App'x 187, 189 (11th Cir. 2011) (citing *Jones v. Warmack*, 967 So. 2d 400, 402 (Fla. 1st DCA 2007) ("[U]nder Florida law, we do not read clauses in a contract in isolation; we look to the contract as a whole."). Pursuant to the Depositor's Agreement, where a customer has designated another individual to receive statements, like the Contract Plaintiffs have admittedly done here, they cannot circumvent their

22

responsibility to object by asserting that the statements were never received *or made available* to them.

In sum, although Gooden and Taylor have presented a factual issue as to the delivery of specific account statements, the remaining Plaintiffs have failed to do so.   Therefore, the Contracts Plaintiffs were obligated to object to any unauthorized activity within the period designated by the Depositor's Agreement.

The latest disputed check or withdrawal is dated April 13, 2011, and the latest disputed wire transfer occurred on April 19, 2011.   The Depositor's Agreement imposes a thirty-day objection period for items and a one-year objection period of funds transfers.  *See* Depositor's Agreement at 15, 29.   Thus, the Depositor's Agreement established deadlines of May 13, 2011, and April 19, 2012, in which the Contract Plaintiffs were obligated to object to unauthorized items and funds transfers, respectively.   According to BB&T, it was not provided with notice in any respect until counsel received a spreadsheet of disputed transactions in February 2013, well after the aforementioned deadlines.  *See* Composite Exhibit "27" to BB&T's SOF (hereinafter, "February 2013 Spreadsheet").   Thus, BB&T asserts that the Depositor's Agreement bars all claims for want of notice.   In response, Plaintiffs seemingly dispute the admissibility of the February 2013 Spreadsheet, stating that it is "not of record and is hearsay."  *See* Pl. Resp. SOF at ¶ 42. Ultimately, the date the spreadsheet was delivered is of no consequence; Plaintiffs make no claim that they objected to the disputed transactions within the appropriate time period.

To their detriment, Plaintiffs utterly fail to address their obligation to object, implicitly conceding the point.  *See generally Melendez v. Town of Bay Harbor Islands*, No. 14-22383-CIV, 2014 WL 6682535, at *7 (S.D. Fla. Nov. 25, 2014) (conceding that punitive damages were not recoverable by failing to address argument in responsive brief); *Brady v. Medtronic, Inc.*, No.

13-CV-62199-RNS, 2014 WL 1377830, at *6 (S.D. Fla. Apr. 8, 2014) (conceding claims were subject to dismissal by failing to address defendant's argument in plaintiff's opposition to the motion to dismiss); *Slugocki v. U.S. By & Through Dep't of Labor, Office of Workers' Comp. Programs, Div. of Fed. Employees' Comp.*, 988 F. Supp. 1443, 1447 (S.D. Fla. 1997) ("[Plaintiff] appears to concede as much when he fails to address this argument anywhere in his Response brief.").  "A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point.  [The Court] will not do his research for him."  *Pelfresne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990) (Posner, J.) (internal citations omitted).  Indeed, Plaintiffs' entire argument is directed at BB&T's failure to provide account statements, an argument which this Court has rejected.

Nevertheless, the Court has combed the record and is unable to identify a modicum of evidence which would support the conclusion that the Plaintiffs ever furnished an objection to the disputed transactions.  As a last resort, Plaintiffs appear to assert in their Response in Opposition to BB&T's Statement of Facts, ECF No. [163], that the tolling agreements executed between Plaintiffs and BB&T in October 2012 somehow obviate Plaintiffs' need to object.  The tolling agreements acknowledge that the respective Plaintiff intends "to file a complaint on behalf of [Plaintiff] setting forth alleged claims [] against Bank related to a Breach of fiduciary duty regarding the alleged unauthorized and fraudulent transfer of Plaintiff's monies from his bank accounts at the behest and direction of Jeffrey Rubin."  *See* Tolling Agreements, ECF No. [105-1] at 39-72, 90-114.  At no point do the tolling agreements indicate that Plaintiffs properly provided notice.  In fact, the tolling agreements explicitly acknowledge that BB&T does not "waive any defenses, including the Time Defenses, that may exist as of the Effective Date."  *See*

24

*id.* "Time Defenses" are defined by the agreements as "the statute of limitations, estoppel, laches, *or any other defense to the Claims based on the passage of time.*"  *Id.* (emphasis added).  Thus, the execution of the tolling agreements does not eliminate Plaintiffs' need to object under the Depositor's Agreement.

The record is utterly devoid of any evidence that the Plaintiffs ever timely objected to the unauthorized transfers.  Plaintiffs offer no evidence to challenge BB&T's assertion that it was first provided notice of the objections in the February 2013 Spreadsheet.[15]  Accordingly, summary judgment is granted in favor of BB&T on Count II for the Contract Plaintiffs' failure to object within the time period required by the Depositor's Agreement.

### b.    Notice Requirements under U.C.C. Articles 4 and 4A

BB&T also asserts that Articles 4 and 4A of the U.C.C. preclude the Contract Plaintiffs' claims, with Article 4 acting to bar claims stemming from Plaintiffs' "items" or checks, and Article 4A prohibiting claims resulting from unauthorized "funds transfers" or wires.[16]  BB&T is correct as, notwithstanding the Depositor's Agreement, the Contract Plaintiffs' breach of contract claim is susceptible to judgment under the relevant provisions of the U.C.C.

Akin to the time limitations imposed by the Depositor's Agreement, the U.C.C. imposes a duty on a customer to report disputed transactions, provided the customer has received notice of the same.  *See* Fla. Stat. §§ 674.406(6) (items), 670.505 (funds transfers).  Under § 674.406,

---

[15] In a rather conclusory fashion, Plaintiffs assert that the February 2013 Spreadsheet is both "not of record and is hearsay."  *See* Pl. Resp. SOF at ¶ 42.  The first assertion, that this evidence is not in the record, is nonsensical; the Spreadsheet is included as an exhibit to BB&T's Motion.  With respect to hearsay, Plaintiffs offer no valid reason why this evidence should be considered as such, especially in light of the fact that the February 2013 Spreadsheet was apparently prepared by Plaintiffs themselves.

[16] *See supra* notes 11-12 (setting forth definitions of "items" and "funds transfers").

the customer is obligated to review account statements and provide the bank with notice of objectionable activity.  *See* Fla. Stat. § 674.406(3) (requiring customer to "exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized" and "promptly notify the bank of the relevant facts"); *see also Cheese & Grill Rest., Inc., v. Wachovia Bank, N.A.*, 970 So. 2d 372, 375 (Fla. 3d DCA 2007) (citation omitted) (noting that U.C.C. "place[s] the burden of reviewing statements and controlling the transmittal of signed checks upon the customer").  The Code provides an absolute preclusion against liability where the customer fails to fulfill their duty to review and report disputed items, stating,

> Without regard to care or lack of care of either the customer or the bank, a customer who does not within **180 days after the statement or items are made available to the customer** (subsection (1)) discover and report the customer's unauthorized signature on or any alteration on the item **or who does not, within 1 year after that time, discover and report any unauthorized endorsement** is precluded from asserting against the bank the unauthorized signature or alteration.[17]

Fla. Stat. § 674.406(6) (emphasis supplied); *see also Redland Co. v. Bank of Am. Corp.*, 568 F.3d 1232, 1235 (11th Cir. 2009) ("Under Florida law, the customer has an obligation to examine bank statements and notify the bank of any claimed errors or unauthorized activity." (internal quotation, citation, and formatting omitted)); *Lamm v. State St. Bank & Trust Co.*, 889 F. Supp. 2d 1321, 1330 n.9 (S.D. Fla. 2012) *aff'd sub nom. Lamm v. State St. Bank & Trust*, 749 F.3d 938 (11th Cir. 2014) ("The customer's failure to provide the bank with timely notice constitutes a complete defense to claims based on the unauthorized items.")[18]; *Lowenstein v. Barnett Bank of S. Florida, N.A.*, 789 So. 2d 1012, 1013-14 (Fla. 3d DCA 1998) *opinion clarified*, 720 So. 2d

---

[17]  The UCC includes forgeries and signatures "made without actual, implied, or apparent authority" in the definition of "unauthorized signatures."  Fla. Stat. § 671.201(44).

[18] Although *Lamm* was applying New York law, like Florida, New York has codified the UCC in this respect.  *See Monreal v. Fleet Bank*, 95 N.Y.2d 204, 207 (2000) (applying UCC).

596 (Fla. 3d DCA 1998) (citation omitted) ("As mandated by section 674.406, the customer had an obligation to examine bank statements and notify the bank within one year of any claimed errors. The customer's failure to timely discover and report the forgeries bars his claim as a matter of law."). Similarly, § 670.505 prohibits a customer from recovering on an unauthorized funds transfer if the customer fails to object within one year of receiving notice:

> If a receiving bank has received payment from its customer with respect to a payment order issued in the name of the customer as sender and accepted by the bank, and the customer received notification reasonably identifying the order, **the customer is precluded from asserting that the bank is not entitled to retain the payment unless the customer notifies the bank of the customer's objection to the payment within 1 year after the notification was received by the customer.**

Fla. Stat. § 670.505 (emphasis added). The Official Comment to § 670.505 notes that the provision "is in the nature of a statute of repose," and acts as an absolute bar where the customer "has not objected to the debiting of the account within one year after the customer received notification of the debit." *Id.*

As with the Depositor's Agreement, BB&T contends that none of the Contract Plaintiffs properly provided notice under either § 674.406 or § 670.505 within the requisite time frame.

### i.      U.C.C. Article 4

In response to BB&T's contention, Plaintiffs assert the same defense, arguing that there exist fact issues with respect to the delivery of the account statements that otherwise precludes judgment on this issue at this time. As previously noted, the Contract Plaintiffs have categorically failed to introduce evidence with respect to improper or inconsistent delivery. For the same reasons stated before—to the exclusion of Gooden and Taylor—the Court finds that Plaintiffs have failed to rebut the presumption of delivery and the notice requirements were triggered for the remaining Plaintiffs.

Plaintiffs opt not to address whether notification was timely provided each Plaintiff and have, therefore, conceded the point.[19]   The Court is, nonetheless, required to review the record. *See* S.D. Fla. L.R. 56.1(b) (stating that facts may be "deemed admitted . . . provided that the Court finds that the movant's statement is supported by evidence in the record"); *see also United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).   Consistent with this Court's earlier determination that Plaintiffs have failed to introduce any evidence that they timely objected to the disputed items and transfers, BB&T is entitled to summary judgment.

### ii.     U.C.C. Article 4A

Plaintiffs present two arguments in trying to escape the one-year objection requirement of § 670.505, both of which are unpersuasive.   First, Plaintiffs challenge BankAtlantic's security procedures, asserting that it either did not maintain a valid funds transfer security procedure or, alternatively, an unreasonable one.   Next, Plaintiffs assert that the one-year respose period in § 670.505 cannot apply because Plaintiffs never received notice.

Generally, the bank bears the risk of loss of any unauthorized funds transfer:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is not authorized and not effective as the order of the customer under s. 670.202 or is not enforceable, in whole or in part, against the customer under s. 670.203*, the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment* and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund.

Fla. Stat. § 670.204(1) (emphasis added).   The Official Comment to § 670.204 notes that the provision only applies to cases in which, among other things, "no commercially reasonable security procedure is in effect."   *Id.* at cmt 1.   Thus, where there exists a commercially

---

[19] *See supra* p. 23-24.

reasonable security procedure, the bank will be insulated from liability. *See id.*; *Regatos v. N. Fork Bank*, 257 F. Supp. 2d 632, 643 (S.D.N.Y. 2003) ("If no security procedure is in place, the customer has an absolute right to recover.  If a security procedure is in place, and it is followed, the bank is absolved from loss.  But if a security procedure is in place and the bank fails to follow it, then that is as good as no security procedure at all: the loss reverts to the bank and the customer has an absolute right to recover.  This allocation of loss is so integral to the structure of Article 4A that it may not be varied by contract.").  However, § 670.202, referenced above, provides two circumstances where the bank may shift the risk of loss to the customer: (1) where the "payment order received . . . is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency"; or (2) where the bank and customer have agreed to a security procedure and the bank acted in good faith.  *See* Fla. Stat. § 670.202(1)-(2).  Ultimately, these provisions are irrelevant, so long as the bank has properly provided notice of the debit, the repose period in § 670.505 is triggered.

BB&T's argument is limited to the one-year objection period.  As noted, § 670.505 operates as a statute of repose and eradicates the customer's ability to recover where the customer has received notice but has not objected to the debiting of the account within one year. *See* Fla. Stat. § 670.505 cmt. ("Under 4A-505, however, the obligation to refund may not be asserted by the customer if the customer has not objected to the debiting of the account within one year after the customer received notification of the debit.").  Section 670.202 is only implicated when the customer has received notice *and* has properly objected.  Thus, the question presented is not one of whether the payment order was authorized but, rather, whether Plaintiffs received notice of the disputed debits. Thus, the arguments pertaining to BB&T's security

procedures are not relevant where the Plaintiffs have properly received notice and have failed to object.

To resolve the real issue, the Court is presented with a question of statutory interpretation, specifically, with respect to the delivery of account statements and what manner of delivery will suffice in order to trigger the applicable limitations or repose period in which a customer is obligated to object.  Plaintiffs contend that BB&T seeks to expand § 670.505 to reach situations where notice has merely been provided to the customer's agent, and not the customer themselves.  Neither Florida nor any court in this Circuit has spoken to the issue.  As such, this Court examines the definitional provisions of the U.C.C.

The U.C.C. defines "customer" as "a person, including a bank, having an account with a bank or from whom a bank has agreed to receive payment orders." Fla. Stat. § 670.105(1)(c). Viewing this language in a vacuum, it would appear that notice to the "customer," as the term is used in § 670.505, would require notice to the accountholder.  However, the U.C.C. also sets forth when an individual "receives a notice or notification."  Under § 671.201, a person gives notice to another "by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it."  Fla. Stat. § 671.201(26).  More critically, "a person 'receives' a notice or notification when: (a) [i]t comes to that person's attention; or (b) *[i]t is duly delivered in a form reasonable under the circumstances at the place of business through which the contract was made or at another location held out by that person as the place for receipt of such communications*." *Id.* (emphasis added); *see also* Fla.

Stat. § 671.209(5) (mirroring § 671.201(26)).[20]   Confining the use of the phrase "customer" to the actual customer would require the Court to neglect the remaining provisions of the U.C.C.

Plaintiffs' cited authority is distinguishable from the facts presented here.  At issue in *Gold v. Merrill Lynch & Co., Inc.* were five transfers between 2005 and 2007, made by the plaintiff's wife by forging the plaintiff's signature.  *See* No. 09-318-PHX-JAT, 2009 WL 2132698 (D. Ariz. July 14, 2009).  Discovering the transfers in 2008, the plaintiff objected and sought to recover the funds.  *Id.*  In response, the bank sought dismissal pursuant to U.C.C. § 4A-505.  *Id.*  Determining "that the requirement of actual notice best comports with both the language of the statutes and the Official Comments of the U.C.C.," the District of Arizona summarily rejected the bank's contention that mailing the account statements was sufficient to demonstrate notice "*at [that] time*."  *Id.* (emphasis added).

The *Gold* decision was on a motion to dismiss and, accordingly, the court was prohibited from considering extraneous evidence.  *See id.*  Indeed, the *Gold* court noted that it lacked "sufficient evidence *at this point* that the Plaintiff had actual notice of the unauthorized withdrawals."  *Id.* (emphasis added).  Where the *Gold* court found that factual issues obviated the court's ability to assess whether the plaintiff had received notice, no such factual issues are present here.  The Contract Plaintiffs have not introduced any evidence that would create a *genuine* issue of material fact as to whether their designated agent actually received the pertinent account statements.

Next, the court in *Gold* found that the Official Comment to U.C.C. § 4A-204 warranted the conclusion it reached with respect to U.C.C. § 4A-505.  *Id.*  The Official Comment to U.C.C.

---

[20] These definitions are applicable in the circumstances presented here.  *See* Fla. Stat. § 670.105 (4) ("In addition, chapter 671 contains general definitions and principles of construction and interpretation applicable throughout this chapter.").

§ 4A-204 does, in fact, note that while § 4A-204 "is designed to encourage a customer to promptly notify the receiving bank that it has accepted an unauthorized payment order, . . . [t]here is no intention to impose a duty on the customer that might result in shifting loss from the unauthorized order to the customer." *Gold*, 2009 WL 2132698 (citing U.C.C. § 4A-204 cmt.). Without further explanation or reference, the court deduced that "[t]his goal must be considered when determining whether a customer has properly 'received notification' under both [U.C.C. § 4A-204] and [U.C.C. § 4A-505]." *Id.* The Official Comment to U.C.C. § 4A-505, however, notes that "the obligation to refund may not be asserted by the customer if the customer has not objected to the debiting of the account within one year after the customer received notification of the debit." Generally, a statute of repose acts as a complete bar regardless of the circumstances. *See* Black's Law Dictionary (10th ed. 2014) (defining "statute of repose" as "[a] statute barring any suit that is brought after a specified time since the defendant acted . . . even if this period ends before the plaintiff has suffered a resulting injury"). Although the drafters clearly did not intend "to impose a duty on the customer which would result in shifting loss to the customer" under § 4A-204, the drafters included a statute of repose to advance finality and placed the repose period well beyond the ninety-day notification period in § 4A-204.

*Regatos v. N. Fork Bank*, 257 F. Supp. 2d 632 (S.D.N.Y. 2003) is also distinguishable. While the court held that actual, not constructive, notice was required and this requirement could not be varied by agreement,[21] the case did not unequivocally answer whether notification to an agent could constitute "actual notice." *See id.* at 645-46. The bank in *Regatos* entered into a "hold mail" agreement with the plaintiff, retaining statements until they were specifically

---

[21] The Court of Appeals of New York agreed. *See Regatos v. N. Fork Bank*, 838 N.E.2d 629, 630 (2005) (answering certified question from the Second Circuit Court of Appeals).

requested by the plaintiff.  *See id.*  Thus, the plaintiff never received his account statements, through an agent or otherwise.  *Id.* at 645-46 ("Regatos' monthly statements were not sent to him.  Rather, pursuant to [the] 'hold mail' agreement . . . the statements were only available at his request.").  Not addressed, however, was whether notice could be established by sending the statement to plaintiff's hypothetical agent; the court merely noted that "actual notice" was required and constructive notice by virtue of the "hold mail" system was inadequate and in contravention to the statute.  *See id.*; *see also Regatos v. N. Fork Bank*, 838 N.E.2d 629, 634-35 (2005) ("[A]rticle 4–A requires  actual notice, and that this requirement cannot be varied by a 'hold mail' agreement, neither to begin the statute of repose, nor to begin 'reasonable time' under the account agreement.").[22]

Other courts have seemingly disagreed with the contention Plaintiffs put forth under the authority of *Gold* and *Regatos*.  These cases support the proposition that the repose period under U.C.C. § 4A-505 may be commenced when a designated agent has received notice.  *See 198-210 16th St. LLC v. M & Y Sixteen LLC*, 39 Misc. 3d 1206(A), 971 N.Y.S.2d 73, at *8 (Sup. Ct. 2013) ("Case law treats notice received by an agent entrusted to manage an account as received by the principal, even if the agent was actively mismanaging the account at that time." (citation omitted)); *B.B.C.F.D., S.A. v. Bank Julius Baer & Co.*, 910 N.Y.S.2d 43, 46 (2010) ("When a party chooses to delegate [the duty to examine his statements] to another, it may not charge the bank with the loss which ensues, and which results from misplaced confidence in the agent."); *see generally Gutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1309 (S.D. Fla. 2000)

---

[22] *Grabowski v. Bank of Boston*, 997 F. Supp. 111 (D. Mass. 1997) is equally inapposite; the court's discussion of U.C.C. § 4A-505 bears little to no relation to the facts of this case.  *See id.* at 119-20.  Further, Plaintiffs' citation to *Grabowski* for the proposition that "customer" as used in the U.C.C. may not extend to Plaintiffs' purported agent is belied by the definitional provisions of Fla. Stat. §§ 671.201(26) and 671.209(5).

("The law conclusively presumes that the agent has disclosed the knowledge or information to his or her principal, and charges the principal accordingly.").

Based on the foregoing, this Court finds that Plaintiffs' strict construction of § 670.505 is unnecessary and improper in light of the remaining definitional provisions of the U.C.C.  The U.C.C. states that "a person 'receives' a notice or notification when . . . [i]t is duly delivered in a form reasonable under the circumstances at . . . [a] location held out by that person as the place for receipt of such communications."  Fla. Stat. § 671.201(26); Fla. Stat. § 671.209(5).  Here, Plaintiffs do not dispute that they agreed and intended for Pro Sports to receive their account statements, statements containing the contested debits.  Because there is no dispute over whether the Contract Plaintiffs received account statements at the address they designated, those Plaintiffs received notice as per Fla. Stat. §§ 671.201(26) and 671.209(5).  The repose period was triggered and the Contract Plaintiffs were obligated to object within one year.

Again, as with Plaintiffs' notification under the Depositor's Agreement, the record is bereft of any evidence that Plaintiffs objected within the pertinent period and Plaintiffs have repeatedly failed to address this point.  Consequently, no genuine issue of material fact exists as to the date Plaintiffs objected to the unauthorized transactions and summary judgment in BB&T's favor is appropriate.

### c.    *Kearse's Negligence Claims*

As pled in the Fourth Amended Complaint, Kearse requests relief on a theory of negligence.  *See* FAC at ¶ 52.  BB&T contends that this claim fails as a matter of law as Kearse has admitted to entering into a valid contract by virtue of signing the Signature Card for his account and, further, any breach of duty in tort is duplicative of the parties' contractual duties.  Kearse does not dispute this and concedes that he is unable to prevail on his claim for

negligence.  *See* Pl. Resp., ECF No. [162] at 3 ("Kearse does not dispute that he cannot prevail on his negligence claim and . . . does not intend to advance a negligence claim at trial."). Accordingly, summary judgment is warranted on Kearse's claim for negligence.  However, this conclusion does not terminate the Court's inquiry.

Despite conceding the only claim currently pled, Kearse contends that he should be permitted to amend his pleadings to reflect his current contract-based allegations.  *See id.* Specifically, where the Group A Plaintiffs claim that their respective signature cards were forged, Kearse now revokes that assertion and wishes to be considered a Group B Plaintiff as evidenced by his requested amendment in March 2015.  *See* Motion for Leave, ECF No. [105].

At the outset, the Court notes that Kearse has improperly sought amendment of his pleadings through a responsive filing.  "It is not appropriate to seek an order for affirmative relief in a response to a motion."  *Silver v. Karp*, No. 14-80447-CIV, 2014 WL 4248227, at *5 n.3 (S.D. Fla. Aug. 27, 2014) (quoting *Armington v. Dolgencorp, Inc.*, No. 3:07-cv-1130-J-JRK, 2009 WL 210723, at *2 (M.D. Fla. Jan. 20, 2009)); *CompRehab Wellness Grp., Inc. v. Sebelius*, No. 11-23377-CIV, 2013 WL 1827675, at *7 (S.D. Fla. Apr. 30, 2013) (noting that "a response to a motion is not a motion" (citing Fed. R. Civ. P. 7)).  Ignoring the impropriety of the vessel in which Kearse seeks amendment, he has nonetheless failed to demonstrate good cause.

In support of this conversion, Kearse improperly cites to Rule 15(b) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 15(b).  Rule 15(b) provides for amendments "during and after trial."  *Id.*  As noted by BB&T, this request comes prior to trial and, therefore, Rule 15(b) is inapplicable on its face.  The correct standard by which Kearse's instant request is governed is stated by Rule 16(b), which provides that "[a] schedule may be modified only for *good cause* and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  "[G]ood cause exists when evidence

supporting the proposed amendment would not have been discovered in the exercise of reasonable diligence until after the amendment deadline had passed." *Donahay v. Palm Beach Tours & Transp., Inc.*, 243 F.R.D. 697, 699 (S.D. Fla. 2007) (citation omitted).  Where a party is found to not have been diligent, the inquiry ends.  *See Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (citing Fed. R. Civ. P. 16 advisory committee's note; *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) ("If [a] party was not diligent, the [good cause] inquiry should end."))).

This Court has previously rejected Kearse's proposed amendment, finding that the pertinent "information and [] discovery was at all times in [Kearse's] possession and could have been included in prior complaints, but certainly by the Court's [April 14, 2014 amendment] deadline."  *See* Transcript of Hearing, April 22, 2015, ECF No. [180] at 23.  Thus, the Court found that Kearse's lack of diligence precluded his requested amendment.  In essence, Kearse asks this Court to revisit its earlier decision and allow him to proceed as a Contract/Group B Plaintiff.  Yet Kearse has introduced no evidence to persuade the Court that its prior ruling requires reassessment.  This litigation was commenced on October 31, 2013, has been delayed numerous times, and, most critically, the amendment Kearse advances should have been known to him from the dawn of the litigation.  *See Donahay*, 243 F.R.D. at 699 (finding that defendants failed to demonstrate good cause where, *inter alia*, defendants "should have known [about the issue] from the outset of the case").  The inquiry was simple: did Kearse sign a Signature Card for the account at issue?  If the answer was "yes," then Kearse is a Group B Plaintiff; if the answer was "no," then he is aptly grouped with the Group A Plaintiffs.  Kearse has not been shown to be diligent in any sense of the word and the Court need not reassess its earlier ruling.

Ultimately, Kearse's sought-after amendment is inconsequential as he seeks to be grouped with the Contract Plaintiffs whose claims have been rejected as a matter of law.

### 2. The Negligence Plaintiffs (Group A)

Plaintiffs Gaffney, Gooden, Lewis, Moss, Portis, Sheppard, and Taylor (collectively, the "Negligence Plaintiffs") challenge the validity of their Signature Cards for their Disputed Accounts and, with the exception of Gooden, have pled claims for negligence and refund of unauthorized and ineffective funds transfers.[23]  *See* FAC at ¶¶ 102-07, 122-28.  BB&T asserts that these claims cannot pass muster for five general reasons: (1) the claims are displaced by the U.C.C. as they seek to impose an allocation of loss scheme that is inconsistent with Articles 4 and 4A; (2) no proximate cause exists between the Disputed Accounts and the injury suffered; (3) by availing themselves of the benefit of the Disputed Accounts, the Negligence Plaintiffs have ratified the Accounts; (4) the claim for refund of unauthorized and ineffective funds transfer is subject to the expired statute of repose in Fla. Stat. § 670.505; and (5) BB&T had no duty to investigate transactions.  The Court addresses these issues in a logical progression before finally resolving independent issues with respect to Sheppard and Gooden.

### a. *Proximate Cause*

The Negligence Plaintiffs all maintained accounts at BankAtlantic prior to Pro Sports' allegedly improper opening of the Disputed Accounts.  According to BB&T, the Disputed Accounts, however, were simply opened by Pro Sports in order to protect the Negligence Plaintiffs' financial information as the burglary on October 15, 2006 had compromised the data.  Thus, BB&T posits that the Disputed Accounts were simply a continuation of the Prior Authorized Accounts, differing only in account number and utilized for the exact same purpose.

---

[23] Gooden only recently disputed the authenticity of his signature and is pled as a Group B Plaintiff in the FAC.  *See* FAC at ¶ 83.

Based on this conclusion, BB&T quickly concludes that the withdrawals from the Disputed Accounts did not cause the Negligence Plaintiffs any damages.

Under Florida law, negligence is not actionable unless the tortfeasor can be deemed the proximate cause of the alleged injuries. *See Palma v. BP Products N. Am., Inc.*, 347 F. App'x 526, 527 (11th Cir. 2009) (citing *Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003)). "The issue of proximate cause is generally a question of fact concerned with 'whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred.'" *Goldberg v. Florida Power & Light Co.*, 899 So. 2d 1105, 1116 (Fla. 2005) (quoting *McCain v. Florida Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992)). A cause is "proximate" where "prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *Id.* (citation omitted). However, where a separate force or action "intervenes," liability is eliminated. *See id.* ("A negligent actor . . . is not liable for damages suffered by an injured party 'when some separate force or action is the active and efficient intervening cause' of the injury." (quoting *Gibson v. Avis Rent-A-Car Sys., Inc.*, 386 So. 2d 520, 522 (Fla. 1980))).

The Negligence Plaintiffs have introduced evidence that their signatures on the pertinent account documents were forged. Whether the Negligence Plaintiffs would have been in the same position with respect to the disputed transactions had the transactions been pulled from the Prior Authorized Accounts misses the point. The Court will not overlook the simple reality that, as alleged, BankAtlantic allowed accounts to be opened in the Negligence Plaintiffs' names without proper authority, through the use of forged signatures, and without the account owner's knowledge. Thus, the Court declines to find that BankAtlantic's purported negligence was not the proximate cause of the alleged injuries. It is foreseeable that opening an account without the

38

account owner's knowledge would result in fraud on the account.  Furthermore, this question is generally for the trier of fact absent unequivocal facts demonstrating "no more than a single reasonable inference."  *See Palma v. BP Products N. Am., Inc.*, 347 F. App'x 526, 528 (11th Cir. 2009) (quoting *McCain*, 593 So. 2d at 503); *see also Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840-41 (1996) ("The issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review.") (citations omitted); *King v. Cessna Aircraft Co.*, No. 03-20482-CIV, 2010 WL 5253526, at *13 (S.D. Fla. Sept. 13, 2010) *report and recommendation adopted in part*, No. 0320482-CIV, 2010 WL 5173152 (S.D. Fla. Dec. 14, 2010) ("Proximate cause is usually a question of fact for the jury to resolve.").

### b.    Ratification

Pointing to the fact that the Negligence Plaintiffs do not challenge the majority of the debits from their respective Disputed Account and have repeatedly retained the benefits of Pro Sports' operation of the same, BB&T contends that the Negligence Plaintiffs have ratified the Disputed Accounts.  Under Florida law, "[r]atification of an agreement occurs where a person expressly or impliedly adopts an act or contract entered into in his or her behalf by another without authority."  *Deutsche Credit Corp. v. Peninger*, 603 So. 2d 57, 58 (Fla. 5th DCA 1992) (citations omitted).  Ratification must be unequivocal and intelligent: if the principal does not have "full knowledge of all material facts and circumstances relating to the unauthorized act or transaction at the time of the ratification," then ratification has not occurred.  *Id.* (citing *G & M Restaurants Corp. v. Tropical Music Serv., Inc.*, 161 So. 2d 556, 558 (Fla. 2d DCA 1964); *Ball v. Yates*, 29 So. 2d 729 (1946), *cert. den.*, 332 U.S. 774 (1947)) (further citations omitted); *see also Zurstrassen v. Stonier*, 786 So. 2d 65, 71 (Fla. 4th DCA 2001) ("Ratification occurs where a

party with full knowledge of all the material facts makes an affirmative showing of his or her express or implied intention to adopt an act or contract entered into without authority.") (citation omitted).  Indeed, "[a] n affirmative showing of the principal's intent to ratify the act in question is required."  *Peninger*, 603 So. 2d at 58 (citation omitted); *see also Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1355 (11th Cir. 2011) (citing *Frankenmuth Mut. Ins. Co. v. Magaha*, 769 So. 2d 1012, 1021-22 (Fla. 2000)) ("The principal must have full knowledge of the initially unauthorized agents' conduct and approve of that conduct.").

It cannot be disputed that the Negligence Plaintiffs received countless benefits from Pro Sports' continued operation of their Disputed Accounts, including mortgage and utilities payments as well as compensation through direct deposits from the Plaintiffs' respective NFL teams.  Nevertheless, this evidence does not yield the conclusion that ratification has occurred. BB&T fails to establish that the Negligence Plaintiffs were even aware that this business was being conducted from anything but their Prior Authorized Accounts.  Absent the Negligence Plaintiffs' knowledge that the Disputed Accounts existed, it cannot be said that the Negligence Plaintiffs had "full knowledge of all material facts and circumstances relating to the unauthorized act or transaction."  Therefore, ratification has not occurred.  A stronger case would be presented where the Negligence Plaintiffs were aware that the activity was being conducted through entirely new accounts.  This, however, is not the case.  A party cannot ratify something of which he or she has no knowledge.

To the extent there exists a question of fact relating to any alleged ratification, summary judgment is inappropriate.  *See Peninger*, 603 So. 2d at 58-59 ("[T]the issue of whether an agent's act has been ratified by the principal is a question of fact.") (citation omitted); *see also Seyler v. Washington Mut. Bank, FA*, No. 207-CV-772-FTM-29DNF, 2009 WL 4730554, at *3

(M.D. Fla. Dec. 4, 2009) (disputed fact precluded summary judgment on the affirmative defense of ratification).  Simply put, because questions remain as to whether the Negligence Plaintiffs were aware of the Disputed Accounts, determining ratification as a matter of law is improper.

        ***c.        BB&T's Duty to Investigate***

Next, BB&T contends that it had no duty monitor the transactions occurring through the Disputed Accounts.  BB&T is correct.  Generally, depository banks "have no duty to investigate transactions made by authorized agents of the account holder."  *Lamm v. State St. Bank & Trust*, 749 F.3d 938, 948 n.7 (11th Cir. 2014) (citing *Home Fed. Sav. & Loan Ass'n of Hollywood v. Emile*, 216 So .2d 443, 446 (Fla. 1968); *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1205 (11th Cir. 2003)); *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014) ("Florida does not require banking institutions that conduct routine banking services to investigate transactions involving its demand deposit accounts[.]") (citations omitted); *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 549 (Fla. 2d DCA 2003) ("We would radically alter the law of banking if we required banks to review credit card accounts and checking accounts to make certain that their customers were spending their money wisely."); *Wiand v. Wells Fargo Bank, N.A.*, No. 8:12-CV-557-T-27EAJ, 2015 WL 518826, at *4 (M.D. Fla. Feb. 9, 2015) (citing *Lawrence v. Bank of America, N.A.*, 455 F. App'x 904, 907 (11th Cir. 2012) ("Florida law imposes no duty on a bank to investigate transactions.").  The bank's responsibility extends only to confirming that the agent, at the time of the transaction, has the authority to make the transaction.  *See O'Halloran*, 350 F.3d at 1205 ("The bank is responsible only for making sure that the employee, at the time of the withdrawal, has the authority to make withdrawals on behalf of the accountholder entity.").

Again, the Court will not turn a blind eye to the obvious realities of Plaintiffs' claims. Although the Court has determined that the Negligence Plaintiffs may not pursue those claims related to the opening of the Disputed Accounts as they are barred by the applicable statute of limitations, Fla. Stat. § 95.11(3), the totality of the negligence alleged will not be cast aside. Plaintiffs' negligence claim encompasses both the opening of the Disputed Accounts *and* the damage flowing therefrom. Plaintiffs are simply unable to seek damages on the former. Those claims not precluded by § 95.11(3) must be considered through the lens of reality, not in isolation. As Plaintiffs assert, BankAtlantic was negligent in allowing non-authorized individuals to open an account in their names and suffered damages both at the time the accounts were opened, as well as when each illicit transaction was performed. *See* Order on Motion to Dismiss, ECF No. [35] at 6-7 (Rosenbaum, J.) ("[T]he Group A Plaintiffs suffered damages as soon as Pro Sports diverted funds away from the only accounts of which they were aware without their authorization. Nevertheless, Plaintiffs also suffered damages when Bank Atlantic authorized transactions in which Pro Sports transferred funds out of the unauthorized accounts to third-party accounts.").

While BB&T is correct in its assertion that it had no duty to monitor individual transactions, the allegations extend beyond the individual transfers and debits. The breach the Negligence Plaintiffs complain of does not stem from BankAtlantic's failure to monitor but, rather, BankAtlantic's opening of the account with forged signature cards and/or improper powers of attorney. Furthermore, this is not Plaintiffs' attempt to "recast" their allegations to conform to a theory that will survive summary judgement; Plaintiffs have premised their theory of liability premised on the opening of the Disputed Accounts and the illicit transactions that

flowed therefrom. Any failure to monitor on the part of BankAtlantic is irrelevant to the theory the Negligence Plaintiffs advance.

### d.   *U.C.C. Displacement*

The most substantial argument presented by BB&T is one this Court has already had occasion to consider. *See Anderson v. Branch Banking & Trust Co.*, 56 F. Supp. 3d 1345, 1351-52 (S.D. Fla. 2014).   BB&T contends that the Negligence Plaintiffs' common law claims are displaced by the loss allocation principles in Fla. Stat. §§ 674.401 and 670.204, and by the absolute liability preclusions in Fla. Stat. §§ 674.406(6) and 670.505.   Stated simply, BB&T asserts that Plaintiffs' negligence claim is inconsistent with the U.C.C.'s statutory allocation of loss and related notice provisions.

Section 671.103, Florida Statutes, provides that common law principles of law and equity shall supplement the U.C.C. "unless displaced by the particular provisions" of the same.   Where the rights, duties, and liabilities of the parties are governed by the U.C.C., the Code displaces common law claims; however, the Code is not the "exclusive means" by which a plaintiff may seek to remedy an alleged harm suffered as a result of a funds transfer.   *See Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1274–75 (11th Cir. 2003) (citation omitted); *see also Corfan Banco Asuncion Paraguay v. Ocean Bank*, 715 So. 2d 967, 971 (Fla. 3d DCA 1998) (finding that Article 4A preempted plaintiff's negligence claim, but withholding judgment on whether Article 4A preempts negligence claims in all cases).   Indeed, Article 4A is "replete with references to common law remedies," and is more appropriately viewed as existing to create a synergy between it and other legal doctrines.   *Regions Bank*, 345 F.3d at 1275 ("[T]he Drafting Committee intended that Article 4A would be supplemented, enhanced, and in some places, superseded by other bodies of law . . . the Article is intended to synergize with other legal

doctrines." (quoting T.C. Baxter & R. Bhala, *The Interrelationship of Article 4A with Other Law*, 45 Business Lawyer 1485, 1485 (1990))).  Accordingly, a plaintiff is not necessarily precluded from bringing a claim *related* to provisions of the Code.  But, where the plaintiff's claim is *inconsistent* with the rights, duties, and liabilities contained within the Article, the plaintiff may not sidestep those obligations and pursue her claim under the common law.  *See id.* (quoting U.C.C. § 4A-102 cmt. ("[R]esort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.")).

As previously noted, see *supra* Section III.A.1,b., Articles 4 and 4A allocate loss in a particular manner.  For items, Article 4 provides that the payor bank is liable regardless of care for paying an item not "properly payable."  Fla. Stat. § 674.406(1).  A customer forfeits their right to recover, however, "[w]ithout regard to care or lack of care," where the customer fails to object to the unauthorized or altered item within 180 days after the statement or items are made available to the customer.  Fla. Stat. § 674.406(6).  Similarly, Article 4A initially places the risk of loss on the bank.  Fla. Stat. § 670.204(1) ("If a receiving bank accepts a payment order issued in the name of its customer as sender which is not authorized and not effective . . . or is not enforceable, in whole or in part, against the customer . . . the bank shall refund any payment of the payment order received from the customer . . . .").  Again, like Article 4, a customer may not seek recovery on an unauthorized funds transfer where he or she fails to object within one year of receiving notification of the transfer.  Fla. Stat. § 670.505.   According to BB&T, because Articles 4 and 4A explicitly cover the illicit transactions relating to unauthorized funds transfers and items, the negligence claim is preempted by the U.C.C..

The Court agrees with BB&T, in part.  When considered in isolation, any negligence theory premised solely on the unauthorized transfers would be displaced by Articles 4 and 4A as

the claims fall precisely within the duty contemplated by the statutory scheme under the aforementioned Articles. *See Corfan*, 715 So. 2d at 971 ("The duty claimed to have been breached by [defendant] in [plaintiff's] negligence count is exactly the same duty established and now governed by the [U.C.C.]. Under such circumstances . . . the statutory scheme preempts the negligence claim . . . ."); *2006 Frank Calandra, Jr. Irrevocable Trust v. Signature Bank Corp.*, 816 F. Supp. 2d 222, 236 (S.D.N.Y. 2011) *aff'd*, 503 F. App'x 51 (2d Cir. 2012) ("Any common law claims about the existence of unauthorized wire transfers or an unauthorized signature on a check, and the mechanics of how those transactions were conducted, fall within the regime of Articles 4-A and 4.") (citation omitted). Yet, as revealed numerous times throughout this litigation, the Court will not dissociate the challenged debits from their context and haphazardly view Plaintiffs' claims through such a narrow lens.

Stripped of its excess, BB&T's argument becomes more transparent. According to BB&T, because the Negligence Plaintiffs are precluded from seeking recovery on the opening of the Disputed Accounts, "all that remains . . . are those [claims] that arise from allegedly unauthorized individual wire transfers and items occurring within the statute of limitations." BB&T Mot., ECF No. [143] at 27. In essence, BB&T asks the Court to disregard Plaintiffs' theory of negligence based on the fact that Plaintiffs may not pursue damages caused by the opening of the Disputed Accounts. Simply because certain claims for damage are barred by Fla. Stat. § 95.11 does not mean that Plaintiffs' basis of liability has been transformed into an entirely different theory. While the predicate acts of duty, breach, and causation may have occurred before the statute of limitations deadline, damages were being incrementally incurred by virtue of every illicit transaction. "The last element constituting a cause of action for negligence . . . is the occurrence of damages." *Kelly v. Lodwick*, 82 So. 3d 855, 857 (Fla. 4th DCA 2011) (citing

*Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003).  Thus, the Negligence

Plaintiffs' claims accrued when the Disputed Accounts were opened, *as well as* when monies

were transferred out of them for allegedly improper purposes.[24]  BB&T presents no authority

which would support the uprooting of the predicate negligent acts merely because certain

damages are beyond the statute of limitations.  Ultimately, it is of little consequence that the

overwhelming majority of the damage incurred was suffered as a consequence of the individual

debits.  BB&T's purported negligence stems from allowing accounts to be opened in the

Negligence Plaintiffs' names with forged signatures and/or improper authorization or

identification; Plaintiffs do not assert that BB&T's negligent actions were related to the

individual debits.[25]

Based on the proper construction of Plaintiffs' negligence claim, BB&T's cited authority

is unpersuasive.  In *ReAmerica, S.A. v. Wells Fargo Bank Int'l*, 577 F.3d 102 (2d Cir. 2009), the

customer's consultant forged the signature of the customer's executive officer on numerous

payment orders, diverting those funds to a personal account.  *Id.* at 104-05. Because the

customer's negligence claim was predicated upon the unauthorized transfers, Article 4A

precluded the customer's common law negligence claim.  *Id.* at 106-07.   The customer in *Ma v.*

*Merrill Lynch* was also the victim of a rogue employee.   In *Ma*, the bank's employee made a

series of wire transfers using the customer's forged signature from the customer's valid account.

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 86 (2d Cir. 2010).  The Court

---

[24] At the hearing on June 4, 2015, the Court found that testimony regarding the alleged negligent opening of the Group A Plaintiffs' accounts was "inextricably intertwined" with the account transactions.  *See* Transcript of Hearing, June 4, 2015, ECF No. [179] at 40-41.

[25] To the extent Plaintiffs do seek recovery on this basis, such a theory is precluded by Articles 4 and 4A.  *See Corfan*, 715 So. 2d at 971; *2006 Frank Calandra, Jr.*, 816 F. Supp. 2d at 236.

found that, at its core, the customer's claims were that he did not order or approve the transactions and, therefore, Article 4A was unavoidable.  *Id.* at 90-91.  Thus, the negligence in both *ReAmerica* and *Ma* directly related to the unauthorized transactions and do not raise the same theory of negligence as Plaintiffs assert here.

Despite BB&T's explicit and repeated protests, *Gilson v. TD Bank*, is the more instructive authority.  The Court in *Gilson* was presented with an analogous scenario where accounts were opened without proper authorization or authority allowing the individual who opened the accounts to transfer substantial funds out of the accounts for his own benefit.  *See Gilson v. TD Bank, N.A.*, No. 10-20535-CIV, 2011 WL 294447, at *2 (S.D. Fla. Jan. 27, 2011).  The Court found that "the basis for [the plaintiff's] negligence claim extend[ed] beyond [the bank's] conduct with regard to the wire transfers into and out of the accounts" and extended to the reckless conduct with respect to the account openings.  *Id.* at *9.  Accordingly, Article 4A, which governs only wire transfers, was inapplicable.  *Id.*  The same is true here.  Plaintiffs' accusations with respect to BankAtlantic's lack of care exceed simple objections to unauthorized funds transfers.  Instead, they extend to the imprudent handling of the account openings.  The theory of negligence is not changed simply because certain damages cannot be pursued due to the statute of limitations.  The first three elements of negligence—duty, breach, and causation, see *Kelly*, 82 So. 3d at 857—occurred prior to the expiration of the statute of limitations, yet Plaintiffs continued to suffer damages.  Because Plaintiffs' negligence theory is not inconsistent with the rights, duties, and obligations under the U.C.C., Plaintiffs' claim is not displaced.[26]

---

[26] Furthermore, the claim is not displaced based on BB&T's assertion that Pro Sports' operation of the Disputed Accounts was not based on fraudulent animus, nor was it otherwise improper or conducted in secret.  This is a factual conclusion, disputed by the parties.

### e.   Count III and the Statute of Repose, Fla. Stat. § 670.505

The Negligence Plaintiffs' claim for refund of unauthorized and ineffective funds transfer (Count III of the FAC) is subject to the one-year statute of repose set forth in Fla. Stat. § 670.505.  This provision precludes recovery if the customer fails to object within one year of receiving notice.  Fla. Stat. § 670.505 ("[T]he customer is precluded from asserting that the bank is not entitled to retain the payment unless the customer notifies the bank of the customer's objection to the payment within 1 year after the notification was received by the customer.").  BB&T argues that the Negligence Plaintiffs failed to timely object.  In response, Plaintiffs continue to assert that § 670.505 requires actual notice to the customer before the repose period can be triggered.

The Court has already addressed this issue in full, finding that Plaintiffs' strict construction of § 670.505 is not required.  *See supra* Section III.A.1.b.ii.  As stated previously:

> The U.C.C. states that "a person 'receives' a notice or notification when . . . [i]t is duly delivered in a form reasonable under the circumstances at . . . [a] location held out by that person as the place for receipt of such communications."   Fla. Stat. § 671.201(26); Fla. Stat. § 671.209(5).   Here, Plaintiffs do not dispute that they agreed and intended for Pro Sports to receive their account statements, statements containing the contested debits.  Because there is no dispute over whether the Contract Plaintiffs received account statements at the address they designated, those Plaintiffs received notice as per Fla. Stat. §§ 671.201(26) and 671.209(5).  The repose period was triggered and the Contract Plaintiffs were obligated to object within one year.

*Id.*  Therefore, Count III of the FAC is subject to the repose period in § 670.505.  Yet again, judgment as a matter of law is appropriate as there is no genuine issue of material fact as to the date Plaintiffs notified BankAtlantic of the disputed transactions.

### f.      Sheppard and the 2009 Signature Card

Unlike the majority of the Negligence Plaintiffs, Sheppard subsequently executed a valid Signature Card for his Disputed Account, adding his wife as a signatory and designating Tequilla Harris as Power of Attorney.   The uncontested Signature Card was executed on October 19, 2009, and, according the BB&T, Sheppard is precluded for pursuing challenges to transactions occurring after that date as they are barred by the Depositor's Agreement.[27]

Sheppard first asserts that the operative date of the Signature Card is unknown, and the Court agrees.   Under Sheppard's signature, where it reads "Date Signed," there is no date.   *See* Orrizzi Aff., at Ex. C, 24.   While the Signature Card indicates a "Revised By" date of October 19, 2009, it also bears a stamp of November 19, 2009.   *See id.*   This may have been a simple clerical error.   Nonetheless, the precise date the Depositor's Agreement became binding on Sheppard remains uncertain and the Court cannot grant summary judgment given this factual controversy.   What is clear, however, is that the transactions occurring after the operative date of the Depositor's Agreement will be precluded as there has been no evidence of objection on the part of Sheppard.   *See supra* Section III.A.1.a.,

### g.      Gooden's Purported Negligence Claim

Like Kearse with respect to the Contract Plaintiffs, Gooden is an odd man out.   Originally pled as a Group B Plaintiff, Gooden has since modified his allegation, having suddenly determined that the Signature Card for his account is a forgery.   For the same reasons Kearse has been denied amendment herein, Gooden will be denied the same, having failed to show "good cause" under Fed. R. Civ. P. 16.   *See supra* Section III.A.1.c.   Accordingly, BB&T is entitled to

---

[27] Four transactions fall within this period: (1) a wire in the amount of $250,000.00 on October 28, 2009; (2) a wire in the amount of $100,000.00 on November 4, 2009; (3) a wire in the amount of $150,000.00 on December 17, 2009; and (4) a wire in the amount of $150,000.00 on December 18, 2009.   *See* Composite Exhibit "E" to the FAC, ECF No. [89-5] at 8.

judgment as a matter of law on Gooden's breach of contract claim for the reasons stated in Section III.A.1.a., *supra*.

### 3.    The Troy Bank Transactions

BB&T also moves for summary judgment on the Troy Bank Transactions, asserting that Kearse, Sheppard, and Taylor are barred from recovering these funds on the alternative theory that the proximate cause of the losses cannot be attributed to BankAtlantic.  Plaintiffs do not intend to pursue these transactions further.  *See* Pl. Resp., ECF No. [162] at 33-34; Pl. Resp. SOF at ¶¶ 50-52.  Therefore, summary judgment is granted in favor of BB&T on these claims.

### B.    Plaintiffs' Motion for Partial Summary Judgment

Having resolved the issues above, the Court may briefly dispose of Plaintiffs' Motion for Partial Summary Judgment.  Plaintiffs seek summary judgment on BB&T's Fifth, Sixth, Thirty-Eighth, and Thirty-Ninth Affirmative Defenses, ECF No. [96] ("BB&T's Answer").  BB&T's Fifth and Sixth Affirmative Defenses assert that Plaintiffs' claims related to funds or wire transfers are either barred or waived as a result of Plaintiffs' failure to object during the one-year repose period set forth in Fla. Stat. § 670.505.  *See* Answer at 16-18.  BB&T's Thirty-Eighth and Thirty-Ninth Affirmative Defenses as to Counts II and IV, relate to Plaintiffs' alleged failure to comply with the conditions precedent to suit as set forth in the Depositor's Agreement, specifically, the customer's duty to notify the bank of any unauthorized wire transfer within one year.  *Id.* at 36-38.

Thus, Plaintiffs' arguments are precisely those presented by BB&T's Motion.  Indeed, the arguments Plaintiffs present in support of their Motion are identical to those presented in opposition to BB&T's Motion regarding both the Depositor's Agreement and the application of § 670.505.  *Compare* Pl. Resp., ECF No. [162] *with* Pl. Mot., ECF No. [138].  Although

resolution of these issues with respect to Plaintiffs' Motion requires the Court to view the record in BB&T's favor, *see Davis*, 451 F.3d at 763, the same material issues of fact or, more critically, lack thereof, remain.  Accordingly, Plaintiffs' Motion is denied as set forth more fully in Section III.A.1.a., III.A.1.b., and III.A.2.e., *supra*.

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendant Branch Banking and Trust Company's Motion for Summary Judgment, **ECF No. [143]**, is **GRANTED IN PART AND DENIED IN PART**.  Defendant BB&T's Motion is **GRANTED** with respect to the following claims in Plaintiffs' Fourth Amended Complaint:

1. Count I (Negligence) as it relates to Jevon Kearse *only*.  Defendant BB&T's Motion is denied with respect to the remaining Plaintiffs, Derrick Gaffney, Ray Lewis, Clinton Portis, Santana Moss, Lito Sheppard and Fred Taylor, under Count I.

2. Count II (Breach of Contract) in its entirety.

3. Counts III and IV as to all Plaintiffs.

Plaintiffs' Motion for Partial Summary Judgment on Defendant's Fifth, Sixth, Thirty-Eighth, and Thirty-Ninth Affirmative Defenses, **ECF No. [138]**, is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 27th day of July, 2015.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record